IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            )
                                      )
            Plaintiff,                )    CR No. 12-184
                                      )
                                      )    Washington, D.C.
        vs.                           )    February 8, 2016
                                      )    3:30 p.m.
ALFREDO BELTRAN LEYVA,                )
                                      )
            Defendant.                )
_____)


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          AMANDA LISKAMM
                             ANDREA GOLDBARG
                             ADRIAN ROSALES
                             Assistant United States Attorney
                             555 4th Street, N.W.
                             Washington, D.C. 20036
                             (202) 252-7785
                             andrea.goldbarg@usdoj.gov


For the Defendant:           A. EDUARDO E. BALAREZO
                             Balarezo Law
                             400 5th Street N.W.
                             Suite 300
                             Washington, D.C. 20001
                             (202) 639-0999
                             info@balarezolaw.com

APPEARANCES CONTINUED:

Interpreter:                    Teresa Salazar


Court Reporter:                 William P. Zaremba, RMR, CRR
                                Official Court Reporter
                                U.S. Courthouse
                                333 Constitution Avenue, NW
                                Room 6511
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1              P R O C E E D I N G S

2         DEPUTY CLERK:  All rise.  This Honorable Court is

3    now in session.  The Honorable Judge Richard J. Leon

4    presiding.  God save the United States and this Honorable

5    Court.  Please be seated and come to order.

6         (Defendant entered.)

7         DEPUTY CLERK:  Your Honor, we have Criminal Action

8    12-184, United States of America versus Alfredo Beltran

9    Leyva.

10        Counsel, please approach the lectern and identify

11   yourselves for the record.

12        MS. GOLDBARG:  Good afternoon, Your Honor.

13   On behalf of the government, Andrea Goldbarg,

14   Amanda Liskamm, Adrian Rosales, Marcia Henry, with Paralegal

15   Specialist, Angela Ancalle-Jimenez; and FBI agents,

16   Britton Boyd and Paul Peschka.

17        THE COURT:  Welcome.

18        MR. BALAREZO:  Good afternoon, Your Honor.

19   Eduardo Balarezo and William Purpura on behalf of

20   Mr. Beltran Leyva.

21        THE COURT:  Welcome.

22        Ms. Goldbarg.  Who's going to be with you at the

23   trial?

24        MS. GOLDBARG:  Who's going to be present at

25   counsel table?

1          THE COURT:  Who will be at your table during the

2    trial?

3          MS. GOLDBARG:  The four prosecutors, the paralegal

4    specialist, and probably one of the two agents.

5          THE COURT:  Four prosecutors?

6          MS. GOLDBARG:  Yes, Your Honor.  The same

7    prosecutors that have been present.

8          THE COURT:  I thought they had

9    Judge Colleen Kollar-Kotelly's case.

10          MS. GOLDBARG:  Judge Kotelly forced us to pick

11    which trial, and Ms. Liskamm chose this trial.

12          There are other prosecutors in front of Judge

13    Kollar-Kotelly.

14          THE COURT:  Okay.  So you're going to have four

15    prosecutors?

16          MS. GOLDBARG:  Yes, Your Honor.

17          THE COURT:  Who else?

18          MS. GOLDBARG:  We have our paralegal specialist,

19    Angela Ancalle-Jimenez.

20          And one of the two agents, case agents in the

21    case, depending on movement of witnesses and so forth.

22          THE COURT:  Sitting at the table?

23          MS. GOLDBARG:  Or in the first row of the pews,

24    Your Honor, depending on availability of space.

25          THE COURT:  I'll think about that.

1              MS. GOLDBARG:  Thank you.

2              MR. BALAREZO:  Yes, Your Honor.

3              THE COURT:  What's the deal with Mr. Tun?

4              MR. BALAREZO:  There is no deal, Your Honor.

5              THE COURT:  He hasn't entered an appearance.

6              MR. BALAREZO:  That's correct.

7              THE COURT:  If he going to be in the courtroom?

8              MR. BALAREZO:  He may be in the courtroom at

9    times, but not at the table.

10             THE COURT:  Is he's going to be in the courtroom,

11   you have to introduce him to the jury.

12             MR. BALAREZO:  He won't be at the table,

13   Your Honor.

14             THE COURT:  That's not the issue.

15             MR. BALAREZO:  Okay.

16             THE COURT:  If he's -- who's going to be

17   introduced to the jury?

18             MR. BALAREZO:  Mr. Purpura and I will be

19   introduced as Mr. Beltran Leyva's counsel.

20             THE COURT:  Mr. Tun is also in that relationship.

21             MR. BALAREZO:  All right.  Then he will not be in

22   the courtroom, Your Honor.

23             THE COURT:  Okay.  Fine.

24             I don't want to take a chance any jurors have a

25   pre-existing relationship with Mr. Tun, who is a local

1  counsel, unlike Mr. Purpura.

2          MR. BALAREZO:  That's fine, Your Honor.

3          THE COURT:  So --

4          MR. BALAREZO:  He will not be in the courtroom,

5  Your Honor.

6          THE COURT:  If it comes to pass that he comes to

7  the courtroom, we'll have to deal with that at that time.

8          MR. BALAREZO:  Yes.

9          Your Honor, I just have one issue to raise with

10 respect to the government's representations of there may be

11 one or two agents.

12         I believe the rule indicates that they need to

13 designate an agent who will be the case agent sitting at the

14 table, and we'd request that they do that.

15         THE COURT:  There's only one case agent that will

16 be designated --

17         MR. BALAREZO:  Okay.

18         THE COURT:  -- and that person can sit at the

19 table.

20         MR. BALAREZO:  No.  I understand, but they haven't

21 designated one.  That's what I'm asking, so...

22         THE COURT:  Well, whether or not someone who's the

23 case agent or not is the function of what they did on the

24 case, isn't it, Ms. Goldbarg?

25         Do you have a case agent in this case?

1              Who's the agent in charge of the case?

2              MS. GOLDBARG:  Yes.  We have a case agent and we

3       have a co-case agent.  So since one of the co-case agents --

4              THE COURT:  Who is in charge of the case?

5              MS. GOLDBARG:  Britton Boyd.

6              THE COURT:  Then he'll be designated the case

7       agent, and he'll be able to sit at the table.

8              I'm not going to have two agents sitting inside

9       the doors.  The other one can sit out in the audience.

10             MS. GOLDBARG:  We would request, however, if we

11      add him to the list of people to be introduced --

12             THE COURT:  He can't be in the courtroom to hear

13      witness testimony.  Cannot be in the courtroom to hear

14      witness testimony.

15             Only one agent can be in the courtroom to hear

16      witness testimony.  That's the case agent.

17             Do you expect to call him to the witness stand,

18      the case agent?

19             MS. GOLDBARG:  No.

20             THE COURT:  You don't?

21             MS. GOLDBARG:  We do not.

22             THE COURT:  Okay.  Very good.

23             MS. GOLDBARG:  Thank you.

24             THE COURT:  All right.  Let's start off with --

25      we have a number of miscellaneous-type motions that have

1    recently been filed in this case.  I want to get them dealt

2    with.  Some are ex parte under seal, some are not.

3            All right.  So motion for shave and a haircut.

4    Never had that happen before.  Never heard of it.

5    Don't know anything about it.  Never had an issue with it.

6    Been doing this 14 years.  Never had to have a motion filed

7    or to have to file an order.  Is something going on here

8    unusual in this case?

9            MR. BALAREZO:  No, Your Honor.  That's actually a

10   motion that has been filed regularly in many of these large

11   conspiracy cases.

12           THE COURT:  Never in this courtroom.

13           MR. BALAREZO:  If the Court doesn't see a need for

14   it, then I suspect you'll deny it or -- and then we'll deal

15   with that, so...

16           THE COURT:  Looking at the defendant right now,

17   his hair looks very neat, very trimmed.

18           MR. BALAREZO:  It does.

19           THE COURT:  And his beard looks very neat and very

20   trimmed.

21           MR. BALAREZO:  We're hoping he looks that same way

22   for trial, Your Honor.  That's all.

23           THE COURT:  If there's a problem, bring it to the

24   Court's attention.

25           MR. BALAREZO:  Will do.

1          THE COURT:  I'll deal with the Marshals.  We'll
2    find out what the problem is.
3          If the jail has run out of razors and shaving
4    cream, we'll get some here downstairs.  We'll let him shave
5    in the morning before he starts.  We'll get the problem
6    solved.
7          MR. BALAREZO:  No problem, Your Honor.  Thank you.
8          THE COURT:  Hold on.  Don't go away.
9          Motion to direct the U.S. Marshals to provide
10   greater variety of lunch to defendant.
11         Again, never heard of such a thing.  Never seen
12   any issue of that kind before.  Don't know why it should be
13   a problem.
14         MR. BALAREZO:  Well, Your Honor --
15         THE COURT:  I mean, obviously, you're not asking
16   for sushi or something.  And you're not asking for any kind
17   of special dietary considerations either for religious
18   purposes or medical health purposes.  That would be
19   different.
20         MR. BALAREZO:  Well, Your Honor, he is on a
21   diabetic diet at the jail.  So to the extent that the
22   marshals can provide something besides two slices of bread
23   and a slice of cheese and a drink box, we ask that that be
24   possible.
25         In effect, the Court is aware where he is housed.

1    My understanding is that he's going to be awake at about

2    4:00 or 5:00 in the morning, brought here by 8:00 in the

3    morning.

4           And the only meal he would get would be here at

5    the courthouse, which will consist of those two slices and a

6    slice of cheese and a drink.  And we'd like him, obviously,

7    to be comfortable, to the extent possible, by having a

8    decent meal while he's here.

9           THE COURT:  I'll talk to the marshals about that.

10          MR. BALAREZO:  And, again, at the end of the day,

11   obviously, he won't leave until the very end.

12          And I don't even know if he's going to get dinner

13   by the time he gets there.  He may or may not.

14          THE COURT:  That really doesn't make a lot of

15   sense to me, that they would not at least keep something on

16   hold for him there if he arrives.

17          MR. BALAREZO:  They may.  I don't know, but...

18          THE COURT:  If he arrives, say, at 7:00 at night

19   or something like that.

20          MR. BALAREZO:  Right.

21          THE COURT:  And dinner was served at, say, 6:00 or

22   5:30 or something, that they couldn't put something in

23   his -- some kind of a Styrofoam container on hold for him in

24   a refrigerator so he could have it.

25          MR. BALAREZO:  But my concern more is while he's

1    here in the courthouse.  It's a long day, obviously, and he

2    needs, I think, more than that.

3                THE COURT:  It is a long day.  All right.

4                All right.  So why don't we take that a day at a

5    time and see how we deal with that.  All right.

6                Now, on the clothing, again, motion for clothing

7    order.  Never had that problem in 14 years.

8                Defense counsel brings clothes in, we store them

9    under lock and key in that closet over there in the morning.

10   Either marshals or defense counsel can bring the clothing to

11   him back in the jail cell and he can change.

12               MR. BALAREZO:  We'll take care of that.

13               THE COURT:  Never had a problem.  So I don't see

14   any reason why we need to deal with that either.

15               MR. BALAREZO:  Fair enough.

16               THE COURT:  All right.  If there's an issue, I

17   invite you to bring it back to the Court's attention.

18               MR. BALAREZO:  I will.  Thank you.

19               THE COURT:  I don't think it's likely to be a

20   problem.  Certainly hope it won't be.

21               All right.  I've got two motions ex parte, under

22   seal, from the government.  And I want to deal that.

23               So, Ms. Goldbarg, you can come up.

24               (Thereupon, sealed proceedings were held in this

25   transcript.)

1          THE COURT:

2

3

4

5

6

7          MS. GOLDBARG:

8          THE COURT:

9

10          MS. GOLDBARG:

11

12

13

14

15

16

17          THE COURT:

18

19          MS. GOLDBARG:

20          THE COURT:

21

22

23

24          MS. GOLDBARG:

25          THE COURT:

1

2

3

4

5          MS. GOLDBARG:

6

7

8

9

10

11

12          THE COURT:

13

14          MS. GOLDBARG:

15

16

17          THE COURT:

18

19

20

21

22          MS. GOLDBARG:

23          THE COURT:

24

25

1

2          MS. GOLDBARG:

3          THE COURT:

4

5

6

7          MS. GOLDBARG:

8          THE COURT:

9          MS. GOLDBARG:

10         THE COURT:

11         MS. GOLDBARG:

12

13

14

15

16

17         THE COURT:

18         MS. GOLDBARG:

19

20

21         THE COURT:

22

23         MS. GOLDBARG:

24         THE COURT:

25

1

2

3

4          MS. GOLDBARG:

5          THE COURT:

6

7

8

9

10

11          MS. GOLDBARG:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7          THE COURT:

8

9

10          MS. GOLDBARG:

11          THE COURT:

12

13

14

15

16

17          MS. GOLDBARG:

18          THE COURT:

19

20          MS. GOLDBARG:

21

22

23          THE COURT:

24

25

1          MS. GOLDBARG:

2          THE COURT:

3

4

5

6          MS. GOLDBARG:

7          THE COURT:

8

9

10

11

12

13

14

15          MS. GOLDBARG:

16          THE COURT:

17

18

19

20

21

22

23

24          MS. GOLDBARG:

25          THE COURT:

1

2

3

4          MS. GOLDBARG:

5

6

7

8

9

10

11          THE COURT:

12

13

14

15

16

17

18

19

20

21

22

23          MS. GOLDBARG:

24          THE COURT:

25

1

2          MS. GOLDBARG:

3

4

5       THE COURT:

6       MS. GOLDBARG:

7

8

9       THE COURT:

10      MS. GOLDBARG:

11      THE COURT:

12

13      MS. GOLDBARG:

14

15

16      THE COURT:

17      MS. LISKAMM:

18      THE COURT:

19

20

21

22      MS. LISKAMM:

23      THE COURT:

24

25

1

2

3

4

5

6

7

8

9          MS. GOLDBARG:

10

11         THE COURT:

12

13         MS. LISKAMM:

14

15

16

17

18

19

20

21

22

23

24

25

1

2          THE COURT:

3

4

5

6          MS. LISKAMM:

7

8          THE COURT:

9

10

11

12          MS. LISKAMM:

13

14          THE COURT:

15

16

17          MS. LISKAMM:

18

19

20          THE COURT:

21          MS. LISKAMM:

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          THE COURT:

16

17          MS. LISKAMM:

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10          THE COURT:

11

12

13

14

15

16

17

18

19

20

21

22          MS. LISKAMM:

23          THE COURT:

24          MS. LISKAMM:

25

```
 1

 2

 3

 4

 5

 6

 7

 8

 9          THE COURT:

10

11

12          MS. LISKAMM:

13

14

15

16

17

18

19          THE COURT:

20          MS. LISKAMM:

21

22

23

24

25          THE COURT:
```

1          MS. LISKAMM:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          THE COURT:

21

22

23

24

25

1

2

3          MS. LISKAMM:

4

5

6

7

8

9

10

11

12          THE COURT:

13

14          MS. LISKAMM:

15

16          THE COURT:

17

18

19

20          MS. LISKAMM:

21          THE COURT:

22

23

24

25

1

2

3

4

5

6

7

8          MS. LISKAMM:

9          THE COURT:

10

11

12

13          MS. LISKAMM:

14

15

16          THE COURT:

17

18          MS. LISKAMM:

19

20          (Open court)

21          THE COURT:  All right, Counsel.  The Court had to

22   discuss with the government two motions they had filed

23   ex parte under seal; and having done that, let me give you

24   an update on what's going on here.

25          The first of the two motions was a motion -- it's

 1  actually not even a motion, it's a notice regarding Project

 2  Fountainhead reports.

 3          And with regard to the Project Fountainhead

 4  reports, essentially, what this boils down to is I've asked

 5  the government to file this in a non-ex parte, under seal

 6  form so that you'll have what they're reporting here, with

 7  the exception of an attached exhibit, which they have

 8  represented to the Court is an actual excerpt from Project

 9  Fountainhead reports that is a law enforcement sensitive

10  document.  And as to that document, I'm not going to, at

11  this time, ask them to reveal that and put that on the

12  public record in this case, because this is a DEA database

13  that has a law enforcement sensitive dimension to it.

14          Now, with regard to what's in the notice itself,

15  you will get a copy of that report that's not under seal and

16  it's not ex parte, which, essentially, is a representation

17  to the Court that the information that's contained in this

18  database that is voluntarily maintained by the DEA for its

19  own assistance, while it does --

20          DEPUTY CLERK:  Excuse me, Your Honor.  He's not

21  hearing.  The defendant is not hearing.

22          (Pause)

23          DEPUTY CLERK:  Ready, Judge.  Sorry.

24          THE COURT:  While it doesn't have -- while it does

25  have, I should say, specific references to impressions,

1   markings, or logos that are found on narcotics packages and

2   it does state the date when those logos were -- when those

3   packages were seized, the type of drug involved, describes

4   the picture of the particular marking, the location in which

5   it was seized, and the agent who submitted it, it doesn't

6   include, and I -- indeed, the exhibit that they attached

7   from the database which I have reviewed -- it does not link

8   the particular logo to any particular cartel,

9   drug-trafficking organization or whatever, and, therefore,

10  has limitations as to its relevance and its value

11  whatsoever.

12          Government counsel has represented to the Court

13  that as to the shipments in question here, of which there

14  were seven, in one or two of them, as I recall it, there

15  were some markings that were located.  Those markings have

16  been provided to defense counsel in this case.  But they

17  have not run it against the database, and so they do not

18  know --

19          Well, first of all, they don't know what the

20  database would yield with regard to those markings, first of

21  all.  Second of all, even if they did know, they would know

22  from their familiarity with the Fountainhead database, that

23  they will not reveal or link in any way those logos to a

24  particular drug-trafficking organization.

25          I directed government's counsel to run them

1    against the database and determine, after doing so, whether

2    there may be any information within the database that might,

3    in some way, shape or form link those markings to some

4    drug-trafficking organization, whether it be the

5    Beltran Leyva one or some other one.  And then once we know

6    the answer to that question, I'll be in a better position to

7    know to what extent, if any, there is any discoverable

8    material that would be of any value in that regard.

9            So you'll be getting a cleaned-up version of this

10   ex parte, under-seal motion, but it will not include the

11   Exhibit 1 that the Court has reviewed.

12           I will await to see what the government learns

13   with regard to its database check.  The government has

14   assured me they have no intention and never had any

15   intention of using that Fountainhead database to prove their

16   case in any way, shape or form, and, therefore, they hadn't

17   done the kind of checking that I had just directed them to

18   do in an abundance of caution prior to the commencement of

19   the trial.

20           Now, Ms. Liskamm, do you have anything I need to

21   change or add with regard to that characterization, based on

22   our discussion?

23           MS. LISKAMM:  No, Your Honor.  I just wanted to

24   clarify.  Does the Court want us to file the notice --

25           THE COURT:  You can file the notice that's non-ex

1   parte, not under seal, but exclude the exhibit.

2          MS. LISKAMM:  Okay.  Very well.  Thank you,

3   Your Honor.

4          THE COURT:  All right.

5          Now, the other document that was filed by the

6   government under seal was a motion to file ex parte, under

7   seal, as well as an ex parte notice as well.

8          The Court, based on reviewing those documents,

9   does not find anything in any of those documents that, in

10  its judgment, warrants filing the motion itself under seal,

11  or, for that matter, ex parte, at this time.

12         Essentially what these documents indicate is that,

13  in abundance of caution, the government recently reached out

14  to the U.S. Intelligence Community to see if they may have

15  any materials that are discoverable with regard to this

16  defendant in the possession of any of the various members of

17  the U.S. Intelligence Community, and they were recently

18  informed that there are some documents, but whether they're

19  discoverable or not, of course, is a completely different

20  consideration altogether, and the government counsel in this

21  case, Ms. Goldbarg, is in the process of reviewing those

22  documents.  She's looked at some; she's going to look at

23  some others later.

24         Later this week, I told her to direct the agency

25  in question that they should make them available sooner than

1    Thursday of this week, because the Court is concerned about

2    having any revelations later in the week that might delay

3    the selection of the jury next Tuesday.

4            So as a result, she is going to pass on the

5    Court's order to that particular agency; that they make

6    those documents available to her tomorrow so that she can

7    review them, and then report to the Court ASAP whether or

8    not there's anything, in her judgment, that would be

9    discoverable either as, well, of course, *Brady*, of course,

10   Rule 16 material or *Giglio* material.  So I will await a

11   report from the government with regard to that and

12   hopefully, as soon as tomorrow.

13           Depending upon what they find, if anything, it

14   could, in theory, delay the start of the trial.  Hopefully,

15   it will have no effect on the start of the trial whatsoever.

16           But I don't know what they have in their

17   possession, I don't know if anything that they have in their

18   possession might be discoverable, and I don't know, if it is

19   discoverable, whether or not it would necessitate a CIPA

20   hearing.  I have no idea.

21           So I'm sitting here in the dark, just like defense

22   counsel, and to a certain extent, government counsel are,

23   because they haven't seen all the things that they may have

24   in their files.  So would this have occurred months ago, but

25   it didn't, and we are where we are.

1          So if the -- I informed Ms. Goldbarg, if the

2     agency in question is unwilling to make those documents

3     available tomorrow to her, that they are to appear in my

4     courtroom tomorrow, and, under oath, be prepared to explain

5     to me why they can't make those documents available to her

6     tomorrow.

7          I'm just simply not going to sit by and allow some

8     intelligence agency to just, you know, unnecessarily run out

9     the clock here, especially when it could affect jury

10    selection in this case.

11         Ms. Goldbarg, do you have anything that you need

12    to suggest my recharacterizing or changing with regard to my

13    summary?

14         MS. GOLDBARG:  No, Your Honor.

15         THE COURT:  Very good.

16         All right.  Let's turn to the witness list.

17         MS. HENRY:  Good afternoon, Your Honor.

18         THE COURT:  Are you going to deal with the witness

19    list?

20         MS. HENRY:  That I am, Your Honor.

21         THE COURT:  That you are, huh, okay.

22         So you've got the short straw.

23         Well, you know you're not going to have 35

24    witnesses, you know that, right?

25         MS. HENRY:  Well, Your Honor, if I could just

1   explain the nature of the witnesses that --

2            THE COURT:  I asked you a question.  You know

3   you're not going to have 35 witnesses, don't you?

4            MS. HENRY:  Now that you said it, perhaps that

5   might be the case.

6            THE COURT:  It's not a perhaps.  I've already

7   explained to your colleagues in this case, I am not going to

8   unnecessarily prolong this trial, I'm not going to do it.

9            You've got seven shipments.  You've got to put

10  your case in as to your shipments.  They're within -- you've

11  represented to the Court they're within the time frame in

12  question.  Okay.  Fine.

13           MS. HENRY:  That's correct.

14           THE COURT:  But we're not going to prolong this

15  trial much, if anything, beyond that in terms of your

16  putting evidence on.

17           So you better start by focusing on what you need

18  to put on with regard to those seven shipments during the

19  relevant time period of this alleged conspiracy, and

20  anything beyond that is probably going to fall in the

21  category of want as opposed to need.

22           And as I said at the last hearing, you're going to

23  need to be very mindful of the difference between want and

24  need.  I am not going to put this jury through a three-month

25  trial if I can do this trial in two months, consistent with

1  the Constitution, and consistent with the requirements of a

2  fair trial to both sides.

3         So when you give me a list with 35 names, that's

4  silliness.  We're not going to be putting on 35 witnesses in

5  this case.

6         Now, let's start with the law enforcement

7  personnel.

8         MS. HENRY:  Yes, sir.

9         THE COURT:  USCG Ronald Towery, why do you need

10 him?

11        MS. HENRY:  Your Honor --

12        THE COURT:  You're going to go through each one,

13 give me a proffer if you need him.  If you can do that -- if

14 you can't, someone else better come up to the podium.

15        MS. HENRY:  Yes, Your Honor.

16        THE COURT:  Go ahead.  Why do you need Ronald

17 Towery.

18        MS. HENRY:  This witness was a U.S. Coast Guard

19 officer on one of the Coast Guard ships that interdicted a

20 cargo container ship called the Ocean Song.

21        THE COURT:  Ocean Song.

22        MS. HENRY:  Yes, Your Honor.

23        THE COURT:  When was that interdiction occurred,

24 what year?

25        MS. HENRY:  I believe it was in 2007.

1          THE COURT:  '07.

2          Was he the commanding officer?

3          MS. HENRY:  No.  He was a member of the team that

4    boarded -- excuse me.  He was a member of the team that was

5    on the ship and boarded the Ocean Song and saw events that

6    occurred on the Ocean Song, including the discovery of the

7    cocaine on board.

8          THE COURT:  Okay.  Sounds particularly relevant.

9    All right.

10         Who else, if anyone, do you know who was involved

11   in the Ocean Song boarding/interdiction?

12         MS. HENRY:  That's the only one, Your Honor.

13         If I may just provide an overview for each of the

14   seizures, the witnesses that are listed there fall into a

15   couple different categories.  One relates to the Coast

16   Guard.  In most cases, those were the members who ended up

17   boarding the vessels and saw the cocaine and all of the

18   discovering of the cocaine, the crew members, the fuel

19   tests, they observed all of these things.

20         The second category are, quite frankly,

21   chain-of-custody witnesses, because most of those

22   interdictions took place at sea.  The drugs that were then

23   issued needed to be transported along the way from the

24   interdiction point, in some cases, to an additional ship,

25   and then to another country on land, and then to the

1    United States.

2          THE COURT:  Okay.  We'll deal with them in a

3    second.

4          MS. HENRY:  Certainly.

5          And then the third category, Your Honor, is the

6    chemists, and those are the individuals who tested and

7    analyzed either samples or the bulk of the cocaine that was

8    seized from the various interdictions.

9          THE COURT:  How long of direct examination for

10   Ronald Towery?

11         MS. HENRY:  I wouldn't imagine more than, four --

12   and quite frankly, Your Honor, for any of the Coast Guard

13   witnesses, and this is a very generous estimate, I would say

14   40 minutes.

15         THE COURT:  All right.

16         Now, let's go down to No. 4, Pete Trappen, U.S.

17   Coast Guard, Pete Trappen.

18         MS. HENRY:  Yes, Your Honor.

19         THE COURT:  Who's he?

20         MS. HENRY:  Pete Trappen was, just by way of

21   background, he is connected -- he and the next three

22   witnesses are connected to two seizures that occurred very

23   close in time, also in 2007, that were seizures by the --

24   excuse me, the U.S.S. Morganthau and the U.S.S. Halliburton.

25         Mr. Trappen.

1          THE COURT:  Hold on now.  Hold on.

2          MS. HENRY:  Yes.

3          THE COURT:  Trappen was involved in both seizures,

4   Morganthau and --

5          MS. HENRY:  And Halliburton, yes.

6          THE COURT:  Halliburton.

7          He was involved in both?

8          MS. HENRY:  Yes, Your Honor.

9          He was on an aircraft that viewed the go-fast

10   vessels that were being intercepted by the Morganthau and

11   the Halliburton, and he was available to view the video that

12   was being taken of the crew members on the go-fast vessels

13   dumping the bales over on the side of the go-fast vessels.

14          THE COURT:  Now, why is there two other people who

15   saw the same things being called?

16          MS. HENRY:  Again, those, Your Honor --

17          THE COURT:  Coker and Disk.

18          MS. HENRY:  Coker and Disk.

19          Coker is the records custodian.  He's the person

20   who downloaded the video of -- excuse me, of the go-fast

21   crew members dumping the bales overboard.

22          Disk was --

23          THE COURT:  He didn't actually witness it?

24          MS. HENRY:  He is a records custodian.

25   He completes the authentication.  He's a chain-of-custody

1   witness, Your Honor.

2            THE COURT:  All right.

3            And what about the U.S. Coast Guard, are these

4   people officers?

5            MS. HENRY:  Some of them, yes, Your Honor.

6            For example, Mr. Disk was the commanding officer

7   of the Halliburton.

8            THE COURT:  Disk.  Did Disk witness the events?

9            MS. HENRY:  He witnessed the interception of the

10  go-fast vessels by the Halliburton.

11           THE COURT:  So not Morganthau, though?

12           MS. HENRY:  The Halliburton, specifically the

13  Halliburton.

14           THE COURT:  The Halliburton.

15           So you need him for Halliburton, but you don't

16  need him for Morganthau?

17           MS. HENRY:  Correct.  There's a different witness

18  for Morganthau.

19           THE COURT:  Trappen.

20           MS. HENRY:  Yes.

21           No, no, no, Your Honor.  If I may have one moment,

22  Your Honor.

23           THE COURT:  Well, you just told me that Trappen

24  was Morganthau and Halliburton.

25           MS. HENRY:  I'm sorry.  Yes, he was located on the

1  aircraft that saw from overhead.

2          THE COURT:  You don't need him then.

3          Why do you need him for?  If you've got the

4  officer in charge of the boat that did the interdiction,

5  Adam Disk, why do you need him?

6          MR. BALAREZO:  Because, in part, he's the person

7  who took the video of the boat -- excuse me.  He was the one

8  who witnessed the video being taken of the go-fast boats,

9  dumping the bales over the side -- excuse me, the bales of

10  cocaine being dumped over the side of the go-fast vessels.

11          THE COURT:  Were those bales of cocaine recovered?

12          MS. HENRY:  They were not.

13          THE COURT:  They were not recovered.

14          MS. HENRY:  Well --

15          THE COURT:  How do you know they were cocaine

16  then?

17          MS. HENRY:  Well, some -- the ones that were

18  recovered were then later tested by the chemists who we're

19  going to be calling.

20          THE COURT:  So some were recovered?

21          MS. HENRY:  Yes.  Some but not all.

22          THE COURT:  So Trappen was a video person?

23          MS. HENRY:  His role was a navigator.  So he was

24  onboard an aircraft where there was a video being taken and

25  he could view the video being taken.

1          THE COURT:  Well, you just told me Disk saw it as

2    to Halliburton.

3          MS. HENRY:  Disk was the person who actually went

4    onto the go-fast vessel.

5          THE COURT:  And he was the person who was in

6    charge of the boat that was doing the interdicting, as

7    I understand it?

8          MS. HENRY:  Correct.

9          THE COURT:  So he witnessed the throwing of the

10   bales over himself, did he not?

11         MS. HENRY:  If I may confer, Your Honor, one

12   moment, Your Honor.

13         THE COURT:  Uh-huh.

14         MS. HENRY:  Your Honor, just a point

15   clarification.  Mr. Trappen saw it happen, the bales being

16   dumped.  And Mr. Disk is the person who ended up doing the

17   recovery of a portion of the bales that were dumped over.

18         MR. BALAREZO:  Your Honor, I just have a question,

19   because I'm -- is Mr. Disk a commander also?  Was that

20   right?  And he picked up the bales?

21         THE COURT:  I heard he was in charge of the boat,

22   she said.

23         MS. HENRY:  He was.

24         THE COURT:  She said he was in charge of the boat.

25         MR. BALAREZO:  Okay.  I just wanted to make sure.

1    Thank you.

2            THE COURT:  We have a video of the boats, of the

3    bales being thrown over the side, you said, right?

4            MS. HENRY:  Yes, Your Honor.

5            THE COURT:  And Mr. Coker is the person who's the

6    records custodian of that video, right?

7            MS. HENRY:  Correct, Your Honor.

8            We don't have stipulations regarding a lot of the

9    seizure-related evidence, and so a lot of these witnesses

10   are there to make sure that we have our authentication

11   processes and chain of custody in place.

12           THE COURT:  Who's the witness who's going to link

13   those bales to this defendant?

14           MS. HENRY:  Your Honor, part of the testimony

15   regarding the seizures are going to come from the

16   cooperating witnesses.

17           THE COURT:  Explain that.

18           MS. HENRY:  So, Your Honor, we have three

19   different types of witnesses in this case.  The cooperating

20   witnesses are the co-conspirators in the case with the

21   defendant.  They can speak about the conspiracy from their

22   perspective as whatever their various roles are, whether

23   it's strategizers, persons who implemented the strategy

24   regarding the shipments, et cetera.

25           The law enforcement witnesses are there to really

1  talk about what happened when all of the strategy and

2  planning went awry, and, therefore, the seizures of the

3  cocaine occurred.

4          And so with respect to the law enforcement

5  witnesses' ability to say that the defendant is the person,

6  the reason why they're being called is not so much that --

7  they're there to talk about how that seizure -- excuse me,

8  how that shipment of cocaine went wrong, which is where

9  their role came into, which is seizing it.

10          The co-conspirators can discuss how the shipments

11  actually got through.

12          THE COURT:  So who's the other Coast Guard person

13  that you need as it relates to the Morganthau shipment?

14          MS. HENRY:  I think that is the only one.  Excuse

15  me, one more.  I apologize.  Mr. Walloper.  He's No. 12.

16          THE COURT:  What number?

17          MS. HENRY:  He's No. 12.

18          THE COURT:  Is he an officer?

19          MS. HENRY:  He was a member of the boarding team

20  on the Morganthau that boarded the go-fast vessel.

21          THE COURT:  Does that mean you don't know if he's

22  an officer?

23          MS. HENRY:  Is he an officer?  Yes.

24          THE COURT:  Were there bales being thrown over in

25  that one too?

```
 1              MS. HENRY:  Yes, Your Honor.

 2              (Pause)

 3              THE COURT:  What years were Morganthau and

 4    Halliburton interdictions?

 5              MS. HENRY:  Also 2007.

 6              THE COURT:  All three, Ocean Song, Halliburton,

 7    and Morganthau?

 8              MS. HENRY:  Yes.

 9              THE COURT:  All right.  Who's the next Coast Guard

10    person you need for interdiction?  Is that Harrison, 25?

11              MS. HENRY:  Well, there are three witnesses here,

12    18, 19, and 20.

13              Were you asking specifically about the seizures

14    I've already mentioned or additional seizures?

15              THE COURT:  No.  I thought there were seven

16    seizures.

17              MS. HENRY:  Right.

18              THE COURT:  So I assume, perhaps incorrectly, that

19    you had Coast Guard people that related to all of those

20    seizures?  Maybe you don't.

21              MS. HENRY:  Well, yes, Your Honor.  The next three

22    witnesses that I'm about to discuss relate to a seizure that

23    was done by Colombian law enforcement authorities.

24              So witnesses 18, 19, and 20 are all -- they're not

25    from the United States Coast Guard, but they're law
```

 1   enforcement witnesses who would testify regarding a seizure.

 2           THE COURT:  They're Colombians?

 3           MS. HENRY:  Yes, Your Honor.

 4           So with respect to your estimate, these are the

 5   only law enforcement witnesses who would be Spanish

 6   speaking.

 7           THE COURT:  What does CTI mean?

 8           MS. HENRY:  The -- I'm not familiar -- as familiar

 9   with the full Spanish term, but it's essentially an

10   investigative arm of the Colombia prosecution.

11           THE COURT:  So the first of these three,

12   Mr. Carvejal, I don't even know how to -- C-a-r-v-a-j-a-l,

13   Carvejal, Toro Carvejal, he is an agent of the Colombia

14   police?

15           MS. HENRY:  He is part of the Colombian Navy.

16           THE COURT:  Colombian, excuse me.

17           MS. HENRY:  Navy.

18           THE COURT:  Navy.

19           And what vessel was he involved in the

20   interdiction of?

21           MS. HENRY:  Well, this was a -- I don't know that

22   the vessel itself had a name, they were just seizures that

23   were made by the Colombian law enforcement, but he is the

24   person who boards the boat.

25           THE COURT:  Was it an ocean-borne seizure?

1              MS. HENRY:  Yes.

2              THE COURT:  But the boat didn't have a name?

3     I think that's tradition in -- go ahead, you can go check.

4              MS. HENRY:  Well, the go-fast vessels, Your Honor,

5     often don't.

6              For example, the Halliburton and Morganthau, those

7     are the name of the Coast Guard ships that interdicted the

8     go-fast vessel.  The go-fast vessel itself didn't have a

9     name.

10             But there were other seizures where there were

11    actual names because the ships themselves were a little bit

12    bigger.

13             THE COURT:  So he was involved in what

14    interdiction?  What time and what place?

15             MS. HENRY:  This was also in 2007, Your Honor.

16             THE COURT:  Okay.  Where was it located, off the

17    coast of Colombia?

18             MS. HENRY:   I believe so, Your Honor.  Hold on

19    one second, please.

20             Yes, Your Honor.

21             THE COURT:  Do you know what month in '07?

22             MS. HENRY:  November.

23             THE COURT:  How do you plan on referring to this

24    particular seizure so that the jury can keep straight the

25    seven different seizures here if there's no name for the

```
 1   boat that either the capturers were on or the boat that they

 2   took the stuff from?

 3            MS. HENRY:  I think this one is distinguishable in

 4   that it was done by Colombian law enforcement rather than

 5   United States law enforcement or Coast Guard personnel.

 6            THE COURT:  So there's only one seizure that falls

 7   into that category?

 8            MS. HENRY:  I'm sorry?

 9            THE COURT:  There was only one seizure that falls

10   into that category?

11            MS. HENRY:  One group of seizures, Your Honor,

12   yes.

13            So there were three boats, three go-fast vessels,

14   and this is part of one of them.

15            In addition, one of the cooperating witnesses is

16   going to testify regarding this particular load of cocaine

17   that ended up being seized.

18            THE COURT:  So does this represent one of the

19   seven seizures or three of the represented seizures?

20            MS. HENRY:  We group them as one.

21            One moment, Your Honor.  I apologize.

22            (Pause)

23            MS. HENRY:  To clarify, Your Honor, the go-fast

24   vessels that were seized by the Morganthau, the Halliburton,

25   as well as the Colombian law enforcement, those three
```

1    go-fast vessels left at the same time.  So we are counting

2    them as three of the seven seizures that we're introducing.

3    They were all seized around the same -- they all left around

4    the same time.  It's just that they happened to be seized by

5    different -- two different countries' law enforcement and

6    two different U.S. ships.

7              THE COURT:  So in the Ocean Song case, how many

8    go-fast vessels were seized?

9              MS. HENRY:  That was just the one, the Ocean Song.

10   That's the actual name of the ship that was seized,

11   Ocean Song.

12             THE COURT:  So that was the ship carrying the

13   illicit drugs?

14             MS. HENRY:  Yes.

15             THE COURT:  And the Halliburton and Morganthau

16   case?

17             MS. HENRY:  Those are U.S. Coast Guard frigates.

18             THE COURT:  Two separate events.  How many go-fast

19   vessels with each event?

20             MS. HENRY:  One.

21             THE COURT:  One go-fast vessel.

22             Okay.  So that's three seizures up to that point.

23             Now we're at this Colombian seizure that had three

24   go-fast vessel boats.

25             MS. HENRY:  That was one, Your Honor.

1          THE COURT:  You said there were three boats.

2          MS. HENRY:  I'm sorry.

3          THE COURT:  Did you misspeak?

4          MS. HENRY:  Let me clarify.

5          THE COURT:  Please.

6          (Pause)

7          MS. HENRY:  May I run down the list, Your Honor?

8          There are seven total seizures that we're

9    introducing.  The ones that we have spoken about so far are

10   the following:  One is the Ocean Song, and that's a cargo

11   container.  The Morganthau is a U.S. vessel that was seizing

12   an unnamed go-fast boat.  The Halliburton is a U.S. vessel

13   that was seizing an unnamed go-fast vessel.  So that's three

14   there.

15          The seizure that's going to be testified about by

16   the Colombian law enforcement witnesses, they also seized an

17   unnamed go-fast vessel.

18          THE COURT:  Just one?

19          MS. HENRY:  Just one.

20          THE COURT:  And you don't know the name of the

21   ship they were on when they did that?

22          MS. HENRY:  No, Your Honor.

23          THE COURT:  It was a Colombian Navy?

24          MR. WHITTED:  It was -- yeah.  Exactly.

25          THE COURT:  That was in November of '07.

1          MS. HENRY:  Yes, Your Honor.

2          THE COURT:  Now, why do we need three witnesses to

3  talk about that?  Why couldn't one suffice?

4          MS. HENRY:  Three witnesses to discuss the

5  Colombian seizure?

6          THE COURT:  Uh-huh.

7          MS. HENRY:  They're the same type of witnesses as

8  the U.S. law enforcement.  One of them was aboard -- boarded

9  the actual go-fast vessel.  The second one -- excuse me,

10  Mr. Vega, he assisted in the offloading of the cocaine, and

11  is also part of the chain of custody.  And then the third

12  witness is the chemist.

13          THE COURT:  Ms. Lozana is a chemist?

14          MS. HENRY:  Ms. Lozana.

15          THE COURT:  That's a woman, Nohora?  That's a

16  woman's name?

17          MS. HENRY:  Yes, Your Honor.

18          THE COURT:  Okay.  So she's a chemist.

19          And Mr. Vega is a navy personnel?

20          MS. HENRY:  He is part of the CTI, Your Honor.

21          THE COURT:  Law enforcement person?

22          MS. HENRY:  Correct.

23          THE COURT:  So you think there's some question, if

24  Nohora testified, there would be some chain-of-custody

25  problem that would necessitate Vega.

1          MS. HENRY:  Well, Your Honor, we've learned from

2     the defense that there is, at present, no intention to

3     stipulate to many of the chain-of-custody and

4     chemist-or-analysis issues that would normally be -- or that

5     have previously been stipulated to in other types of cases

6     like this.  And so because we need to be prepared to address

7     that should it come up, we wanted to front it for the Court

8     just so that we would have our list of witnesses available,

9     should we have to address this.

10         THE COURT:  Mr. Balarezo, what's your thinking on

11    this subject?  Why do we need three witnesses when we could

12    do it with one?  Are you going to challenge chain of

13    custody?

14         MR. BALAREZO:  Your Honor, on some of these,

15    I think there may be an issue, yes.

16         THE COURT:  Well, let's be specific.

17         MR. BALAREZO:  Your Honor --

18         THE COURT:  Let's start with the Ocean Song,

19    do you have a chain-of-custody issue with that one?

20         MR. BALAREZO:  Your Honor, with respect to the

21    Ocean Song, the discovery that we've gotten has been some

22    pictures, I don't know if the videos pertain to it.  There

23    have been a chemist report.

24         My understanding is that a drug seizure was made

25    from the Ocean Song by the Coast Guard.  From there,

1   I don't know what happened to the drugs.  I know that the

2   government still does not have them.  I don't know what they

3   pertain to -- at least I understand that they don't have

4   them; they were burnt or something.  I don't know how it is

5   that they propose to show a chain of custody, so

6   I don't know how I'm going to stipulate to anything.

7   So yes, we won't stipulate to chain of custody.

8           We told the government that we would stipulate as

9   to the qualifications of the expert so we didn't have to

10  waste time with that.  But at this point, we're not prepared

11  to stipulate as to the analysis of the drugs themselves,

12  because we believe that we can -- that there is fertile

13  cross-examination of chemists, and we intend to do that.

14          THE COURT:  Do you see any issue or do you foresee

15  any issue between that which was seized and that which was

16  tested?

17          MR. BALAREZO:  Your Honor, I don't know.

18  The paperwork that I have is -- as I said, we have

19  photographs or videos.  We have the tests.

20  I don't recall -- I don't believe we've gotten all of the

21  logs.

22          In prior cases, I have gotten statements from each

23  of the Coast Guard people that were involved, saying,

24  I so-and-so did X, did Y.  I don't recall seeing that in all

25  of these cases.

1           So, yes, I do foresee some issues.  And I'm not

2    going to -- in zealously representing my client, I am not

3    going to make the government's case or make the

4    government -- make the government's case any easier.

5    That's not what I'm here to do.  The government has had a

6    year and a half now to prepare for this case, and the burden

7    is on them.  That's really all I could say at this point.

8           And I'm not trying -- to be very clear,

9    Your Honor, I'm not trying to make this trial any longer

10   than it needs to be, but the government has a burden and

11   they need to put on their proof, so...

12           THE COURT:  All right.

13           Ms. Henry.  What's No. 5?

14           MS. HENRY:  The Gatun, Your Honor.

15           THE COURT:  What's it called?

16           MS. HENRY:  G-a-t-u-n.

17           THE COURT:  That's the name of the ship?

18           When did that seizure occur?

19           MS. HENRY:  I'm sorry?  I believe that was also in

20   2007, in March.

21           THE COURT:  Gatun is a U.S. vessel?

22           MS. HENRY:  No.  That's the name of the seized

23   ship.

24           THE COURT:  Seized ship?  Okay.

25           MS. HENRY:  Yes.  Similar to the Ocean Song.

```
1              THE COURT:  And where was it seized, off of where?

2              MS. HENRY:  Panama, I believe.

3              THE COURT:  Who did the seizing?

4              MS. HENRY:  That was also -- that was a Coast

5    Guard.

6              THE COURT:  That was a Coast Guard.

7              Which witnesses relate to this?

8              MS. HENRY:  That would be witnesses 25 and 26.

9              In addition to witness No. 3, who we had

10   previously discussed -- excuse me, 2.  I'm sorry.

11             MR. BALAREZO:  No. 3.

12             MS. HENRY:  No. 2.

13             THE COURT:  We've never discussed that person.

14             MS. HENRY:  Fair point.

15             THE COURT:  DEA Special Agent Scott Schoonover, we

16   never discussed that person.

17             MS. HENRY:  Yes, Your Honor.

18             I apologize, Your Honor.

19             THE COURT:  We discussed, No. 1, U.S. Coast Guard

20   Ronald Towery.

21             MS. HENRY:  Correct.

22             The first three witnesses were all related to the

23   Ocean Song.

24             Witness No. 1 and witness No. 3 are solely related

25   to the Ocean Song.
```

1          Witness No. 2 covers the Ocean Song, the Gatun,

2     the Lena Maria and the San Jose, which we have yet to get

3     to.  But he is a chain-of-custody witness for four of the

4     seizures.

5          THE COURT:  We'll get to him in a minute.

6          Let's start with the Coast Guard, 25 and 26.

7     Why do you need both?

8          MS. HENRY:  No. 26 is the chemist, Mr. Jolly.

9     He tested the cocaine.

10         Witness No. 25.

11         THE COURT:  Did he test it on the scene or later?

12         MS. HENRY:  Later.

13         THE COURT:  So he has no evidence as to the

14    seizure or chain of custody?

15         MS. HENRY:  Correct.  He's solely the chemist.

16    Every chemist in this case is solely the chemist.

17         THE COURT:  Okay.  How about Harrison, what is his

18    role or her?

19         MS. HENRY:  Mr. Harris boarded the Gatun, and he

20    participated in discovering the bales of cocaine.

21    He photographed the cocaine and he observed the field

22    testing of the cocaine.

23         THE COURT:  All right.  What's the next one?

24         MS. HENRY:  The next two seizures, Your Honor, are

25    the Lena Maria and the San Jose.  They both occurred in

1   September of 2004.

2          THE COURT:  Different days?

3          MS. HENRY:  Within about a week apart, Your Honor.

4          THE COURT:  U.S. Coast Guard?

5          MS. HENRY:  These would be witnesses No. 28, 29,

6   31, 32.

7          THE COURT:  Well, wait a minute.  Which ones are

8   the Lena Maria?

9          MS. HENRY:  I'm sorry.  So the Lena -- the reason

10  why I'm listing them together is because the seizures are

11  often treated as together because they were so close in

12  time; however --

13         THE COURT:  They're separate.

14         MS. HENRY:  They are separate.

15         THE COURT:  Who did the Lena Maria then?

16         MS. HENRY:  That would be No. 28.

17         Also No. 2, as I mentioned, regarding chain of

18  custody.

19         THE COURT:  Let's focus on 28 for a second.

20  Who's this person?

21         MS. HENRY:  That is the Coast Guard member who was

22  part of the boarding team that went onboard the Lena Maria.

23         THE COURT:  And where did this take place?

24         MS. HENRY:  This happened off the coast of Ecuador

25  in the eastern Pacific.

1          THE COURT:  Remind me, where did the Ocean Song,

2  Halliburton and Morganthau take place?

3          MS. HENRY:  The Ocean Song, I believe, was off the

4  coast of Panama.  The Morganthau and the Halliburton were

5  closer to also in the eastern Pacific.

6          These all took place around the same region,

7  it was just a matter of which countries they were closer to.

8  But they all took place in the eastern Pacific Ocean.

9          THE COURT:  Okay.  So Joseph Levan or Levan,

10  however he says his name, he was on the boarding team,

11  right?

12          MS. HENRY:  Correct.

13          THE COURT:  And who was Charles Gris, No. 29?

14          MS. HENRY:  He is part of the boarding team for

15  the San Jose.

16          THE COURT:  Where did that one take place?

17          MS. HENRY:  Also off the coast of Ecuador.

18          THE COURT:  So he didn't have anything to do with

19  Lena Maria?

20          MS. HENRY:  No, Your Honor.

21          THE COURT:  All right.  Who is Chad Brick, 31?

22          MS. HENRY:  That's a chain-of-custody witness,

23  Your Honor, for the Lena Maria -- I'm sorry, excuse me, the

24  San Jose.

25          He was on the ship that picked up the drugs from

1   the ship that interdicted the San Jose.

2            THE COURT:  And who's the chain-of-custody witness

3   for the Lena Maria?

4            MS. HENRY:  That is, in part, Mr. Schoonover,

5   No. 2.

6            THE COURT:  What did he do?

7            MS. HENRY:  I'm sorry, Your Honor?

8            THE COURT:  What did he do?

9            MS. HENRY:  Mr. Schoonover?

10           THE COURT:  Uh-huh.

11           MS. HENRY:  He's the individual who, for the Lena

12  Maria, he traveled to retrieve the cocaine from the cutter

13  that had it.

14           THE COURT:  So he will testify to receiving it

15  from the Coast Guard and then taking it to the laboratory

16  people?

17           MS. HENRY:  Taking it to Florida, yes, Your Honor.

18           THE COURT:  How about when it got to Florida, who

19  did it go to then?  Who was the chemist who it went to then?

20           MS. HENRY:  No. 32, Ms. Altieri.

21           Ms. Altieri was the chemist for both the

22  Lena Maria and the San Jose.

23           THE COURT:  Will she testifying to receiving it

24  from Mr. Schoonover?

25           MS. HENRY:  She's going to testify that she

1  analyzed the samples in this case relating to the specific

2  case numbers, which Mr. Schoonover will testify to.

3            THE COURT:  All right.

4            Is there a chain-of-custody witness for the

5  Ocean Song?

6            MS. HENRY:  Oh, I'm sorry.  Mr. Schoonover.

7  I apologize.

8            THE COURT:  And the chemist was Goodlin?

9            MS. HENRY:  Yes, Your Honor.

10           THE COURT:  And how about the Halliburton?

11           MS. HENRY:  I'm sorry?

12           I'm sorry, is Your Honor asking for chain of

13  custody for Halliburton?

14           THE COURT:  Who's the chain-of-custody witness for

15  the Halliburton, Coker?

16           MS. HENRY:  Oh, Mr. Caira, C-a-i-r-a.

17           THE COURT:  What number?

18           MS. HENRY:  He's No. 7.

19           THE COURT:  He's chain of custody?

20           MS. HENRY:  Yes, Your Honor.

21           THE COURT:  And which chemist did the Halliburton?

22           MS. HENRY:  There were two.

23           THE COURT:  Chemists?

24           MS. HENRY:  Yes, Your Honor.

25           THE COURT:  Why do you need two chemists for the

1    Halliburton?

2              MS. HENRY:  One chemist tested the sample from the

3    Halliburton seizure, and the other chemist tested the

4    remainder of the cocaine.

5              THE COURT:  The what?

6              MS. HENRY:  The remainder of the cocaine.

7              This is one of the seizes where the bale was

8    dumped overboard.

9              THE COURT:  What numbers are the two chemists?

10             MS. HENRY:  Nine and ten.

11             THE COURT:  For the Morganthau, Mr. Trappen did

12   the boarding.

13             Who was the --

14             MS. HENRY:  Mr. Trappen was the navigator in the

15   aircraft that viewed for the Morganthau.

16             THE COURT:  Excuse me.  Who did -- the boarding

17   was Walper?

18             MS. HENRY:  Walper, correct.

19             THE COURT:  And who was the chain-of-custody

20   witness in that one?

21             MS. HENRY:  Also Mr. Caira.

22             THE COURT:  Who was the chemist in that one?

23             MS. HENRY:  That would be Mr. Allred and

24   Ms. Van Mali, 13 and 14.

25             THE COURT:  Two chemists?

```
1              MS. HENRY:  One for the bulk and one for the

2    sample.

3              THE COURT:  So that leaves No. 8, Jesus Rey

4    Zambada.  Is that a cooperator?

5              MS. HENRY:  Yes, Your Honor.

6              THE COURT:  And the next cooperator is what,

7    No. 11.

8              MS. HENRY:  11.

9              THE COURT:  Juan Carlos Ramirez?

10             MS. HENRY:  Yes, Your Honor.

11             THE COURT:  And the next one is Jerman Perez

12   Ocampo?

13             MS. HENRY:  Yes, Your Honor, 15, 16, and 17.

14             The next set of cooperators would be 23, 24, 27.

15             THE COURT:  Who's Kowalski and Judi O'Brien?

16             MS. HENRY:  Mr. Kowalski is a records custodian.

17   And Ms. --

18             THE COURT:  For what purpose?

19             MR. WHITTED:  That is for the purpose of

20   introducing a recorded call in which the defendant is

21   speaking.

22             THE COURT:  Recorded where, at the jail?

23             MS. HENRY:  Yes.  At the facility here in the D.C.

24   area.

25             THE COURT:  What's the relevance of the call?
```

1          MS. HENRY:  Your Honor, it's for identification

2    purposes.  There's going to be a witness who testified

3    having heard the defendant speaking and would be able to

4    testify that this call represents the defendant.

5          So O'Brien is the translator who provided a

6    certified transcript of the call, because the call was in

7    Spanish.

8          THE COURT:  Well, what's the relevance of the

9    call?  What does it relate to?

10         MS. HENRY:  It's a way of identifying the

11   defendant.

12         THE COURT:  Say again.

13         MR. PURPURA:  Judge, I can't hear.  Can we come to

14   the bench?

15         May you please speak up so we can hear you.

16         MS. HENRY:  Certainly.

17         THE COURT:  I couldn't hear you myself.

18         MS. HENRY:  Certainly, Your Honor.

19         It's just a method of identifying the defendant.

20         THE COURT:  What's the substance of the call;

21   what's it about?

22         MS. HENRY:  One moment, Your Honor.

23         (Pause)

24         MS. HENRY:  Again, Your Honor, it's for the

25   purposes for identification.  The defendant -- it's a

1   conversation between the defendant and his son, wherein his

2   voice is audible.

3          Two of the cooperators will be able to testify

4   that they recognize that voice as the voice belonging to the

5   defendant.

6          THE COURT:  Why is that necessary?  I don't --

7   do you expect there to be some issue as to whether the

8   cooperators actually know the defendant at all?

9          MS. HENRY:  Well, part of -- as we understand it

10  from the defense filings -- is there is going to be some

11  question as to how these cooperators know that the defendant

12  is the person that they were interacting with or how do they

13  know that the defendant was part of the conspiracy, and this

14  is one method of showing that.  They've had prior

15  interactions with him in which they have had enough

16  interactions with him to know what he sounds like.

17         THE COURT:  Do you have any cooperators who are

18  going to be testifying that they never actually met the

19  defendant but only dealt with him over the phone?

20         MS. HENRY:  I don't believe so, Your Honor.

21         THE COURT:  So every single cooperator, as I would

22  expect, will testify under oath that he has personally met

23  with and been in the room with and at other meetings with

24  other people with this particular defendant, right?

25         MS. HENRY:  Correct, Your Honor.

1          THE COURT:  So why would there be some issue as to

2    whether they know his voice?

3          MS. HENRY:  Well, part of it is, Your Honor, they

4    have not had -- most of the cooperators, because either they

5    or the defendant have been in custody for some time, have

6    not had interactions recently with the defendant.  So they'd

7    be able to hear a recording from today and know that it's

8    the same person that they interacted with whenever the last

9    time it was that they interacted with him personally.

10         THE COURT:  Well, they're going to be sitting

11   right there and they're going to look at him.

12         MS. HENRY:  He looks very different from the way

13   he looked when he was arrested.

14         THE COURT:  He's not going to be speaking in their

15   presence.  He doesn't have any obligation to speak at all.

16         MS. HENRY:  Correct, Your Honor.

17         THE COURT:  He has a constitutional right to

18   remain silent.

19         We can revisit the issue, but I don't see any --

20   at this point, any reason why you're going to get witnesses

21   21 and 22 in at all.  I don't see any need for it; I don't

22   see any reason why you'd get them at all.

23         MS. HENRY:  Your Honor, if I can just correct

24   something that was placed on the record regarding the

25   cooperating witnesses, there is at least one who has never

1  directly met the defendant.

2          THE COURT:  Which one?

3          MS. HENRY:  No. 16.

4          THE COURT:  Say that again, 16.

5          MS. HENRY:  16.

6          THE COURT:  So he's going to be testifying --

7  well, we'll come back to them in a second.

8          The next cooperator is No. 27, you said?

9          MS. HENRY:  Right.  We had 23, 24, 27, 30, 33, and

10  34.

11          THE COURT:  30, 33, did you say?

12          MS. HENRY:  Yes, Your Honor.  And 34.

13          (Pause)

14          THE COURT:  Yeah.  That's 11 cooperators.

15  You said No. 15 has never actually met the defendant?

16          MS. HENRY:  16.

17          THE COURT:  I wrote down 15.  Which is it?

18          MS. HENRY:  16.  1-6.

19          THE COURT:  Elkin Caldas.

20          MS. HENRY:  Yes, Your Honor.

21          THE COURT:  Never met the defendant?

22          MS. HENRY:  No.

23          THE COURT:  So how does he know the defendant?

24          MS. HENRY:  Your Honor, he was the accountant who

25  was in charge of the accounting records for a Colombian

1    drug-trafficking organization that was a source of supply

2    for the defendant and his drug-trafficking organization.

3              THE COURT:  Well, there's a serious question

4    whether that ledger is ever coming in.  I have ruled on the

5    other ledger but not on that ledger at all, and there's a

6    serious question about that.

7              Who else would be testifying about that ledger,

8    anyone else besides 16?

9              MS. HENRY:  Your Honor, he's the person who kept

10   the ledger, so he would be testifying about them.

11             THE COURT:  Is there anyone else who would be

12   testifying about the ledger and its contents?

13             MS. HENRY:  I don't believe so, Your Honor.

14             If I may confer?  Thank you.

15             (Government counsel conferred off the record.)

16             MS. HENRY:  Your Honor, just to clarify, this

17   witness's –– the ledgers that this witness kept and created

18   are different, I believe, from the ledgers that Your Honor

19   had indicated he did not issue a ruling regarding.

20             Those ledgers the government has cut from its

21   case, so they will not be presented at trial.  These are the

22   ledgers, instead, that we would like to introduce through

23   this witness.

24             THE COURT:  Now I'm confused.  These are the

25   Colombian ledgers that I've already ruled on?

1        MS. HENRY:  No, Your Honor.  There are, I believe,

2   three sets of ledgers.

3        THE COURT:  I was only aware of two.  What's the

4   third?

5        MS. HENRY:  These are the third, because they did

6   not come up as an issue prior.

7        There was a different set of ledgers that

8   Your Honor indicated might be problematic, not the ones that

9   Your Honor has already ruled on.

10        THE COURT:  We had quite a bit of --

11        MS. HENRY:  Briefing.

12        THE COURT:  -- briefing and arguing on the first

13   ledger.  I ruled on that first ledger.  That's off the

14   table.

15        MS. HENRY:  Correct.

16        THE COURT:  I've already ruled on that.

17        MS. HENRY:  Correct.

18        THE COURT:  The second ledger you brought to the

19   Court's attention relatively recently within the last few

20   months --

21        MS. HENRY:  Correct.

22        THE COURT:  -- as I recall it.

23        MS. HENRY:  Correct.

24        THE COURT:  And I indicated at one of my earlier

25   hearings I was not likely to allow you to use that.

 1             MS. HENRY:  Which is why, then, the government

 2    decided not to try to introduce it at trial.

 3             THE COURT:  Okay.

 4             So now there's a third Colombian ledger that this

 5    Mr. --

 6             MS. HENRY:  Yes.

 7             THE COURT:  -- 16 --

 8             MS. HENRY:  Yes, Your Honor.

 9             THE COURT:  -- Mr. Caldas is involved in.

10             MS. HENRY:  Yes, Your Honor.

11             May I have one moment?

12             THE COURT:  Yeah.

13             MS. HENRY:  Thank you.

14             (Government counsel conferred off the record.)

15             THE COURT:  Mr. Balarezo, are you aware of this

16    third ledger?

17             MR. BALAREZO:  Your Honor, maybe I'll clarify the

18    government's case.

19             The first set of ledgers was a ledger that had to

20    do with, Juan -- Chupeta Ruiz Sabadia, the Colombian who

21    went to Brazil.  And the Court already ruled that that

22    wasn't coming in; however, for some reason, the government

23    did place it in their exhibit list.

24             THE COURT:  No, no, no, no, that's not what I

25    ruled.

1          MR. BALAREZO:  All right.  The Court -- then

2    maybe -- then I ask for a clarification, Your Honor, because

3    I think we're all confused as to what the Court's ruling

4    was.

5          THE COURT:  There's no confusion at all as to the

6    first ledger whatsoever.

7          I said that once he left and fled the country --

8          MR. BALAREZO:  Right.

9          THE COURT:  -- entries made thereafter would not

10   be useable by the government.

11         MR. BALAREZO:  Right.  But the --

12         THE COURT:  While he was in the country of

13   Colombia and was interacting with the people who were making

14   the notations in the ledger and checking them as to their

15   accuracy and verification, I said those would be useable to

16   explain what the ledger entries are.

17         We have a witness who was involved in the

18   inputting of those items in the ledger and was knowledgeable

19   of what the particular symbols and names meant, what the

20   significance of them were, and, of course, he'd be subject

21   to cross-examination.

22         MR. BALAREZO:  Right.

23         THE COURT:  But once the person left the country,

24   any entries made thereafter where there wasn't that kind of

25   interaction to verify the accuracy of what was being

 1    inputted and what the meaning of it was, that, to me, struck

 2    me as way too risky.  And I was not going to permit the

 3    government to use those entries in the ledger after he fled

 4    from Colombia to Panama.

 5            MR. BALAREZO:  Well, Your Honor, the thing is, he

 6    left --

 7            THE COURT:  What part of that is confusing to you?

 8            MR. BALAREZO:  It's not, Your Honor.  But this is

 9    what I meant.

10            Ramirez left Colombia in June of 2004.

11    The transactions that the government alleges are in those

12    ledgers that pertain to my client took place in, I believe,

13    November of 2004 after he left.

14            So to the extent that the Court is ruling that the

15    ledgers, ledger entries that were made after Chupeta left

16    Colombia in June of 2004 are not coming in.  That's -- then

17    I don't understand what the remaining pre-June 2004 ledgers,

18    what the relevance is to this particular case.

19            THE COURT:  Well, we'll give the government a

20    chance to explain what they want to use those ledgers for,

21    but that is not consistent with my recollection.  And if we

22    need to, we can get the transcripts and go and check.

23            MR. BALAREZO:  Well, we have the ledgers,

24    Your Honor, they're from November of 2004, after Chupeta

25    left Colombia.  I don't think there's any doubt about that

1  one.

2          THE COURT:  Oh, we'll see what Ms. Goldbarg says.

3          MR. BALAREZO:  All right.  We'll see.

4          The second set of ledgers that I'm aware of are

5  handwritten ledgers that were made by --

6          THE COURT:  Separate drug cartel, separate drug

7  organization altogether.

8          MR. BALAREZO:  Your Honor, I don't know what we're

9  trying here still and we're a week from trial, but I'm

10  waiting for the government to explain.

11          But the second set of ledgers are ones that were

12  made by Vincente Zambada, who's a defendant in Chicago.

13  He has not been listed as a witness, so I assume, then, the

14  government is not going to try to bring these ledgers in if

15  the author is not going to be a witness.

16          This third set of ledgers that the government is

17  talking about now that were supposedly made and/or kept by

18  Elkin Soto Caldas, S-o-t-o, C-a-l-d-as, who was a Colombian,

19  who worked, I believe, for the Ramone Quintero San Clemente

20  Organization, which was Colombian and Mexico, the government

21  has identified certain pages of those particular ledgers

22  that apparently pertain somehow to my client.  His name

23  doesn't appear.  The cooperator will come in and say

24  something about them, that's all I know.  So those are the

25  three sets of ledgers that I'm aware of.

1           THE COURT:  Ms. Goldbarg.

2           MS. GOLDBARG:  Yes, Your Honor.

3           THE COURT:  What's your recollection as to 1, 2?

4   And then, of course, what's the story with 3?

5           MS. GOLDBARG:  Your Honor, my recollection is that

6   the Court and defense raised an issue with regards to the

7   admissibility of the ledgers by the witness that we're going

8   to call -- if I can get the name -- witness 11 -- those were

9   the original Colombian documents that we provided at the

10  very beginning of discovery.

11          A witness that we decided not to call because, at

12  the last status conference, Your Honor referred to them as

13  Sinaloa Cartel ledgers, indicated that you would not allow

14  those to be admitted.  There was also an issue, since the

15  witness that would be testifying to them, did not actually

16  create them.

17          The ledgers that are at issue right now with

18  regards to witness 16, that witness authored, created, made,

19  kept those ledgers.  Since there's no admissibility or

20  authentication issue, that issue was never raised before the

21  Court.  They were produced many months ago to defense

22  counsel.

23          So again, since it didn't raise to be an

24  evidentiary issue that the other ledgers did, it was never

25  raised before Your Honor.  So that's why Your Honor was not

1   aware of these ledgers.

2           THE COURT:  Let's back up.

3           MS. GOLDBARG:  Yes, Your Honor.

4           THE COURT:  As to that particular ledger, who

5   created it?

6           MS. GOLDBARG:  The witness who will be testifying.

7           THE COURT:  All right.  And when did he create it?

8           MS. GOLDBARG:  At the time that he was entering

9   the transactions that were reflected in the documents.

10          THE COURT:  And what years are those?

11          MS. GOLDBARG:  2006 to 2008.

12          THE COURT:  And at whose direction was he making

13  the entries?

14          MS. GOLDBARG:  His role within the organization,

15  he was the accountant.

16          THE COURT:  He was the accountant.

17          MS. GOLDBARG:  Correct.  So that was his function

18  within the organization.

19          THE COURT:  All right.  And what organization was

20  he an accountant in?

21          MS. GOLDBARG:  It was a Colombian organization

22  that was one of the sources of supply that sent cocaine to

23  the defendant.

24          THE COURT:  And was he the person who -- I haven't

25  seen these ledgers that you're referring to, I don't think.

1          MS. GOLDBARG:  They're in the government exhibit

2    binder that we provided to the Court, and they're Exhibit 7.

3          MR. BALAREZO:  Your Honor, I don't think the

4    government answered the question as to at whose direction

5    was he making the ledgers.  I think that's important.

6          MS. GOLDBARG:  That was --

7          THE COURT:  We haven't gotten to that yet.

8          MR. BALAREZO:  Yeah.  We'd need to know now.

9          THE COURT:  Where was he getting the data that

10   he's inputting into these ledgers?

11         MS. GOLDBARG:  From his participation in the

12   organization and from his boss Ramone -- from his

13   participation in the organization and from his direct boss.

14         THE COURT:  Who's that?

15         MS. GOLDBARG:  Ramone Q-u-i-n-t-e-r o, San

16   Clemente, S-a-n, C-l-e-m-e-n-t-e.

17         THE COURT:  So he will testify that he received

18   information from Mr. San Clemente?

19         MS. GOLDBARG:  Correct.

20         THE COURT:  And that he inputted into these

21   ledgers?

22         MS. GOLDBARG:  Correct.

23         THE COURT:  So he doesn't have firsthand knowledge

24   of the information sent to him?

25         MS. GOLDBARG:  Yeah, I believe he does,

1    Your Honor, because he was also -- his role was to be the

2    accountant, so he kept the record-keeping of the

3    organization.  But he was also one of its top lieutenants

4    invested in the cocaine loads, participated in the

5    shipments.  So he also has firsthand knowledge of what was

6    going on.

7              THE COURT:  These are made contemporaneous with

8    the events?

9              MS. GOLDBARG:  Yes, Your Honor.

10             THE COURT:  This is his handwriting here in

11   Exhibit 7?

12             MS. GOLDBARG:  That is his handwriting in

13   Exhibit 7, yes, Your Honor.

14             THE COURT:  Are there references in here to this

15   defendant specifically?

16             MS. GOLDBARG:  No, Your Honor.

17             THE COURT:  Are there any code words used to

18   relate to this particular defendant or his organization,

19   alleged organization?

20             MS. GOLDBARG:  There is not a specific reference

21   to the defendant, Your Honor.  There is a reference to the

22   broker for the Beltran Leyva organization, indicating that

23   those certain shipments were going to the defendant and his

24   organization.

25             THE COURT:  Now, I notice that some of these are

```
1   in handwriting and some are typed.

2           MS. GOLDBARG:  Correct.

3           THE COURT:  Why are some typed, and who typed

4   them?

5           MS. GOLDBARG:  He did, Your Honor.

6           MR. BALAREZO:  Your Honor, I'm sort of -- could we

7   get the name of this so-called broker, because we just got a

8   bunch of pages, we have no idea who's who.

9           THE COURT:  Where would the reference be to this

10  broker person?

11          (Counsel conferred off the record.)

12          MS. GOLDBARG:  Your Honor, Exhibit 17.1, there is

13  a reference to the code name that this witness provided to

14  the broker.

15          THE COURT:  7.1?

16          MS. GOLDBARG:  Yes.

17          There's a similar reference on 7.2.

18          THE COURT:  Where is it?

19          I'm looking at 7.1.  Where is this thing you're

20  talking about?

21          MS. GOLDBARG:  Upper right-hand corner, by the

22  number 300, there is a word, M-u-g-r-e, that is the code

23  word that this witness used to reference the broker for the

24  Beltran Leyva organization.

25          THE COURT:  Wait a minute.  Hold on.
```

1             This is 7.1?

2             MS. GOLDBARG:  Yes, Your Honor.

3             THE COURT:  Upper right corner, you said?

4             MS. GOLDBARG:  I'm sorry, upper left-hand corner.

5             Fourth line down, it says "Minus 300."

6             THE COURT:  Okay.

7             MS. GOLDBARG:  And then after that, the witness

8     will testify that the handwriting beyond that is the code

9     word that this witness used.

10            THE COURT:  I can't read it on my copy, but what

11    do those letters say?

12            MS. GOLDBARG:  M-u-g-r-e.

13            THE COURT:  M, as in Michael?

14            MS. GOLDBARG:  You can see it more clearly on the

15    second page as well, Your Honor.

16            THE COURT:  Is that M, as in Michael, M-u-g-r-e?

17            Did you say M, as in Michael?

18            MS. GOLDBARG:  Yes, Your Honor.

19            Likewise on page 7.2, Your Honor, upper left-hand

20    corner where it says "Minus 600," you see the same code word

21    used as well.

22            Same thing, Your Honor on page 7.3, the title of

23    the document, the last word is M-u-g-r-e.

24            THE COURT:  Who is this person M-u-g-r-e?

25    What's his name?

1            MS. GOLDBARG:  You'd like us to --

2            THE COURT:  A broker.

3            MS. GOLDBARG:  It's witness No. 17.

4            And then on page 7.4, there's a code word,

5    C-o-n-e, that refers to witness No. 23.

6            MR. BALAREZO:  What's the code word for 23?

7            MS. GOLDBARG:  It's an --

8            (Government counsel conferred off the record.)

9            THE COURT:  I'm looking at 7.4.  I don't see where

10   this reference is.  Help me out, please.

11           You said 7.4, right?

12           MS. GOLDBARG:  Yeah.  7.4.

13           THE COURT:  Right in the middle, C-o-n-e?

14           MS. GOLDBARG:  Yes, Your Honor.

15           THE COURT:  Cone.

16           And this relates to shipment during what time

17   frame?

18           MS. GOLDBARG:  Your Honor, these ledgers cover

19   shipments from 2006 to 2008.  And these include the three

20   go-fast vessels that were seized in November of 2007, the

21   ones previously identified as being seized by the

22   U.S.S. Morganthau, the U.S.S. Halliburton, and the Colombian

23   Navy.

24           THE COURT:  Is this FBI agent Paul Peschka?

25           MS. GOLDBARG:  Yes, Your Honor.

1          THE COURT:  What is his potential role as a

2   witness in this case?

3          MS. GOLDBARG:  Identification, Your Honor.

4          THE COURT:  Identify.

5          MS. GOLDBARG:  The defendant.

6          He was onboard the plane that picked up the

7   defendant in Mexico when Mexico turned over custody of the

8   defendant to the United States government, where the

9   defendant identified himself as Alfredo Beltran Leyva.

10          MR. BALAREZO:  We'll stipulate to that,

11   Your Honor.

12          THE COURT:  Well, we've made progress today, then,

13   if we have a stipulation.

14          MS. GOLDBARG:  Then we've removed one witness,

15   Your Honor.

16          You're correct, we're not at 35.  We're now at 34.

17          THE COURT:  All right.  So let's start with the

18   first cooperator.

19          MR. BALAREZO:  Your Honor, just -- the government

20   just asked me a question.

21          Just so we're very clear, we'll stipulate that the

22   person sitting in the tan uniform is Alfredo Beltran Leyva,

23   the defendant in this case.

24          We're not going to stipulate to the voice,

25   because, again, I don't see what that issue is, but that's

1    all we're stipulating to.

2              THE COURT:  So the two cooperators who are going

3    to testify to ledger entries are Nos. 11 and 16;

4    is that right?

5              MS. GOLDBARG:  No, Your Honor.

6              The only person that's going to testify as to --

7    I'm sorry, as to the ledgers, Government's Exhibit 7, is,

8    yes, government witness 16.

9              And then government 11 has his own ledgers, yes,

10   Your Honor, that we previously disclosed.

11             THE COURT:  Right.  Those two cooperators, 11 and

12   16, are here for the purpose of testifying as to the

13   contents of two different ledgers.

14             MS. GOLDBARG:  Correct, Your Honor.

15             THE COURT:  So let's start with No. 8.

16             MS. GOLDBARG:  Your Honor, if I may just revisit

17   the Court's -- regarding the audio recording in regards to

18   what defense counsel asked, the government has marked as

19   Government's Exhibit 20.1, a photograph.

20             THE COURT:  20.1?

21             MS. GOLDBARG:  Yes, Your Honor.

22             THE COURT:  Now, who's that?

23             MS. GOLDBARG:  That's the defendant, Your Honor.

24             The reason the government is asking for an audio

25   verification is that, as you can see, at the time of his

1   arrest, the defendant looked very different than what he

2   looks like now.

3           And so the issue, as Ms. Henry was raising to the

4   Court, several witnesses have not seen the defendant since

5   he's been arrested; therefore, other means of identifying

6   the defendant are going to be through his voice.

7           And that is the purpose.  And it should be a very

8   short purpose of introducing the recording where he

9   acknowledges that it's him, and witnesses can authenticate

10  that that's the voice of the person they spoke with.

11          THE COURT:  Mr. Balarezo should agree, with his

12  client's blessing, to stipulate that that photograph, 20.1,

13  is a picture of him at the time he was turned over to U.S.

14  authorities, then that would obviate the need of the FBI

15  agent.

16          MS. GOLDBARG:  There's a difference, Your Honor.

17          20.1 is the photograph taken at the time the

18  defendant was arrested in January of 2008 by the Mexican

19  authorities.  He then spent the next few years in Mexican

20  custody.

21          And then when he was extradited from the

22  United States -- from Mexico to the United States in 2014,

23  his one Special Agent Paul Peschka, took photographs of him

24  and got his identification of being this person who was

25  there.

1          THE COURT:  But if he would stipulate that this is

2     what -- this was him at the time that he was arrested in

3     2008 --

4          MR. BALAREZO:  We won't stipulate to that,

5     Your Honor.

6          We'll stipulate that this is Alfredo Beltran Leyva

7     in the courtroom.

8          I'm not going to stipulate that this picture,

9     Government's Exhibit 20.1, is my client.

10          I think --

11          THE COURT:  Well, who took that picture, 20.1?

12          MS. GOLDBARG:  This was a photograph that was

13     taken at the time of his arrest in Mexico.

14          MR. BALAREZO:  You can get that from the Internet,

15     Your Honor.

16          MS. GOLDBARG:  Yeah.  It's publicly available,

17     Your Honor.

18          THE COURT:  Who took the picture?

19          MS. GOLDBARG:  I don't know, Your Honor.

20     I'm assuming someone in the Mexican authorities may have

21     taken it.

22          THE COURT:  How are you going to get it admitted

23     into evidence?

24          MS. GOLDBARG:  Because there are all the witnesses

25     that have met with the defendant and had various

1    interactions with him, have recognized this as being the

2    person that they met with and were dealing with.  This is

3    Alfredo Beltran Leyva that they were dealing drug

4    transactions.

5            THE COURT:  Oh.  Well, they're going to identify

6    the photograph.

7            MS. GOLDBARG:  Correct.  Yes, Your Honor.

8            THE COURT:  Okay.  Witness No. 8, Jesus Ray

9    Zambada, what is his purpose and role in this testimony?

10           MR. BALAREZO:  Your Honor, before -- if I may

11   interrupt again.

12           Again, if I understood the Court's ruling

13   previously, was that this was not going to be a trial about

14   the Sinaloa Cartel, it was going to be about whatever

15   organization my client allegedly belonged to.

16           My understanding is that Jesus Rey Zambada is a

17   member of the Sinaloa Cartel.  He's the brother of

18   Mayo Zambada, along with Chapo Guzman, the head of the

19   Sinaloa Cartel.

20           So I think -- I would ask if the Court could get a

21   clarification as to how he fits in with the non-Sinaloa

22   conspiracy that we're supposedly trying here.

23           THE COURT:  Well, she just started a discussion

24   about this witness.

25           MR. BALAREZO:  I just want to let the Court know.

1          THE COURT:  We're not going to even -- because

2    I have to adjourn in three minutes, we're not going to get

3    to the bottom of that today.  We're going to have to

4    continue it tomorrow, if the snow isn't too bad.

5          MR. BALAREZO:  We'll come in.

6          THE COURT:  One to three inches.

7          MS. GOLDBARG:  Your Honor, the government is not

8    making this trial about the Federation, it's not making this

9    trial about anyone other than the defendant; however, to

10   understand the conspiracy to which the defendant

11   participated in, it's important to talk about his criminal

12   partners, his co-conspirators, people that supplied him

13   cocaine, people that transported for him, people that did

14   enforcement for him.

15         And the witnesses that we have narrowed down the

16   list to from the original 30 plus that we started with to

17   the ones that we have selected here are all people that had

18   face-to-face dealings with the defendant, discussions about

19   moving, receiving, transporting cocaine in furtherance of

20   this charged conspiracy and the defendant's role in each one

21   of those shipments.

22         THE COURT:  So who's Jesus Rey Zambada?

23         MS. GOLDBARG:  He is a fellow Mexican trafficker,

24   who had conversations, direct, face-to-face conversations,

25   with the defendant.  They discussed sending multiple

1    shipments, multiple tonnage quantity shipments of cocaine.

2              THE COURT:  Was he a part of a different cartel?

3              MS. GOLDBARG:  This is where things get

4    complicated, Your Honor, because I know that you've insisted

5    that we can't talk about the Federation.

6              But what's important to understand is that the way

7    that the Beltran Leyvas and this defendant gets involved

8    into the drug trafficking is that they have a very close

9    alliance with Chapo Guzman.  Chapo Guzman is partners with

10   Mayo Zambada and the Zambadas, and there is an association

11   in which they all share resources.

12             If a shipment of 10,000-kilos is coming in, it may

13   be coming into a port that is controlled by Chapo Guzman,

14   but the defendant and the other criminal partners are all

15   investing in these loads.

16             Sometimes those drugs are being sent to the

17   defendant in Culiacán, and his role is to take the drugs up

18   to the United States.

19             THE COURT:  Would it not be the government's

20   position that in a situation where Mr. Zambada, for example,

21   was working in conjunction with this defendant,

22   hypothetically --

23             MS. GOLDBARG:  Absolutely, Your Honor.

24             THE COURT:  -- that they were working together to

25   accommodate a shipment into a Mexican port, and then working

1   together, in combination for a exporting of that shipment to

2   an American city or an American point of entry --

3           MS. GOLDBARG:  Yes, Your Honor.  For example --

4           THE COURT:  -- that they were co-conspirators?

5           MS. GOLDBARG:  Absolutely, Your Honor.  I mean,

6   they are co-conspirators.

7           We've talked to our witnesses not to use the word

8   "Federation," not to talk about other cartels.

9           But the truth of the matter is, this witness

10  provided support to the defendant when the defendant would

11  call this witness and say, can you help me receive a load in

12  this area, in which case this witness would.

13          Again --

14          THE COURT:  That's part of a conspiracy.

15          MS. GOLDBARG:  It is.  He's a co-conspirator.

16          THE COURT:  Right.

17          So obviously, it's going to take a little

18  self-discipline, not only on the part of the witnesses but

19  on your part and your counsel -- your co-counsel's part, to

20  not paint with too broad a brush, and to not unfairly use

21  references to other cartels or to the Federation as a means

22  to dirty up this particular defendant or to, in some way, be

23  unfair to this defendant and limit his ability to defend

24  himself through his counsel.

25          MS. GOLDBARG:  Yes.

1          THE COURT:  So we're going to avoid that and focus

2     on conduct of individuals that the government alleges were

3     acting in a co-conspiratorial way with this particular

4     defendant --

5          MS. GOLDBARG:  Correct.

6          THE COURT:  -- if you can prove it, to ship drugs

7     into the United States.

8          MS. GOLDBARG:  By way of example, Your Honor, we

9     have -- for example, there are many various Colombian

10    sources of supply.

11         We did not choose to ask all of, you know, those

12    who were cooperating, all of them to testify, because some

13    of them were saying, I knew my drugs were going to Chapo,

14    and that the Beltran Leyvas were participating in that.

15         We removed those witnesses because we wanted to

16    make sure that we could focus our witnesses on those that

17    had dealings with the defendant and could testify to their

18    direct knowledge of the defendant and his organization's

19    role in receiving these cocaine shipments.

20         THE COURT:  Well, as I count this witness list,

21    if you take the two ledger testimony witnesses off -- not

22    off, but I mean --

23         MS. GOLDBARG:  Consider done.

24         THE COURT:  If you don't count those two, 11 and

25    16.

1          MS. GOLDBARG:  Correct.  Yes.

2          THE COURT:  The other nine cooperators that are

3    left, you've represented to the Court, and we'll go into it

4    more in specific tomorrow, are people who had firsthand

5    interaction with this particular defendant, that you believe

6    you can show firsthand interaction --

7          MS. GOLDBARG:  Correct.

8          THE COURT:  -- that was conduct relating to the

9    shipment of drugs either from Colombia to Mexico for later

10   transshipment to the United States or shipment from Mexico

11   to the United States.

12         MS. GOLDBARG:  Absolutely.

13         And what we've done, Your Honor, is that we've

14   made sure -- we've taken to heart Your Honor's instructions

15   that none of these witnesses be cumulative.  So where we may

16   have had three or four transporters, we've narrowed it down

17   to one.  So we've done everything that we can.

18         But, again, as the Court is aware, it's a larger

19   conspiracy, it's a complex conspiracy, and we've limited the

20   roles that each witness can testify as to the various

21   aspects.

22         THE COURT:  Well, to say the least, jurors, and I

23   might add lawyers and judges, oftentimes have difficulty

24   keeping straight multiple conspiracies that are

25   simultaneously occurring.  So we have to be cautious not to

```
 1   overwhelm the jury with evidence that suggests unfairly and

 2   erroneously multiple conspiracies.  I think we have to stay

 3   focused, to the extent you have evidence that you're

 4   proffering, of a conspiracy between a witness and this

 5   defendant.

 6            MS. GOLDBARG:  Absolutely, Your Honor.

 7            THE COURT:  And he -- they're all he's -- they can

 8   be cross-examined by Mr. Balarezo, and they can -- the

 9   jurors can decide who to believe and who not to believe.

10            MS. GOLDBARG:  Absolutely, Your Honor.

11            THE COURT:  All right.  Well, we'll reconvene

12   tomorrow at 11:00.

13            MS. GOLDBARG:  I may not be here tomorrow.

14            THE COURT:  Well, you don't need to be here.

15   You've got four lawyers on your team?

16            MS. GOLDBARG:  Correct.

17            THE COURT:  You've got four lawyers.  So you've

18   got a very sizable team here.

19            MS. GOLDBARG:  Yes, Your Honor.

20            THE COURT:  So you continue to work with your

21   intelligence community to get to the bottom of these

22   questions that are out there.

23            MS. GOLDBARG:  Yes, Your Honor.

24            THE COURT:  We'll reconvene at 11:00.  That gives

25   a little extra time to deal with the snow.  God only knows
```

1    what we're going to encounter tomorrow.  The good news is

2    the projection is one to three inches, and if we were in

3    New England, three inches would be no issue at all.  But

4    we're not in New England, unfortunately, so...

5               All right.  See you tomorrow.

6               DEPUTY CLERK:  All rise.

7               This Honorable Court now stands in recess until

8    the return of court.

9               (Recess from 4:30 p.m. to 11:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: May 3, 2016_____       /S/__William P. Zaremba_____

                                 William P. Zaremba, RMR, CRR