IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )     CR No. 12-184
                                   )
                                   )     Washington, D.C.
     vs.                           )     February 9, 2016
                                   )     12:00 p.m.
ALFREDO BELTRAN LEYVA,             )
                                   )
          Defendant.               )
_____)


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        AMANDA LISKAMM
                           ADRIAN ROSALES
                           Assistant United States Attorney
                           555 4th Street, N.W.
                           Washington, D.C. 20036
                           (202) 252-7785
                           andrea.goldbarg@usdoj.gov


For the Defendant:         A. EDUARDO E. BALAREZO
                           Balarezo Law
                           400 5th Street N.W.
                           Suite 300
                           Washington, D.C. 20001
                           (202) 639-0999
                           info@balarezolaw.com

APPEARANCES CONTINUED:

Interpreter:                Teresa Salazar


Court Reporter:             William P. Zaremba, RMR, CRR
                            Official Court Reporter
                            U.S. Courthouse
                            333 Constitution Avenue, NW
                            Room 6511
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2           DEPUTY CLERK:  All rise.  This Honorable Court is
 3    now in session.  The Honorable Judge Richard J. Leon
 4    presiding.  God save the United States and this Honorable
 5    Court.  Please be seated and come to order.
 6           (Defendant entered.)
 7           DEPUTY CLERK:  The matter before the Court,
 8    Criminal Case No. 12-184, the United States of America
 9    versus Alfredo Beltran Leyva.
10           Counsel, please come forward and identify
11    yourselves for the record.
12           MS. LISKAMM:  Good morning, Your Honor.
13           On behalf of the United States, Amanda Liskamm;
14    Adrian Rosales; Marcia Henry; paralegal specialist,
15    Angela Ancalle-Jimenez; and FBI Special Agents Britton Boyd
16    and Paul Peschka.
17           THE COURT:  Welcome back.
18           MR. BALAREZO:  Good afternoon, Your Honor.
19    Eduardo Balarezo on behalf of Alfredo Beltran Leyva.
20           THE COURT:  Welcome back.
21           All right, Counsel.  We left off yesterday, we
22    were going through the cooperators.  We'll return to, I
23    think it was, No. 8, Jesus Rey Zambada.
24           MR. ROSALES:  Good morning, Your Honor.
25           Your Honor, I believe yesterday we left off with
```

1  No. 8, and Your Honor was saying that No. 8 would be a

2  co-conspirator of the defendant.

3          This particular cooperator, as we stated

4  yesterday, had a mutual agreement with the defendant, in

5  which this cooperator's organization and the defendant's

6  organization helped each other to receive shipments of

7  cocaine in Mexico that were coming from Colombia.  They also

8  helped each other transport those shipments of cocaine

9  through Mexico to various points of distribution throughout

10 Mexico and into the United States.

11         THE COURT:  So he was -- so the government's

12 position is that this is a co-conspirator with the

13 defendant?

14         MR. ROSALES:  That's correct, Your Honor.

15         THE COURT:  All right.

16         MR. ROSALES:  All right.

17         THE COURT:  Even though he may be in a different

18 organization?

19         MR. ROSALES:  Yes, Your Honor.

20         And I want to make clear for the Court that while

21 this witness is a member of another organization and could

22 sit up on the witness stand for days talking about his

23 activities as a member of that organization, his focus of

24 his testimony will be his direct interactions with the

25 defendant and with the defendant's organization regarding

1    these shipments.

2          So aside from helping each other receive

3    shipments, they also had a mutual agreement to invest in

4    those shipments.  And so his testimony will focus on not

5    only the receipt of each other's shipment, but also when and

6    how each other invested in those shipments.

7          He did have face-to-face meetings with the

8    defendant in this case as well.

9          THE COURT:  All right.  That gets us to No. 11,

10   Juan Carlos Ramirez.  This is -- we've already talked about

11   this person.  He's going to testify about ledger entries.

12         MR. ROSALES:  That is correct, Your Honor.

13         THE COURT:  So we already know, roughly -- remind

14   me, did he make the entries himself or supervise the entries

15   that were made?

16         MR. ROSALES:  This is the witness who supervised

17   the entries that were made.

18         THE COURT:  Right.  Okay.  Because we have two

19   people that are in this category of accountants, for lack of

20   a better way of putting it.

21         MR. ROSALES:  Yes, Your Honor.

22         And I hope we made it clear yesterday that with

23   respect to the other accountant who has ledgers, he was the

24   author of those ledgers; and as we stated before and as

25   Your Honor brought up yesterday, we had another set of

1  ledgers that we wrote a motion on maybe a couple of months

2  ago in which those ledgers were not authored by the witness.

3  We've since cut the witness from our list.

4          THE COURT:  Good.

5          MR. BALAREZO:  Your Honor --

6          THE COURT:  The fewer, the better.

7          Come on up.

8          MR. BALAREZO:  Thank you, Your Honor.

9          This is the issue I raised yesterday with respect

10 to this cooperator, Juan Carlos Juanitas, alias Chupeta.

11         The Court clarified, for me at least, yesterday

12 that the ruling was that the ledgers either authored or

13 directed to be authored by Jupetta prior to his leaving

14 Colombia in June of '04, may be admissible or they could be

15 used.  Anything -- or the ledgers that were made after that

16 period after June of '04 could not be used.

17         Now, my understanding from --

18         THE COURT:  That's because the proffer to date

19 from the government has been --

20         MR. BALAREZO:  Right.

21         THE COURT:  -- that he not only supervised the

22 entries, the entries that were made, but he reviewed them.

23         MR. BALAREZO:  Right.

24         THE COURT:  So he not only knew what was being

25 entered in there and gave the information to the scribner,

1   so to speak, who's not available, he's dead.

2           MR. BALAREZO:  Well, one of them is available.

3           THE COURT:  One of them is available, one's dead.

4           He not only supervised the entries made by the

5   scribner, he reviewed the entries made by the scribner, and

6   is in the position, subject to cross-examination, to

7   vouching for the act -- well, their meaning and their

8   accuracy.

9           MR. BALAREZO:  Right.

10          But the issue right there is, Your Honor, my

11  understanding is that the Jupetta did not do those things

12  post June 2004.

13          Now, my understanding also is that --

14          THE COURT:  Yeah.  That's why those are not going

15  to be usable.

16          MR. BALAREZO:  Right.

17          But the issue is that the government's -- what

18  they disclosed to the defense is that the shipments that

19  were supposedly notated in the ledgers occurred after he

20  left Colombia.

21          So these ledgers that pertain to the shipments in

22  which my client supposedly had an interest or the

23  Beltran Leyvas had an interest happened in either October or

24  November of 2004.

25          So my point is -- my question is, then, what is

1   the relevance of Jupetta speaking about ledgers prior to

2   June of '04, if my client doesn't figure in those ledgers or

3   the Beltran Leyvas?

4           THE COURT:  The government's in a better position

5   to answer that question than I am.

6           MR. BALAREZO:  It's a matter of relevance, though,

7   Your Honor.

8           And I would object to any transcripts coming in

9   pre, or any testimony also coming in pre -- from

10  pre-June 2004, because there is no relevance to the material

11  at hand at that point.

12          THE COURT:  Well, that wasn't the impression

13  I had.

14          MR. BALAREZO:  And I would ask the government to

15  clarify because that's what the discovery shows, Your Honor.

16          MR. ROSALES:  I can clarify that.

17          To be clear, the government understands the

18  Court's ruling in that the ledgers that were authored or

19  that were made after or when the defendant went to -- when

20  the witness went to Brazil are not going to be admitted into

21  evidence.

22          The relevance to the ledgers that were authored

23  and reviewed by this witness for accuracy prior to him

24  leaving to Brazil are relevant to this case because, as

25  Your Honor is aware, we've had lengthy discussions about

1    this witness and these ledgers and these shipments.

2            There are a series of ten shipments that -- in

3    which this witness can implicate the defendant as one of the

4    investors.

5            THE COURT:  Prior to his leaving in '04?

6            MR. ROSALES:  Ten total shipments, Your Honor,

7    that occur prior to him going to Brazil, and some occur

8    after him going to Brazil.

9            So the relevance is that he should absolutely be

10   able to talk about those other shipments that are reflected

11   in the ledgers, which he can say he knows were going to the

12   defendant and members of his organization as investors in

13   these shipments.

14           Now, granted the two seizures that he can talk

15   about, which are reflected in the ledgers -- and I'm sure my

16   co-counsels will strike me in the head if I'm getting this

17   wrong -- the two shipments that are the seizures, the

18   Lena Maria and the San Jose, those occurred after he went to

19   Brazil.  Those are reflected in the ledgers; but as

20   Your Honor has made clear, those ledgers will not come in.

21           But he absolutely has knowledge of those shipments

22   and can talk about those shipments himself.

23           THE COURT:  Independent of the ledgers?

24           MR. ROSALES:  Independent of the ledgers, because,

25   again, he was the leader of the organization.  He authorized

1    the shipments to occur.  He knew who they were going to

2    based on his communications with co-conspirators.

3              THE COURT:  Remind me.  Did he have any firsthand

4    interaction or contact with the defendant?

5              MR. ROSALES:  He did, Your Honor.

6              THE COURT:  In person?

7              MR. ROSALES:  In person.

8              THE COURT:  Okay.  Very good.  Thank you.

9              Okay.  That gets us to -- that was No. 11.

10             Of course, they're not necessarily going to be

11   introduced in this order, right?  This is just a numbering

12   system.

13             MR. ROSALES:  We tried.

14             And we added a footnote saying that, obviously,

15   due to unforeseen circumstances, we may need to switch our

16   witness order around, but we'd like to keep it in this

17   order.  Things may change.

18             THE COURT:  All right.

19             MR. ROSALES:  And if Your Honor would permit,

20   it may go a little smoother today if each of us sort of does

21   our own witnesses.

22             THE COURT:  Sure.

23             MR. ROSALES:  So we --

24             THE COURT:  I don't care.  It's fine.  I think

25   next is 15, Jerman Perez Ocampo.

1          MS. HENRY:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. HENRY:  Your Honor, Mr. Ocampo was a Colombian

4     broker, and he was a broker between a source of supply in

5     Colombia and the defendant and his organization.

6          Essentially, the source of supply in Colombia had

7     access to transport of -- by cargo containership of coke

8     from points in Ecuador across the Pacific, to points in

9     Mexico controlled by the defendant's drug-trafficking

10    organization.

11         Mr. Ocampo was the person who brokered the deals

12    between that transporter and source of supply and the

13    defendant's drug-trafficking organization.

14         THE COURT:  Did he have firsthand involvement with

15    the defendant?

16         MS. HENRY:  Yes, Your Honor.  He was present at

17    meetings where the defendant was present to discuss strategy

18    regarding drug shipments.  In addition, he personally

19    accepted payment of money for the transport from the

20    defendant.

21         THE COURT:  When you say "broker," was he involved

22    in the arrangement from the supplier, the manufacturer of

23    the product?  Was he involved in the brokering of the deal

24    from the manufacturer to the shipment sources?

25         MS. HENRY:  Yes, Your Honor, he invested in the

1    load, the transport invested in the load, the defendant's

2    drug-trafficking organization invested in the load.  And so

3    they were all invested in getting it from Ecuador to Mexico.

4              MR. BALAREZO:  Your Honor --

5              THE COURT:  Yep.

6              MR. BALAREZO:  -- could the government identify

7    which of these witnesses will talk about which loads, the

8    seizures that we just have out there?

9              THE COURT:  If you can.  I don't know if this

10   person can be linked to any of these seizures.

11             MR. BALAREZO:  Or any of them.

12             MS. HENRY:  Your Honor, no, this witness is not

13   going to discuss the seizures for which we're introducing

14   evidence through the other law enforcement witnesses;

15   however, he can speak to a seizure that did occur.  It was

16   an unsuccessful load that was -- that he brokered that ended

17   up being seized in 2007 in Panama.  So he can talk about it,

18   but we're not going to introduce any law enforcement

19   witnesses to talk about it.

20             THE COURT:  So the seven seizures that we went

21   over yesterday, you and I, starting with the Ocean Song, and

22   ending with, in our discussions, the San Jose, he doesn't

23   have firsthand knowledge of those particular shipments?

24             MS. HENRY:  No, Your Honor.  Those were with, as

25   I understand, different sources of supply, and so he would

1    not have been able to speak about those.

2         THE COURT:  Whereas possibly -- well, you may not

3    know this, does Zambada, the first one we talked about,

4    Mr. Zambada, did he have firsthand knowledge of any of these

5    interdicted shipments?

6         MS. HENRY:  Of the seven seizures?

7         It's my understanding that yes, he did,

8    Your Honor.

9         THE COURT:  Which one was he or ones was he

10   knowledgeable about, did he have knowledge about?

11        MR. ROSALES:  Of the Gatun, Your Honor.

12        THE COURT:  Say again.

13        MR. ROSALES:  The Gatun.

14        THE COURT:  The Gatun.

15        And Ramirez, the fellow we just talked about with

16   the accounting entries --

17        MR. ROSALES:  The Lena Maria and the San Jose.

18        I can also tell you the witness we talked about,

19   another witness with letters yesterday -- let me get his

20   number, No. 16.

21        THE COURT:  16.

22        MR. ROSALES:  He is involved or has knowledge of

23   the three go-fast vessels.

24        THE COURT:  Well, we're just getting to that one

25   now.

1          MR. ROSALES:  Okay.

2          THE COURT:  Who's witness is that one?

3          MR. ROSALES:  It's Ms. Liskamm's.

4          THE COURT:  That's Elkin Caldas.

5          MS. LISKAMM:  Yes, Your Honor.

6          As we discussed briefly yesterday, this witness

7    was an accountant for a Colombian-based drug trafficking

8    organization that was supplying the Beltran Leyvas

9    organization.

10          And his ledgers reflect, as Your Honor saw

11   yesterday, notations referencing certain loads that he had

12   brokered with the broker who was working on behalf of the

13   Beltran Leyvas; specifically, he will discuss the three

14   go-fast vessels that were interdicted in November of 2007 by

15   the Halliburton, the Morganthau, and then also the Colombian

16   naval frigate.

17          THE COURT:  Okay.  So the Halliburton, Morganthau,

18   and Colombian navy interdictions?

19          MS. LISKAMM:  Correct, Your Honor.

20          THE COURT:  And he'll be testifying with regard to

21   the journal entries we have -- you have put in the --

22          MS. LISKAMM:  That's correct.  Government's

23   Exhibit 7.

24          THE COURT:  But he did not have personal

25   interaction with the defendant?

1        MS. LISKAMM:  That's correct.  He is the only

2   cooperating witness that does not have firsthand personal

3   interaction with the defendant.

4        THE COURT:  All right.  Alejandro Tascon

5   Rodriguez, No. 17.

6        MS. LISKAMM:  Yes, Your Honor.  This individual

7   first met the defendant and his brothers in the 1990s, where

8   he worked with the defendant and his brothers to receive

9   airplanes full of cocaine on airstrips in Mexico that were

10  then transported to the United States.

11       During that time, he had firsthand dealings with

12  the defendant, and, obviously, the co-conspirators, the

13  brothers.

14       The defendant then, in the early 2000s --

15       THE COURT:  You're going to be contending that

16  he's a co-conspirator with this defendant?

17       MS. LISKAMM:  That's correct, Your Honor.

18       THE COURT:  Even though he may be part of a second

19  organization?

20       MS. LISKAMM:  Well, as Your Honor will hear is our

21  belief, that he at one point in time was a broker for the

22  Beltran Leyva organization, and I'll get to that in one

23  second.

24       Prom approximately 2001 to 2005, this defendant

25  worked as an accountant for an individual who partnered with

1    the defendant on loads that were coming from Colombia.

2    And so this individual had -- this witness had knowledge of

3    all the loads the defendant was investing in with this

4    partner, his name is Julio Beltran, who's not a familial --

5    does not have familial relationship with the defendant.

6              THE COURT:  This is the one whose code name was

7    Mugre.

8              MS. LISKAMM:  This witness's code name is Mugre,

9    yes, Your Honor.

10              THE COURT:  He's referenced in the earlier

11    witness's journal, Caldas's journal.

12              MS. LISKAMM:  That is correct, Your Honor.

13              THE COURT:  This Mugre.

14              MS. LISKAMM:  That's correct.

15              THE COURT:  What does Mugre mean?

16              MS. LISKAMM:  I am not at all fluent in Spanish.

17    It means something dirty or has something to do with dirt.

18              THE COURT:  Interesting.

19              All right.  So for a period of time, he was --

20    your contention will be that he was part of the organization

21    itself?

22              MR. THOMPSON:  That's correct, Your Honor.

23              After he worked as an accountant for Julio

24    Beltran, who was eventually killed by leaders of the

25    defendant's organization, as well as the Sinaloa Cartel, the

1    defendant began working as a broker for -- excuse me, this

2    witness began working as a broker for the defendant and his

3    brother Arturo Beltran Leyva to negotiate broker loads

4    between the Beltran Leyva organization and the Ramone

5    Quintero organization in Colombia, which is reflected in the

6    ledgers which are Exhibit 7.

7                THE COURT:  Okay.

8                MR. BALAREZO:  Your Honor --

9                THE COURT:  Yeah.  Come on up.

10               MR. BALAREZO:  I'm going to have to raise this

11   now, because it's going to be a big issue at trial.

12               The government continually says "the defendant's

13   organization."

14               First of all, Alfredo Beltran Leyva is on trial

15   here.  If these witnesses have anything to say about him,

16   I think that's what they need to tell us; not that they work

17   with his organization.  And if they did work with his

18   organization, then they need to know how that -- how my

19   client fit into the organization and what he did.

20               They can't just try "Beltran Leyva organization,"

21   and throw a lot of stuff up there and smear my client.

22   They need to be specific about what these witnesses did with

23   him, what my client did, what his role was.  Not just say

24   they worked with the defendant's organization, because that

25   really is going to be prejudicial, Your Honor.

1          And I can just foresee a lot of objections at

2     trial with this, and I think the government needs to be a

3     little bit more specific.

4          THE COURT:  Well, we're not -- I'm not trying to

5     get from the government today every single little detail.

6          MR. BALAREZO:  I understand.

7          THE COURT:  I'm trying to get an overview of who

8     these cooperators are and how they fit into this mosaic so

9     I can get some sense of where, factually, they're going to

10    add value.  And if there's any that are going to be

11    redundant, then deal with some of that right now, deal with

12    that problem right now.

13         It looks, so far, like they've taken to heart the

14    Court's admonitions to try to stay focused, stay narrow, and

15    get in the evidence that they believe is necessary to prove

16    their case.  And I'm actually pleased to see that they've

17    taken it to heart.

18         Now, oh, the proof is in the pudding.

19         MR. BALAREZO:  Absolutely.

20         THE COURT:  Now, the proof is in the pudding.

21         But absolutely, the government is entitled, if it

22    has the evidence, to demonstrate that the defendant was part

23    of an organization.  There's no prohibition legally on doing

24    that, certainly.

25         I understand your point about doing what I

1   admonished the government yesterday to avoid doing, which is

2   painting with a broad brush and painting unfairly with a

3   broad brush to, you know, try to dirty up this defendant

4   unfairly.  So I will be on guard to make sure that that's

5   not happening.

6           And we're going to do everything that I can --

7   I'm going to do everything I can to keep to an absolute

8   minimum, to keep out of this case -- you know, as I've said

9   many times before -- turning this into a trial of the

10  Federation, turning this into a trial of the Sinaloa Cartel.

11  We're not going to do that.

12          And we're going to make every effort to keep this

13  focused on the defendant, his conduct, those he conspired

14  with, that they allege he conspired with, and their efforts

15  to prove that beyond a reasonable doubt.  That's what we're

16  going to do.

17          MR. BALAREZO:  Thank you.

18          THE COURT:  Now, all right.  That gets us to

19  No. 23, Harold Mauricio Ortega?

20          MR. ROSALES:  Your Honor, this witness was,

21  perhaps, the main broker for the Beltran Leyvas organization

22  from approximately 2003 until approximately 2010, resided in

23  Mexico, worked very closely with the defendant and with his

24  organization, and perhaps was the defendant's principal

25  supplier of cocaine in Mexico.

1           THE COURT:  Say that -- I don't know.  Say that

2     again.  He was a broker, right?

3           MR. ROSALES:  Correct.

4           THE COURT:  So he would -- if I understand you

5     correctly, you're going to have evidence that he would

6     arrange for the manufacturers of the cocaine in Colombia to

7     provide that cocaine to this defendant's organization so

8     that they could then transship it to the U.S.

9           MR. ROSALES:  Correct.

10          THE COURT:  Generally, that's your hope.

11          MR. ROSALES:  And there's a second part of that,

12    in that he will explain that for, I would say, almost every

13    shipment that he brokered, there were two portions to that

14    shipment.  One portion was the initial Mexican investment,

15    meaning that the Mexicans purchased that cocaine at the

16    Colombian price before it left Colombia.

17          So, for example, if there's a shipment of 10,000

18    kilograms of cocaine, 5,000 kilograms, from the moment that

19    that shipment leaves Colombia, belongs to the defendant and

20    his organization and other co-conspirators.  The other 5,000

21    still belongs to the Colombian sources of supply.

22          The system in place during the time period of this

23    defendant's testimony was that once the entire shipment

24    arrived in Mexico, this witness was responsible for the sale

25    of the Colombian portion of that shipment; and that the

1   person who he sold a majority of those shipments to, the

2   Colombian portion, was the defendant.

3          That's why I say that he was, the defendant, one

4   of the defendant's principal suppliers of cocaine in Mexico,

5   because once he received the Colombian portion of these

6   portions, he had an arrangement with the defendant in his

7   organization to sell that cocaine to the defendant.  Then

8   the defendant would distribute portions of that, if not all

9   of it, to the United States.

10         THE COURT:  So would it be fair to say he'll

11  provide evidence of negotiating the terms of the deal --

12         MS. LISKAMM:  Yes, Your Honor.

13         THE COURT:  -- with this defendant?

14         MR. ROSALES:  He negotiated the terms of the deal

15  with the defendant's brother, Alfredo Beltran Leyva, and he

16  was in communication with the defendant about the shipments

17  once the defendant received them.

18         THE COURT:  So he had firsthand dealings with --

19         MR. ROSALES:  Yes.  Firsthand dealings with the

20  defendant.

21         THE COURT:  During that period of '03 to '10.

22         MR. ROSALES:  '03 to '08, because in 2008 is when

23  the defendant was arrested.

24         THE COURT:  Right.  '03 to '08.  All right.

25         24, Jorge Gustavo Kessler.

1           MS. HENRY:  Yes, Your Honor.

2           Mr. Kessler was a pilot -- excuse me.  He was

3   responsible for the airline operations for a

4   drug-trafficking organization that worked for members of the

5   defendant's organization, and his expertise is in all manner

6   of airline regulations, and essentially, the shipment of

7   both cocaine, as well as money for payments for that

8   cocaine.

9           So during --

10           THE COURT:  Airline shipments out of Mexico into

11   the U.S.?

12           MR. ROSALES:  No.  Between suppliers in Venezuela

13   and Colombia to Mexico.

14           THE COURT:  Okay.

15           MS. HENRY:  To and from.

16           In addition, he attended meetings where the

17   defendant was present discussing strategy for drug

18   shipments, and has personally observed the defendant make

19   payments to public officials in Mexico.

20           THE COURT:  What years was he involved in this

21   organization and behavior?

22           MS. HENRY:  Your Honor, it was approximately

23   between 2003 and 2007.

24           THE COURT:  Sergio, looks like, Brogon.

25   I'm not sure if that's how you say it, but it's No. 27.

1           MS. LISKAMM:  Yes, Your Honor.

2           This individual was involved with the defendant

3    and his organization from approximately 2001 up until,

4    I would say, 2009 or '10.

5           During the beginning of his involvement with the

6    organization, he was responsible for setting up what can be

7    referred to as a drug corridor, where payments were made to

8    check points to allow for safe passage of loads of cocaine

9    through Mexico.

10           He was also in charge -- for a period of time, he

11    worked on a day-to-day basis with the defendant in Culiacán,

12    where he was in charge of the defendant's security.

13           THE COURT:  In what town?

14           MS. LISKAMM:  In Culiacán, Your Honor.

15           THE COURT:  How do you spell that?

16           MS. LISKAMM:  C-u-l-i-a-c-a-n.  That's in Sinaloa.

17           And during that time, he had, like I said,

18    day-to-day interactions with the defendant, who was in

19    charge of the defendant's personal security.

20           He worked with the defendant to ensure that the

21    public and law enforcement government officials were

22    appropriately paid off to allow the defendant and his

23    organization to operate safely in Mexico and transport their

24    loads north to the United States.

25           He was also present with the defendant when the

1   defendant conducted morning meetings in which the defendant

2   would check in with the plaza bosses of the border towns to

3   check on the status of loads being crossed into the

4   United States and the movement of money back from the

5   United States into Mexico for the payment of those loads.

6          This witness would also be able to testify as to

7   the defendant's involvement in methamphetamine, with

8   receiving ephedrine, cooking it in labs to create ice, and

9   then transporting that ice into the United States.

10          THE COURT:  That gets to a different point;

11  I'm glad you raised it.

12          Of course, the conspiracy charge not only involves

13  cocaine, but methamphetamine.

14          What do you believe the evidence will be that --

15  this is the first time, I think, you've mentioned meth with

16  these cooperators -- would be as to what the sourcing of the

17  methamphetamine was.  Where is it coming from?

18          MS. LISKAMM:  The ephedrine is coming from India.

19          We believe the testimony will show that one of the

20  defendant's brothers, Hector Beltran Leyva, was receiving

21  ephedrin from India, obviously on a boat, and then that

22  ephedrine was being sent to the defendant in Culiacán,

23  where, like I said, it was being cooked into ice and then

24  transported to the United States, and that the defendant was

25  responsible for both turning the ephedrine into ice and

1   transporting it to the United States.

2           THE COURT:  When you say "ice," what do you mean

3   by that?

4           MS. LISKAMM:  Like crystal, it looks like a clear

5   glass block.

6           So the defendant -- this witness will be able to

7   discuss both the defendant and the organization in general,

8   his participation in public corruption in order to allow

9   their loads to be successfully transported throughout

10  Mexico, and also ordered to determine if there are going to

11  be any law enforcement actions against them and to find out

12  information or intel about rival cartels as well.

13          Additionally, this witness was still working for

14  the organization after the defendant's arrest in 2008 and is

15  aware of the defendant's conduct while in custody, both that

16  he continued to have control over the organization from his

17  time in custody, as well as attempts or plans to break the

18  defendant out of custody, which obviously did not go

19  through, were not successful.

20          THE COURT:  Well, this, because of the breadth of

21  topics that you, apparently, hope to examine this witness as

22  to, there will, undoubtedly, be a series of possible

23  objections.  Mr. Balarezo is not a shy, retiring fellow, nor

24  should he be, as to the intrinsic value to the conspiracy of

25  these -- certain of these acts.

1          And obviously, we're quite a ways away from this

2   particular witness.  If you're going to use this roughly as

3   the batting order, this would put him towards the end of

4   your evidence, at least based on these numbers.

5          So I'm cautioning you as to, you know, using your

6   best judgment as to how many husher conferences at this

7   bench we're going to need to have as we go through this

8   witness at a point where the jurors will have already been

9   here two months and their patience will be running very low

10  probably, understandably, I might add.

11         So some of that you can anticipate and avoid, and

12  thereby save -- say, spare the jury from all those husher

13  meetings, or sending them back, even worse, back to the jury

14  room, which they, I think, hate even worse, frankly.

15         So this sounds like the first witness of the ones

16  you've mentioned where there's likely to be a lot of

17  questions and issues, objections raised as to whether or

18  not, you know, this is really intrinsic to the conspiracy

19  charged here, whether or not this is objectionable under

20  403, and whether or not 404(b) will apply to a lot of the

21  evidence that you're planning to try to introduce through

22  this particular cooperator.  So a word to the wise is

23  sufficient.

24         MS. LISKAMM:  Understood, Your Honor.

25         And we've noticed a good amount of this witness's

1   testimony in our motion to admit other crimes evidence that

2   we filed --

3            THE COURT:  Right.

4            MS. LISKAMM:  -- some time ago so that the Court

5   at least -- the defense is on notice and also the Court is

6   aware of what the government seeks to introduce.

7            THE COURT:  Yeah.

8            Well, it's been a while since I read that.  I did

9   read it back then, but I have an unsettling recollection

10  that a lot of what was being represented in there related to

11  not just this defendant but his interactions with the

12  Federation and El Chapo.

13           And maybe I have a bad recollection, maybe I need

14  to go back and re-read it more carefully, but I just sort of

15  have this reflection in hindsight of it being a little far

16  afield.

17           MS. LISKAMM:  And, Your Honor, just to clarify,

18  again, we have absolutely taken to heart what Your Honor has

19  said about not going into the Federation and the Sinaloa

20  Cartel and the evidence, some of which I mention now, that

21  we will be seeking to introduce as inextricably intertwined

22  or 404(b).  We have tried to limit it as much as possible to

23  this defendant specifically or some of his very close

24  co-conspirators, such like his brother Artura Beltran Leyva;

25  and, as I'm sure the Court will hear during trial, how close

1  in the business relationship they have with each other.

2  So it will obviously --

3  THE COURT:  Well, his brother is deceased, as

4  I understand.

5  MS. LISKAMM:  That's correct.  He was killed in

6  2009.

7  THE COURT:  Yeah.

8  MS. LISKAMM:  So we're happy to provide any

9  further information for the Court.

10  But I believe what was put into our motion was

11  very much narrowed down and tailored from the wide breadth

12  that could have been under the theory that -- of the

13  federation or the Sinaloa Cartel.

14  THE COURT:  All right.  No. 30, Edgar Valdez

15  Velirio.

16  MS. LISKAMM:  Your Honor, this witness was a top

17  lieutenant for the organization.  His -- he had a number of

18  responsibilities, but sort of the main ones were he -- were

19  that he ran a plaza for the organization that was the area

20  where the majority of the maritime loads were coming into

21  Mexico.

22  THE COURT:  Did you say a plaza?

23  MS. LISKAMM:  That's correct, Your Honor.

24  THE COURT:  What's a plaza?

25  MS. LISKAMM:  They're like zones that a

1  drug-trafficking organization controls.  In this case, it

2  was Acapulco, the City of Acapulco.

3          THE COURT:  Acapulco?

4          MS. LISKAMM:  Yes.

5          This individual also ran a number of the border

6  plazas, which are obviously integral to this organization to

7  get their loads into the United States.

8          Also very important, he was present with Artura

9  Beltran Leyva, when Artura Beltran Leyva would have daily

10  conversations with the defendant to discuss the status of

11  drug loads, money movement, what was happening with the

12  organization, and he was privy to all those conversations.

13          THE COURT:  The defendant was present for that?

14          MS. LISKAMM:  No.  These were radio

15  communications, so they were, I guess --

16          THE COURT:  His brother.

17          MS. LISKAMM:  Yeah.  They were like akin to being

18  on speakerphone.  So these are conversations between the

19  brother, Artura Beltran Leyva, and the defendant, and this

20  witness was present for those conversations.  And those were

21  pretty much on a daily basis.

22          He also was present and participated in meetings

23  with the defendant, his brother, Artura, and the top leaders

24  of the Sinaloa Cartel to discuss the status of shipments and

25  where loads were being sent and where -- sort of where they

1    were at with receiving the loads, transporting them north.

2            And he also invested in loads with the defendant.

3            THE COURT:  So he had firsthand dealings in person

4    and over the telephone?

5            MS. LISKAMM:  That's correct, Your Honor.

6            THE COURT:  What years, roughly?

7            MS. LISKAMM:  I would say from about 2003 up until

8    the defendant's brother's death in 2009.

9            2001, Your Honor.  I apologize.

10           THE COURT:  2001?

11           MS. LISKAMM:  Yes.

12           THE COURT:  All right.  That gets us to 33,

13   Margarito Flores.

14           MR. BALAREZO:  Your Honor, before we move forward,

15   if I could just go back to Sergio Villareal Barragan,

16   El Grande.

17           THE COURT:  Who are you talking about?

18           MR. BALAREZO:  This is the guy where the Court

19   asked about the meth, the first mention of methamphetamine,

20   two back.

21           THE COURT:  No. 27, Sergio Barragan?

22           MR. BALAREZO:  Villareal Barragan.

23           THE COURT:  Now, hold on now.

24           MR. BALAREZO:  He goes by the name of El Grande,

25   if that'll be easier.

1          B-a-r-r-a-g-a-n, Barragan.

2          MR. BALAREZO:  Right.  That's the second last

3     name, but that's the one I'm talking about.

4          THE COURT:  Villareal was the name before that?

5          MR. BALAREZO:  Right.

6          The issue we have with this, Your Honor, is we

7     litigated the issue of the Rule of Specialty, and the Court

8     has already ruled on our motion.

9          And if the Court recalls, our argument was that

10    when the United States requested the extradition of

11    Mr. Beltran Leyva in the affidavits, the only real drug

12    activity that was mentioned in the United States was the

13    seizure of cocaine, four kilos and 30 odd pounds of meth,

14    methamphetamine in Washington state in Centralia.  And I

15    believe that our argument was that basically that's what

16    Mr. Beltran Leyva was extradited for, and that's what he

17    should be charged for.

18         The Court denied, in part, our motion; however, we

19    do have an issue with the fact that these are the facts that

20    were sent to Mexico for him to be extradited on.  We still

21    believe that's what Mexico extradited him for, and

22    my understanding is the government intends not to put on any

23    evidence of that particular event.

24         I think that's just very -- it's, for lack of a

25    better word, duplicitous, on the government to send that

1   information to Mexico, talk about the seizure, talk about

2   the investigation that began in 2009, talk about these calls

3   that they recorded, talk about all these other things to

4   happened in Centralia, and then there's absolutely nothing

5   in this trial that's going to have to deal with that.

6         They haven't listed anything on the exhibit list.

7   They haven't listed anyone on the witness list pertaining to

8   that.  They didn't name an expert -- a chemist in their

9   expert disclosure; however, that chemist is not listed as a

10  witness in the list that we've gotten.

11        So I would, at the very least, say that

12  methamphetamine should not even be in this case, if all

13  they're going to rely on at this point is for El Grande to

14  talk about some meth- -- some shipments from India, and then

15  things that are being converted in Mexico and sent to the

16  United States.  There's absolutely going to be no

17  corroboration if they're not even going to use the evidence

18  from Washington state.

19        So they're trying to have it both ways:  Ask for

20  Mexico for this particular incident, yet at trial, he's not

21  going to be tried for that.  And I think that is an issue,

22  and we would ask the Court to revisit our motion in light of

23  that.

24        THE COURT:  I think he's arguing you need to

25  introduce more evidence.

1          MR. ROSALES:  I think he's forgetting what the

2    Court has asked the government to do, which is to narrow

3    down its case.

4          And in this particular case, with the seizure that

5    we would have to introduce, which occurred in the

6    United States, we would have to call seven law enforcement

7    witnesses for just that one seizure.

8          Based on the Court's directive in this case, the

9    government did not feel it prudent to put forth the seizure

10   of that -- the evidence of that seizure in the

11   United States.

12         The other issue --

13         THE COURT:  Do you see that that would, in some

14   way, raise an issue with regard to the, you know, prior

15   ruling of the Court?

16         I mean, I can't, off the top of my head, think it

17   would, but I mean.

18         MR. ROSALES:  I don't think it does, Your Honor,

19   because I think that your ruling focused on the language in

20   what we -- what is titled the Aguerda, the last portion of

21   the document, which I think Your Honor has taken as the

22   order -- the so-ordered section of the extradition.

23         On top of that, the government provided, in its

24   motions and in oral arguments, evidence to the Court that

25   more than just the Centralia, Washington seizure was

1    introduced as part of the extradition package.

2          In fact, I mean, now that we're naming names in

3    open court, one of the witnesses who provided an affidavit,

4    which the Mexican government considered and found to be

5    truthful and valid, was that of Alejandro Tascon, who is one

6    of the witnesses that the government is presenting at trial

7    who had direct dealings with the defendant and other members

8    of his organization.

9          THE COURT:  Well, let me ask you this question.

10         Since you're not going to be introducing -- at

11   least my understanding so far is that you're not going to be

12   introducing a shipment of methamphetamine that was seized,

13   why do we need to go into methamphetamine at all?

14         You've got, obviously, lots and lots and lots and

15   lots of evidence that you've proffered, and you've provided

16   discovery to the defense relating to cocaine shipments from

17   Colombia into Mexico and then to the United States.

18   Wouldn't it just be cleaner to just -- and neater and more

19   easily digestible for the jury to just focus on the cocaine?

20         MR. ROSALES:  I think, Your Honor, in this case,

21   we've made the methamphetamine portion of this trial very

22   clean and neat by presenting it through one witness, which

23   counsel is more than free to cross-examine on, and I'm sure

24   that counsel's closing arguments will focus on the fact

25   that, out of all 34, 35 witnesses that the government

1    presented, only one of them talked about methamphetamine.

2            In this particular case, in order to follow the

3    Court's directive, I think that we have other witnesses who

4    are testifying at this trial who could talk about the

5    defendant's involvement in his organizations involving

6    methamphetamine; however, the story itself would not be as

7    clean and neat as presented by this particular witness.

8    So we'd ask the Court's indulgence, that given --

9            THE COURT:  Well, of course, it's conspiracy to

10   distribute methamphetamine, it's not possession with intent

11   to distribute methamphetamine.

12           MR. ROSALES:  Correct.

13           THE COURT:  And there, obviously, is an elemental

14   difference between the two from the burden-of-proof point of

15   view.

16           MR. ROSALES:  Correct.

17           THE COURT:  So you don't have that burden.

18           It is a conspiracy -- it's a component of the

19   conspiracy charge.  Yeah, I see your point.

20           MR. ROSALES:  Thank you, Your Honor.

21           THE COURT:  Margarito Flores.

22           MS. LISKAMM:  Your Honor, this witness will

23   testify about face-to-face personal dealings with the

24   defendant in 2000.

25           THE COURT:  Co-conspirator?

1          MS. LISKAMM:  Yes, co-conspirator, in 2005 in

2     which this defendant spoke to -- excuse me, this witness

3     spoke to the defendant about specific shipments of cocaine

4     that this witness received from the defendant in Chicago,

5     and one of those loads, a portion of the load was then

6     transported here to Washington, D.C.

7          THE COURT:  So this witness is -- was he a part of

8     the organization?

9          MS. LISKAMM:  Yes, Your Honor.

10          THE COURT:  And you said he received a shipment

11     from Mexico in Chicago?

12          MS. LISKAMM:  That's correct, Your Honor.  He had

13     his workers receive it in Chicago.

14          THE COURT:  Was he personally in Chicago or no?

15          MS. LISKAMM:  No.  He was personally in Mexico

16     with the defendant.

17          THE COURT:  And then that shipment was

18     transshipped from Chicago to Washington, D.C., or some

19     portion of it?

20          MS. LISKAMM:  A portion of it, yes, Your Honor,

21     that's correct.

22          THE COURT:  Can you recall what was the size of

23     this shipment to Chicago?

24          MS. LISKAMM:  I believe -- to Chicago or to D.C.,

25     Your Honor --

1          THE COURT:  To Chicago.

2          MS. LISKAMM:  I believe it was just under 300

3    kilograms.  Just one shipment, there were several shipments.

4          THE COURT:  And how much of that came to D.C.,

5    allegedly?

6          MS. LISKAMM:  From that one shipment, the portion

7    that came to D.C. was around 30 kilograms.

8          THE COURT:  So he dealt with the defendant between

9    '05 and, what, '08' when he was --

10          MS. LISKAMM:  Yes, Your Honor.

11          THE COURT:  And that gets us to the last one,

12    Mario Pinedo Alvarez Correa.

13          MS. HENRY:  Yes, Your Honor.

14          Your Honor, this witness was a Colombian who

15    supervised the movement of money between Mexico City and

16    Colombia for the defendant and his drug-trafficking

17    organization between approximately 2003 and 2009.

18          THE COURT:  So money from Mexico to Colombia?

19          MS. HENRY:  Yes, Your Honor.

20          THE COURT:  So he -- this is a co-conspirator

21    also?

22          MS. HENRY:  Yes, Your Honor.

23          THE COURT:  Did he have direct dealings with the

24    defendant?

25          MS. HENRY:  Yes, Your Honor, he was present.

1    He had regular meetings with the defendant's -- in which the

2    defendant's brother Artura and others were present.

3            The defendant was present at the meetings, and

4    this witness was privy to conversations between the

5    defendant and others regarding potential drug shipments.

6            In addition, this witness also personally accepted

7    a payment of $6 million from the defendant in Culiacán in

8    order to invest in an additional drug shipment.

9            THE COURT:  Directly from the defendant?

10           MS. HENRY:  Yes.

11           THE COURT:  So what years did he deal with the

12   defendant?

13           MS. HENRY:  His overall money or his actual

14   interactions with the defendant?

15           THE COURT:  Let's say interactions with the

16   defendant.

17           MS. HENRY:  That was between -- that was in

18   approximately 2007.

19           THE COURT:  Did he deal with the defendant

20   personally before then?

21           MS. HENRY:  No.

22           THE COURT:  No.  So he only -- only one year, he

23   worked directly with the defendant?

24           MS. HENRY:  Where he had personal interactions

25   with the defendant in person and also with respect to

1   receiving the payment of the money.

2          THE COURT:  In '07?

3          MS. HENRY:  Yes.

4          THE COURT:  Very good.  All right.

5          Did you have any question, Mr. Balarezo, about

6   that particular one or no?

7          MR. BALAREZO:  No, Your Honor.  I just have some

8   other questions that we can deal with once we finish with

9   these witnesses, unless we're done.

10         THE COURT:  Well, I thought we'd take a ten-minute

11  break for my court reporter here, especially, and then we'll

12  come back and talk about the exhibits and get back.  We'll

13  probably go to about 1:00 before we take a lunch break,

14  okay?

15         I'll see you in about ten minutes.

16         DEPUTY CLERK:  All rise.

17         This Honorable Court stands in recess.

18         (Recess from 12:15 p.m. to 12:31 p.m.)

19         DEPUTY CLERK:  The Court is again in session.

20  Please be seated and come to order.

21         THE COURT:  All right.  Are we ready to go over

22  the exhibit list?  First exhibit is Ocean Song photographs.

23         MS. LISKAMM:  That's correct, Your Honor.

24         THE COURT:  Who took these photographs?

25         MS. LISKAMM:  Members of the U.S. Coast Guard,

1   Your Honor.

2           THE COURT:  Is there any issue about these

3   photographs that you anticipate, Mr. Balarezo?

4           MR. BALAREZO:  Your Honor, I haven't listened to

5   the testimony.  I think I would still have to have some sort

6   of confirmation of the witnesses that they present that they

7   would be able to authenticate them.

8           THE COURT:  Will any of the witnesses be the

9   people who actually took the photographs?

10           MS. LISKAMM:  In some cases, yes, Your Honor.

11           But in all the cases, the U.S. Coast Guard were

12   present for the interdiction and observed everything that's

13   in the photograph and will be able to testify that they're

14   fair and accurate depictions of the interdiction in this

15   case of the Ocean Song, which should establish the

16   authentication requirements under 901.

17           THE COURT:  Looks like there's 15 photographs.

18           MS. LISKAMM:  That's correct, Your Honor.

19           THE COURT:  Okay.  Why is there a second set of

20   photographs from the -- have to do with the chemist?

21           MS. LISKAMM:  So when the drugs are taken to, in

22   this case, the DEA Southeast Lab, when the chemists receive

23   the photographs, they photograph the individual kilos.

24           So as the Court can see in Exhibit 2, it shows any

25   markings on the kilos.  It basically just documents the

1    condition of the kilograms of cocaine when the chemists

2    receive them before they conduct their testing.

3           So those photos were actually taken by the chemist

4    who will be testifying in court.

5           THE COURT:  Is there any issue, Mr. Balarezo, as

6    to the condition they were received in?

7           MR. BALAREZO:  I believe, Your Honor, we had this

8    issue yesterday.

9           As I mentioned earlier, I can't answer until the

10   testimony.  I think there may be an issue with respect to

11   chain of custody that I raised yesterday, and we intend to

12   raise it, if it is an issue.

13          So you know, I've seen the photographs,

14   I don't know anything about them beyond what the government

15   is saying.

16          THE COURT:  Chain-of-custody issues from what

17   point to what point?

18          MR. BALAREZO:  Well, Your Honor, my understanding

19   is that at least on the maritime seizures, either the Coast

20   Guard or the Colombian seized drugs from various vessels.

21          The witnesses that the government described

22   yesterday are going to be individuals who came in and who

23   boarded the vessels, searched, found the drugs and seized

24   it.

25          Then there was, I believe, a mention of one or two

 1   DEA agents, who, apparently, took the drugs -- and keep in

 2   mind, these are hundreds, thousands of kilos -- took the

 3   drugs somewhere, and from there, I don't know where it went.

 4           Eventually, some of it made its way to a chemist

 5   for the DEA.  I don't know what happened in between the

 6   DEA -- generally, between the boat and the chemist, and

 7   I don't know what happened after the chemist.  So those are

 8   the chain-of-custody issues I intend to raise, if I see

 9   there are any.

10           THE COURT:  So, Ms. Liskamm, are you going to have

11   someone who can testify from personal knowledge of what

12   happened once they were taken into custody initially by DEA

13   agents from the Coast Guard and then what the path was of

14   custody from that point to the chemist's office?

15           MS. LISKAMM:  Yes, Your Honor.

16           There were several people involved in each seizure

17   to get it from the point of interdiction to the actual

18   chemist.

19           We are calling some of the people along the way so

20   that we're not wasting the Court and the jury's time.

21           And as the Court is aware, any sort of missing

22   link with respect to custody goes to weight as to

23   admissibility.  As the Court saw as we went through our

24   witness list yesterday, we have, I believe, at least five

25   witnesses who will be testifying as to chain of custody.

1          And just so the Court's aware, we have the

2    U.S. Coast Guard interdiction.  You know, most of the cases

3    in the eastern Pacific Ocean, the drugs are seized, they're

4    then transported by the Coast Guard, in most cases, to

5    Panama, where the DEA comes and receives the drugs and

6    brings them back to Florida.

7          When the DEA takes custody of the drugs, they're

8    assigned a DEA case number, and then they're ultimately

9    brought to the, again, DEA Southeast Lab, where the chemist

10   will test them.  So we believe that we'll be able to show

11   them through the witnesses that we're calling at trial.

12          THE COURT:  Once they're tested, they're

13   destroyed?

14          MS. LISKAMM:  I believe they were kept for a

15   period of time.

16          And, yes, all of the drugs related to the seizures

17   we're planning on introducing were destroyed, as these were

18   seizures from 2004 and 2007.

19          THE COURT:  All right.

20          3 is Ocean Song Seizure Laboratory Report.

21          MS. LISKAMM:  That's correct, Your Honor.

22          THE COURT:  All right.  And you have the witness

23   who actually did that?

24          MS. LISKAMM:  That's correct.  We're calling

25   Scott Goodlin whose name and signature is on that report.

1          THE COURT:  Next is the Exhibit 4, Gatun Seizure

2     photographs?

3          MS. LISKAMM:  That's correct, Your Honor.

4          THE COURT:  Same as -- I guess, similar to the

5     ones that you've already gone over?

6          MS. LISKAMM:  That's correct.  Taken by the

7     U.S. Coast Guard.

8          THE COURT:  Any issues with those photographs

9     other than the ones you've already addressed?

10          MR. BALAREZO:  Same issues.

11          THE COURT:  No. 5 is the Gatun Seizure laboratory

12     reports.  You'll have the witness who prepared that, right?

13          MS. LISKAMM:  Yes, Your Honor.  Ethan Jolly.

14          THE COURT:  6 is Gatun Seizure chemist

15     photographs.

16          MS. LISKAMM:  And these are the photographs taken

17     by the chemist Ethan Jolly, again, when he received the

18     kilograms at the lab.

19          THE COURT:  And you'll have a witness who will

20     take care of the chain-of-custody issues?

21          MS. LISKAMM:  That's correct, Your Honor.

22          THE COURT:  Okay.  7 is the call-desk ledgers?

23          MS. LISKAMM:  Yes.

24          THE COURT:  We talked about that yesterday.

25     We looked at them, actually, yesterday.

1          MS. LISKAMM:  Yes, Your Honor.

2          THE COURT:  They have the reference to one of the

3    cooperators whose code name was Mugre, as I recall it.

4          MS. LISKAMM:  Yes, Your Honor.

5          THE COURT:  These are all documents that he

6    personally prepared?

7          MS. LISKAMM:  That's correct, Your Honor.

8          THE COURT:  Now, some of them are handwritten.

9    I assume he will be able to identify his own handwriting?

10         MS. LISKAMM:  Yes, Your Honor.

11         THE COURT:  Some of them are typed.

12         MS. LISKAMM:  Yes, Your Honor.

13         THE COURT:  Now, when they were seized, they were

14   in the typewritten -- the ones that were typed were in a

15   typewritten form?

16         MS. LISKAMM:  Yes, Your Honor.

17         THE COURT:  They were on a laptop?

18         MS. LISKAMM:  Yes.  They were -- if I recall

19   correctly, they were on a hard drive.

20         So the handwritten ones he had written and scanned

21   into the hard drive.  And then obviously, the typed ones, he

22   had written on a word processer, and they had all been saved

23   onto the hard drive together.

24         THE COURT:  All right.  So how will these -- how

25   will you seek to introduce these?

1          Who will be the witness who will deal with the

2    seizure of these or the acquisition of these records?

3          MS. LISKAMM:  I plan on introducing them through

4    Elkin Soto.  He voluntarily turned them over to DEA when he

5    was arrested in this case, and he will be able to

6    authenticate them that this is his handwriting; these are

7    the ledgers that he authored and maintained as the

8    accountant for this Colombian DTO.

9          THE COURT:  No. 8 is the jail call?

10         MS. LISKAMM:  That's correct, Your Honor.

11         And we actually have another copy that we provided

12   to defense counsel because his copy was not working

13   previously.  I don't know if counsel has had a chance to

14   review the copy we gave him yesterday to ensure that it

15   works correctly.

16         MR. BALAREZO:  I haven't, but I will, Your Honor.

17         MS. LISKAMM:  Okay.  If it doesn't work, we will

18   try to make another copy available.

19         And we've also allowed -- or provided an

20   opportunity for defense counsel to listen to the copy on our

21   computer that does play; in addition, he has the transcript

22   to it as well.

23         THE COURT:  How long is it?

24         MS. LISKAMM:  I believe it's 12 and a half

25   minutes, Your Honor.

1              Again, we do not plan on introducing or playing

2    the entire call for the jury.  We simply plan on playing the

3    beginning of the call for witnesses to identify the voice

4    that they -- voice or voices that they are hearing in the

5    recording.

6              THE COURT:  Good.  The transcript of the jail

7    call?

8              MS. LISKAMM:  That's correct.

9              THE COURT:  Remind me, what's the substance of the

10   discussion?

11             MS. LISKAMM:  This is a discussion between the

12   defendant and his son.

13             THE COURT:  Is there anything in this particular

14   discussion with the son that's in any way incriminating?

15             MS. LISKAMM:  No, Your Honor, we're not alleging

16   that there's anything incriminating.  Again, we're simply

17   using it for voice identification.

18             THE COURT:  I don't think I'm going to allow you

19   to introduce the transcript.  I want to read it, but I

20   appreciate having the convenience of it, but my guess is a

21   portion of the 12 minutes is all you'll need for the purpose

22   of identification.  Usually, a person recognizes something

23   within a matter of a couple minutes or less.

24             MS. LISKAMM:  That's fine.

25             THE COURT:  No. 9 is the Halliburton seizure

1    photographs?

2            MS. LISKAMM:  Correct.  These are the photographs

3    of the go-fast vessels that the Halliburton interdicted.

4            THE COURT:  This was off of Ecuador?

5            MS. LISKAMM:  This was, I believe, off of

6    Colombia, but it was in the eastern Pacific Ocean.

7            THE COURT:  And who did these photographs?

8            MS. LISKAMM:  The U.S. Coast Guard.

9            THE COURT:  All right.  Video 10 is the seizure

10   video.  What do we need that for?

11           MS. LISKAMM:  So, Your Honor, U.S. Coast Guard

12   Pete Trappen, who we talked about on the witness list, was

13   in an airplane that was flying over both this go-fast vessel

14   and the one that the Morganthau interdicted and videotaped

15   the crew members of both of these go-fast vessels dumping

16   bales of suspected cocaine into the ocean.

17           So Exhibit 10 is the entire video, for

18   completeness, of the go-fast vessels attempting to elude the

19   Coast Guard cutter and then dumping the bales.  And then the

20   excerpt is just the portion of the video that deals with the

21   crew members dumping the bale into the ocean.

22           THE COURT:  That's 10A?

23           MS. LISKAMM:  Correct.

24           THE COURT:  And how long is 10A?

25           MS. LISKAMM:  If I recall correctly, the

1  Halliburton excerpt is approximately 12 minutes.

2          We do not plan on playing the whole 12 minutes for

3  the jury, as it's going to be the same thing for 12 minutes.

4  But we have narrowed it down to the entire time the crew was

5  dumping the bales over, and so we plan on playing just,

6  I guess, a portion of that for the jury.

7          THE COURT:  So the whole video is how long?

8          MS. LISKAMM:  The whole video is, I believe,

9  several hours, if I remember correctly.

10          THE COURT:  You won't be playing that, that's for

11  sure.

12          MS. LISKAMM:  No, we will not, Your Honor.

13          THE COURT:  Have you had a chance to review these,

14  Mr. Balarezo?

15          MR. BALAREZO:  Your Honor, some of the videos

16  I did, some I didn't open.

17          And I told the government that they were going to

18  make one of the videos, I think, available.  But, quite

19  frankly, if it's just a Coast Guard seizure, it's not

20  germane to what I'm trying to do.

21          THE COURT:  So you're not anticipating this will

22  be a source of objections and problems during --

23          MR. BALAREZO:  Same as the photographs, that's

24  all, just authentication on them.

25          THE COURT:  Okay.  All right.

1          11.

2          MR. BALAREZO:  Unless my client is on one of the

3  ships, but I don't think that's the case.

4          THE COURT:  You'd know that by now.

5          MR. BALAREZO:  Hope so.

6          THE COURT:  Certainly better.

7          11.1 is Halliburton and Morganthau seizure

8  photographs.

9          MS. LISKAMM:  These were photographs taken by the

10  individual who picked up the drugs from the Halliburton and

11  the Morganthau in Panama and transported them to Florida for

12  the DEA.

13          THE COURT:  DEA lab was in Miami or --

14          MS. LISKAMM:  Yes, Your Honor.

15          THE COURT:  12 is the chemist photographs?

16          MR. THOMPSON:  Correct.

17          THE COURT:  13 is a lab report?

18          MS. LISKAMM:  Correct.

19          THE COURT:  14 is a lab report also.

20          MS. LISKAMM:  Yes.

21          And so the Court's clarification, for Exhibits 14

22  and 17, they were duplicates.  There were four pages for

23  both of them that were the same lab reports twice, so we

24  broke them up.

25          We provided defense counsel with the revised

numbers, but now the Halliburton lab reports are just 14.1

and 14.2 for those specific lab reports.  And then the

Morganthau lab reports are 17.1 and 17.2.  And we have a

copy for the Court, if Your Honor would like them.

THE COURT:  Oh.  Well, yeah.  Not right now,

but...

MS. LISKAMM:  Okay.

THE COURT:  15 is the Morganthau seizure

photographs?

MS. LISKAMM:  Correct.

THE COURT:  These are Coast Guard photographs?

MS. LISKAMM:  Yes, Your Honor.

THE COURT:  15A and B are seizure videos.

B is –– is B the ––

MS. LISKAMM:  It's just an excerpt.

THE COURT:  Limited excerpt relating to the ––

MS. LISKAMM:  The bales being thrown overboard,

that is correct, Your Honor.

THE COURT:  Is that also 10 minutes or 12 minutes?

MS. LISKAMM:  No.  I believe that one is only two

and a half minutes.

THE COURT:  16 is Morganthau?

MS. LISKAMM:  These are the photos taken by the

chemist.

THE COURT:  Chemist photographs, right.

1          17 is the lab report.

2          MR. THOMPSON:  That's correct.

3          And, again --

4          THE COURT:  The Morganthau shipment.

5          MS. LISKAMM:  We've edited it down from four pages

6    that were duplicative to just two pages.

7          THE COURT:  18 is a recording of some kind

8    involving Mr. Flores.  What's this about?

9          MS. LISKAMM:  Your Honor, this recording was made

10   by Margarito Flores in which she was negotiating a drug load

11   with some of the defendant's co-conspirators who are workers

12   within the defendant's organization.

13         This recording was made after the defendant was

14   already in custody in 2008.  And in the recording, the

15   co-conspirators discuss with Margarito Flores how the

16   defendant is passing messages related to the operations of

17   the drug-trafficking organization while in custody.

18         THE COURT:  So who is Mr. Flores communicating

19   with here?

20         MS. LISKAMM:  He's speaking with an individual who

21   goes by the AKA of La Puerca, and another individual --

22         THE COURT:  Spell that for the reporter.

23         MS. LISKAMM:  P-u-e-r-c-a.

24         And another co-conspirator who goes by the AKA of

25   Musico, M-u-s-i-c o.

1          THE COURT:  And do they refer to the defendant in

2    that conversation?

3          MS. LISKAMM:  They refer to him through a code

4    name that they use for the defendant.

5          THE COURT:  Which is?

6          MS. LISKAMM:  Siete.

7          THE COURT:  Spell that, please.

8          MS. LISKAMM:  S-i-e-t-e.

9          THE COURT:  So Flores will testify that that's the

10   name they use?

11         MS. LISKAMM:  That's correct, Your Honor.

12         THE COURT:  How long is this recording?

13         MS. LISKAMM:  The entire recording, Your Honor,

14   I believe, is approximately 40 minutes.  But, again, we've

15   made an excerpt of the portion that we believe is relevant

16   for the purposes of what we plan to introduce at trial, and

17   that excerpt of the recording is Exhibit 18A.

18         And we've also provided an entire transcript of

19   the recording, which is 18B, and an excerpt of that

20   transcript related to the relevant portion, which is 18C.

21         THE COURT:  How long is the excerpted portion,

22   roughly?

23         MS. LISKAMM:  Approximately two minutes.

24         THE COURT:  Two minutes?

25         Have you had a chance to listen to this?

1          MR. BALAREZO:  Your Honor, I have the transcript.

2   I haven't compared it to the recording.

3          THE COURT:  Recording.

4          MR. BALAREZO:  But here we have one of those

5   issues where -- I understand what the rule 801(d)(1)(E)

6   says, but we have an issue here where a cooperator is going

7   to testify about a conversation with Fernandez, who is

8   La Puerca on the phone, or -- I don't know if it was in

9   person or not, because I didn't even have the date until

10  now.

11         And apparently, this other guy, this second person

12  is going to talk about being in communications with someone

13  named Siete.  So now we have hearsay within hearsay.  And

14  I mean, the government still has to show that these things

15  fit under the exception.

16         And these are the kinds of things that we have to

17  bat at here, you know, phantoms.  We have to deal with a

18  conversation that my client was not a party to.  We don't

19  know whether or not the other person on the phone, in fact,

20  is La Puerca, and we just have to kind of accept it.  And at

21  some point, some of this has to have some relevance.

22         And even with what I'm reading here, the part

23  about 7, it's on page 21.  And Fernandez, AKA, La Puerca

24  says, "No."  Then "Don't tie me up.  You all

25  (unintelligible) how things are."  [Background laughs.]

1        "Listen.  Listen.  I have been keeping in touch

2   with Siete," or 7, "because the attorney came over here to

3   see me and we went -- we sent regards with him and all.

4   (Noise), I told him to help out the friend, and we were

5   there.  But he said he had spoken with you and with the

6   doctor too and not to worry about it and that he should keep

7   pressing on with this issue and that the other stuff didn't

8   matter, that we could take care of it there, the attorney,

9   his attorney, the one who goes to see him, the trustworthy

10  attorney."

11       Then he goes on to say, "The guys were telling me,

12  well, that we were ready for five months, and it's always

13  soon and soon.  And so and, uh, you were not able to -- and

14  I do understand you."

15       THE COURT:  What's the date of the conversation,

16  Mr. Balarezo?

17       MR. BALAREZO:  I don't know the date.

18  I don't know if it's on the front.  I don't have the front

19  page with me.

20       THE COURT:  Well, hold on.

21       MR. BALAREZO:  So, apparently, it was after my

22  client was arrested.

23       THE COURT:  Well, it's got to be here.

24       MR. BALAREZO:  And the issue --

25       THE COURT:  Ms. Liskamm, what's the date of the

1    conversation?

2              MS. LISKAMM:  I believe -- Your Honor, I believe

3    it was in March of 2008.  I believe it was March 27th or

4    thereabout.  I apologize, I don't have the exact date off

5    the top of my head.

6              THE COURT:  Make sure I get it by tomorrow.

7              MS. LISKAMM:  Absolutely, Your Honor.

8              MR. BALAREZO:  And, Your Honor, the issue, again,

9    is, this call, on its face, is not saying that my client is

10   dealing drugs from jail; that he's part of the Beltran Leyva

11   organization while he's in jail.  It's not something that

12   would put him in the conspiracy.

13             THE COURT:  I'm going to review this tonight, this

14   afternoon, and tomorrow.

15             MR. BALAREZO:  Thank you.

16             THE COURT:  And if I were the government,

17   I wouldn't be certain they're going to get this in.

18             MR. BALAREZO:  Thank you, Your Honor.

19             THE COURT:  I'll take a look at it.  I'll give

20   them a chance to argue it.

21             MS. LISKAMM:  And, Your Honor, if I may, I believe

22   that the testimony at trial is going to show that

23   Margarito Flores, La Puerca, and Musico were all

24   co-conspirators with the defendant.

25             I believe that we'll be able to establish that a

1   conspiracy existed, that they were members of the

2   conspiracy, along with the defendant, and that these

3   statements were in furtherance of the conspiracy.

4           Additionally, Your Honor, I believe that the

5   evidence at trial will show, from several witnesses, that

6   this defendant was passing messages through his attorneys

7   while he was in custody in order to facilitate the

8   trafficking activities of his organization.

9           THE COURT:  These were attorneys in Mexico?

10          MS. LISKAMM:  Correct, Your Honor.

11          As well as family members who are visiting him in

12  jail as well, so...

13          THE COURT:  I understand that.

14          MS. LISKAMM:  So, Your Honor, I believe that this,

15  while on its face does not have a lot of significance, but,

16  again, the witness will be able to explain the significance

17  behind it.

18          THE COURT:  Well, let's back up again:  Want and

19  need.

20          MS. LISKAMM:  Understood, Your Honor.

21          THE COURT:  Why do you need it?

22          MS. LISKAMM:  Well, Your Honor has allowed us to

23  present evidence based on the charged conspiracy from 2000

24  to 2012.

25          The defendant is arrested in Mexico in January of

1   2008; and as we have stated in our filings and in court

2   before, our theory is that the defendant continued to manage

3   and supervise the organization from -- while he was still in

4   custody.

5          And so the way he was --

6          THE COURT:  That's certainly not necessary for the

7   purposes of proving that he was a member of a conspiracy.

8          MS. LISKAMM:  No, it's not necessary, Your Honor,

9   but it goes to show his involvement and supervision of the

10  organization from 2008 on while he was still in custody.

11  That's an additional four years of the charged conspiracy

12  that --

13         THE COURT:  Wait a minute.  I thought you just

14  told me that this conversation took place in '07.

15         MS. LISKAMM:  No.  And if I said that, I misspoke,

16  Your Honor.  It's March 27th, 2008.

17         THE COURT:  2008.

18         MS. LISKAMM:  Yes.

19         THE COURT:  So how does this --

20         Go ahead.  I haven't listened to it or read the

21  transcript, so -- and I will.

22         But how would this in any way be evidence of what

23  the defendant was doing after this particular date?

24         MS. LISKAMM:  Your Honor, this is just one more

25  example.

1          And as I said, there's going to be several

2    cooperators who are going to testify that after his arrest

3    in 2008 and continuing on, that he was continuing to order

4    and manage and supervise his workers and the people who took

5    over for him in the organization while he was in custody,

6    which is critical to show his involvement for the time

7    period after his arrest in January of 2008 on.

8          So, Your Honor, I believe that when you hear the

9    evidence at trial, that this -- not only will we able to

10   show that these are co-conspirator statements, but it will

11   also show, basically, what the defendant was doing in

12   custody.

13         THE COURT:  So legally, you don't have to prove in

14   every year between '00 and '12 that there was some overt act

15   going on in the conspiracy.  That's not necessary.  The law

16   doesn't require that.

17         MS. LISKAMM:  I understand, Your Honor.

18         THE COURT:  I understand how you might want to do

19   that.  It doesn't mean you have to do it.

20         And I have to have concerns of the prejudicial

21   effect on the defendant outweighing the probative value of

22   this particular evidence here.

23         And also, it raises concerns because the subject

24   matter involves allegations of the defendant using his

25   attorneys in Mexico as an aid or an assistance to him to

1    continue to run his drug organization, which could raise, in

2    the minds of certain jurors, questions about whether that's

3    going on to this day or whether the government's

4    ineffectively arguing it's going on today through this

5    attorney representing him here today.

6            I'm just -- I want to look -- I'm going to read

7    it, I'll listen to it, but I'm -- let's just say it's not a

8    slam dunk whether you're going to get to use.

9            MS. LISKAMM:  Your Honor, understood.

10           To be clear, we're not making any sort of

11   accusations against Mr. Balarezo whatsoever.

12           THE COURT:  No, I'm not saying you are.

13   I'm saying there's the risk the jurors might misunderstand

14   or misinterpret or might in some way prejudicially draw

15   inferences.  I can't control what they do, obviously, in

16   that regard.  And so, you know --

17           MS. LISKAMM:  If the Court had --

18           THE COURT:  I don't want to get too close to that

19   kind of an issue from the point of view of having any unfair

20   prejudice against this defendant or his counsel, for that

21   matter.

22           MS. LISKAMM:  And, Your Honor, if that is the

23   Court's concern with letting this recording in, or, like I

24   said, the testimony from several of our witnesses that we

25   anticipate at trial, I would suggest that we could possibly

1   craft a limiting instruction so as not to cast any

2   aspersions on what's been going on since the defendant has

3   been in the United States, which we're not trying to do in

4   any way whatsoever.

5           THE COURT:  I understand.

6           MS. LISKAMM:  Okay.

7           THE COURT:  All right.

8           MR. BALAREZO:  Your Honor, but with respect to

9   that date, we still have to deal with the issue that in

10  order for that recording and that La Puercas' statement

11  about being in contact with Siete, that statement has to be

12  a statement during the time of and in furtherance of the

13  conspiracy, and the government has not responded to that.

14          I mean, you know, the other defendant -- other

15  witnesses, cooperators can talk about all they want.  That's

16  fine.  But with respect to this call, how is it in

17  furtherance of the conspiracy if they're not saying anything

18  except that he's been in contact with his lawyer?

19          THE COURT:  Yeah.  I want to listen to this one.

20  And I want to read those -- that transcript.

21          MS. LISKAMM:  And, Your Honor, again, just to be

22  clear, the witnesses are going to be able to provide the

23  context for what that means.

24          As I'm sure the Court is aware, it is common

25  within the drug-trafficking world to use coded words or to

1  dance around an issue in case there is a recording being

2  made --

3          THE COURT:  Absolutely.

4          MS. LISKAMM:  -- as in this case or law

5  enforcement listening.

6          So they're not going to come out and say, oh, I

7  talked to Alfredo Beltran Leyva through his lawyer and he

8  wants us to continue drug trafficking.

9          THE COURT:  Of course not.

10         MS. LISKAMM:  So, you know, I think that, through

11 the witness, both this witness and the other cooperating

12 witness' testimony, it will be clear as to how the defendant

13 continued to operate while in custody.

14         Another idea, Your Honor, if the Court is not

15 comfortable with a limiting instruction is, we could

16 potentially sanitize both the cooperating witness'

17 testimony, as well as the transcripts, so it's not referring

18 to counsel, his Mexican counsel; but, rather, that people

19 were visiting him, and he was passing messages through those

20 people, if the Court would be more comfortable with that.

21         THE COURT:  Let me think about it.

22         MS. LISKAMM:  Okay.

23         THE COURT:  So we'll take the lunch recess.

24 We still have some more exhibits to go through.

25         Also, after lunch, Counsel, if you have in your

1    mind any type of diagram or schematic, whatever you want to

2    use in opening or whatever, you need to prescreen that with

3    the Court.

4         So if you're thinking about using something next

5    week -- now, we won't be getting to opening probably for --

6    it's going to take a couple days to pick the jury, maybe

7    more than a couple days, frankly, depending upon how it

8    goes.  But I don't want you to be caught by surprise about

9    the requirement of prescreening anything you want to use on

10   the ELMO for your opening argument.

11        So if you've got something, so to speak, that you

12   want to use, you need to make sure I see that, and your

13   opponent too, share it with your opponent; same requirement

14   for Mr. Balarezo with his -- anything he might want to use

15   in the opening argument, and to make sure everybody is on

16   the same page there and gets a chance to weigh in as to any

17   possible unfair advantage or disadvantage going on there.

18        So we'll see you at 2:30, Counsel.

19        MS. LISKAMM:  Your Honor, with respect to

20   prescreening, the government totally agrees, we just ask if

21   the Court could possibly set a deadline that the parties

22   could exchange those.

23        THE COURT:  Well, probably Thursday.  I don't know

24   how fast the jury selection is going to go, but I don't want

25   to have to hold a hearing in the middle of jury selection

1    time, because there'll be probably more than enough issues

2    in jury selection.

3             MS. LISKAMM:  So Thursday this week?

4             THE COURT:  Yeah.  It is a three-day weekend.

5    So if you've got something that you want to use in your

6    opening arguments, I don't encourage it generally, to be

7    honest with you.  I don't think it's actually prudent.

8             But if you do have something, provide those slides

9    to one another, say, by noon on Thursday, and then I'll get

10   them that afternoon and give you a chance to raise any

11   concerns you might have Friday, I guess.

12            MS. LISKAMM:  Okay.  Thank you.

13            THE COURT:  All right.  See you at 2:30.

14            DEPUTY CLERK:  All rise.

15            This Honorable Court stands in recess until

16   2:30 p.m.

17            (Recess from 1:05 p.m. to 3:00 p.m.)

18            DEPUTY CLERK:  All rise.  This Honorable Court is

19   now in session.  The Honorable Judge Richard J. Leon

20   presiding.  God save the United States and this Honorable

21   Court.  Please be seated and come to order.

22            MR. BALAREZO:  Can I just raise one issue when my

23   client comes out?

24            THE COURT:  Yes.  You have to wait until he can

25   hear.

(Defendant entered.)

DEPUTY CLERK:  Your Honor, calling Criminal Case No. 12-184, the United States of America v. Alfredo Beltran Leyva.  The defendant is present in the courtroom.

The interpreters for these proceedings, and have been sworn for the record, are Ms. Salazar and Ms. Estrada.

We have Mr. Balarezo as counsel for the defendant. Counsel for the government, we have Mr. Rosales, Ms. Liskamm, and Ms. Henry.

MR. BALAREZO:  Thank you, Your Honor.

Your Honor, it's just regarding the last thing that the Court raised before we broke for lunch concerning the slides or any material that was going to be used for opening.

THE COURT:  Uh-huh.

MR. BALAREZO:  We object to that request, Your Honor, and the reasons are this:  Mr. Beltran Leyva has a right to due process, he has a right under the Sixth Amendment to zealous representation.

And for the defense to provide the government any slides or any material that we intend to use or in opening statements on Thursday, especially before we've gotten any *Jencks*, any materials specific to the witnesses, will give the government a total preview of what our trial strategy, if you will, will be, and that's not really something that

they're entitled to.  There's nothing in the Local Rules,
there's nothing in the Federal Rules of procedure that
require that.

If the Court thinks that there's any issue with
respect --

THE COURT:  Are you planning on using slides?

MR. BALAREZO:  Well, Mr. Purpura is going to do
the opening statement, and I believe he is planning to use a
few slides.  Nothing inflammatory.  Nothing -- I think --
I think at this point, we fairly have an idea of what to do.

If the Court has any concerns, we would suggest,
then, to provide the Court the slides for in-camera review,
because the government is simply not entitled to that.
It's like giving them a roadmap to what we want to do.
And they're definitely not entitled to it before their
opening statements, so that's really our concern.  So we
respectfully object to that.

And, quite frankly, we don't really need to have
the government's.  We just heard what they're going to say.
It doesn't really matter, so...

THE COURT:  Uh-huh.

Well, that's fine with me.  You can provide them
in camera to me.  I don't care.

MR. BALAREZO:  Thank you.

THE COURT:  The government can provide theirs in

camera.  You don't have to show it to them.  I just don't want to have any surprises.

Now, if there's issues, I'm going to have to have a hearing on the record with regard to the issues.

But tell Mr. Purpura to get his slides in by --

MR. BALAREZO:  Noon Thursday?

THE COURT:  Noon on Thursday, that's for sure, have him get them in.

And you're going to get your *Jencks* material to him by Friday, right?  So for your first?

MS. LISKAMM:  (Nodding affirmatively.)

THE COURT:  I guess you're going to have maybe four witnesses, five -- well, I don't know how long these witnesses are going to take, from the descriptions you've given me.  Sounds like the Coast Guard witnesses, who would go first, and the DEA witnesses would only be about 45 minutes each on direct.

MS. LISKAMM:  It should not be very lengthy, Your Honor.

And we actually wanted to address that with the Court as to what the Court sort of estimated or predicted for next week.

We have -- some of the Coast Guard and DEA witnesses are traveling from as far as Hawaii for this trial, and so we're just trying to estimate whether they

should be flying in for next week or if the Court anticipates it starting on the following Monday.

THE COURT:  No.  I don't know what's going to happen with the review of the documents that Ms. Goldbarg is doing right now.  I mean, she's obviously not here. I don't know what she's come upon.  I don't know if whatever she's come upon will necessitate any type of a CIPA hearing. I have no idea.

MS. LISKAMM:  Okay.

THE COURT:  As of right now, the plan's to try to pick a jury starting on Tuesday.  And, you know, when you're trying to pick a jury for a two- to three-month trial, you're talking about probably 100 prospective jurors; you're probably talking 40 to 60 responses of a positive nature to certain questions; the law enforcement question being one, any family members or friends in the law enforcement community; the question involving any involvement in the criminal justice system, either as a witness, a victim, or family member who's a witness or a victim charged with an offense; probably 60, 50-plus responses for that.

And then, of course, the response -- probably 60 to 75 people will respond positively to the difficulty of serving on a trial for two to three months.

That's a lot of time on the bench going through the answers to all those questions.

I'd say two days is very optimistic --

MS. LISKAMM:  Okay.

THE COURT:  -- to pick a jury.

That would be very good to pick a jury in two days.  It might take at least three.

So my guess is you won't be -- because then you've got openings.  Probably won't be calling witnesses till Thursday, in my guess.  We don't sit Friday.

MS. LISKAMM:  Okay.

So does Your Honor think we will get to witnesses on Thursday, I guess is our question?

THE COURT:  Start Tuesday, all day Tuesday and all day Wednesday picking a jury.  Probably.  It's a close question.

MS. LISKAMM:  Okay.

THE COURT:  Maybe one or two.

If we're lucky, they're agents.

They're Coast Guard folks, right?

MS. LISKAMM:  Yeah.

And that's just our question.  Because some of them, like I said, are flying in from Hawaii.  They can be here for Thursday, if the Court thinks we're starting then.  If not, we were going to have them fly in over the weekend so they would be here first thing for Monday.

THE COURT:  Well, let's see how we're doing.

MS. LISKAMM:  Okay.

THE COURT:  We'll make a decision today.

MS. LISKAMM:  Thank you, Your Honor.

THE COURT:  I see your point.

MS. LISKAMM:  Okay.

THE COURT:  Let's talk about these maps.
Why do you need 33 maps?  It seems a little excessive.

This isn't a geography course.

MR. ROSALES:  Your Honor, we need --

THE COURT:  They're pretty --

MR. ROSALES:  One of the reasons why we have so
many maps, Your Honor, is that a lot of the locations that
we are talking about with our witnesses will be unfamiliar
to our jurors.

I would anticipate that many of the jurors may not
even know that Mexico itself is divided into various states.

When the witnesses are describing the City of
Culiacán within the state of Sinaloa, I think it would be
very helpful for the witnesses [sic] to understand
geographically where those states and cities are located,
and also to understand the flow of the drugs from Colombia
through, sometimes, Central America, through the Pacific and
into Mexico and into the United States.

They also help to illustrate the geographic
control, especially in Mexico, that the defendant and his

organization had in their drug-trafficking activities. And, again, we've limited it to maps of areas that our witnesses will testify about in which the defendant and/or his members of the organization were operating in their drug-trafficking activities, or co-conspirators, in the case of the maps of Colombia and Central America.

THE COURT: Well, I would urge you to think about whether you need all 33 of them. I mean, that seems like an awful lot.

Are there any issues with regard to the accuracy of the maps, Mr. Balarezo?

MR. BALAREZO: Your Honor, Mexico is south of the United States. I think that's all that should be relevant.

THE COURT: That was not responsive.

Why don't you try it with something responsive? Is there any question --

MR. BALAREZO: No, Your Honor.

THE COURT: -- as to the accuracy or authenticity of these maps?

MR. BALAREZO: No.

THE COURT: At least we got that settled. All right. I'll think about it.

What's next, photographs of co-conspirators? Let me get that one.

These were taken by who?

MR. ROSALES:  Many of these photographs are either from law enforcement or public information from, you know, news reportings or Websites on the Internet.

And the witnesses will identify the person in the photographs as members of the conspiracy that involved the defendant.

THE COURT:  Who's going to identify where the photograph was taken from and -- I mean, obviously, if the witness didn't take the photograph or search it off of the Internet, someone has to provide the basis for the -- like this first photograph, which is 20.1, is of the defendant.

MR. ROSALES:  That is correct.

THE COURT:  Now, obviously, the witness didn't take the picture.

MR. ROSALES:  What the witnesses will say is that the person -- that the photograph that's shown to them, in this case, of the defendant, fairly and accurately depicts the defendant as he appeared to them during the course of the drug-trafficking conspiracy that's charged here, and that he knows the person in this photograph to be Alfredo Beltran Leyva, the person who he was involved with throughout this drug-trafficking conspiracy, and that would be the foundation that they would lay.

THE COURT:  Mr. Balarezo, is that going to be an issue?

MR. BALAREZO:  I mean, the pictures are of whom they are.

But, for example, 20.2 is Hector Beltran Leyva, my client's brother.  20.3 is Mayo Zambada, who's a member of the Sinaloa Cartel.  20.4 is Chapo Guzman, who's another member of the Sinaloa Cartel.  20.5 is a guy, El Niño, I forget his name, who may or may not be part of the Beltran Leyva, depending upon what witness is testifying. 20.6 is Artura Beltran.  20.7 is Amado Carrillo Fuentes, who died on the operating table many years ago and was not a member of the Beltran Leyva organization.  20.8 is Juan Jose Esparragoza, who is "El Azul," for the blue one, and is not sure whether he's alive or dead.  20.9 is Nacho Coronel, who is dead.

I don't know what the relevance is of all of these pictures and individuals are if we're not trying the Sinaloa Cartel.  Again, I ask at some point this needs to be defined a little bit.  I mean, you know, what's this point of these. I don't know and I'm not trying to be funny.  I'm just asking.

THE COURT:  Well, I can understand the point of the first one.

MR. ROSALES:  Your Honor --

THE COURT:  I think I can understand the point of the second one, if that's the brother of the defendant.

What about the third one?

MR. ROSALES:  Again, in terms of the third one and the fourth one, the witnesses will testify that 20.3 and 20.4, Ismael Zambada Garcia, also known as El Mayo, and Joaquin Guzman Lloyd, also known as Chapo, were also co-conspirators in the defendant's conspiracy.

Again, as I stated earlier, the witnesses, when they testify about these individuals, are going to testify about their interactions; about, for example, El Mayo's interaction with the defendant or with the defendant's organization in the defendant's -- in the charged conspiracy.  There's not going to be this overblown testimony about Chapo Guzman's drug-trafficking exploits that do not encompass the defendant or his organization and the conspiracy that's charged.

THE COURT:  So take the person who -- what's the person's name in 20.3?

MR. ROSALES:  20.3 is Ismael Zambada Garcia.

THE COURT:  And he's in the Sinaloa Cartel?

MR. ROSALES:  He is one of the leaders of the Sinaloa Cartel.

And as Your Honor may recall, when discussing our witnesses earlier today, the Sinaloa Cartel formed a partnership in this conspiracy with the defendant, his organization, in which they had a mutual agreement to

receive drug shipments together.  For example, if the Sinaloa Cartel controlled a particular plaza or area in Mexico that the defendant's organization wanted to bring drugs in from Colombia, because that area was controlled by the Sinaloa Cartel, there was an agreement that the Sinaloa Cartel would receive these shipments of drugs on behalf of the defendant and his organization.

In turn, fees might be paid to the Sinaloa Cartel for this process and/or the Sinaloa Cartel would also be allowed -- members of the Sinaloa Cartel would be allowed to invest in these drug shipments.

The opposite is also true.  If there are areas that the defendant and his organization controlled in which the Sinaloa Cartel saw or members of the Sinaloa Cartel saw as an advantageous point of entry into Mexico for particular drug shipments, they would go to the defendant and/or his other members of the organization and request permission to do so, in turn for either paying certain fees to do so, or in many cases, mutual investments.

The defendant and his organization would be allowed to invest in those shipments that were organized by the members of the Sinaloa Cartel, such as Mayo Zambada or Chapo Guzman.

Now, that being said, that is going to be the focus of the testimony of our witnesses, and that is the

reason why we are introducing these photographs of those individuals.  It's not to discuss the entire history of the Sinaloa Cartel itself.  It's not to discuss the entire history of Chapo Guzman or El Mayo, but they are integral to the story, because they are, in fact, co-conspirators in this charged conspiracy.

MR. BALAREZO:  You know, again, this is the problem we've had from day one, is that the government charged a conspiracy from 2000 to 2012 without defining it in any way, and that's what we've been trying to get to from day one.

What the government is trying to do now is back-door in the Sinaloa Cartel, which the Court already said is not on trial here.

I'm not going to tell the government how to try their case, obviously, but they have Alfredo Beltran Leyva here, he's supposedly -- according to the government, was a member of the Beltran Leyva organization, which was two or more people, who, according to the government, were conspiring to commit an offense.  That's what this trial should be, if anything.  And I believe the Court did say that at some point, it's going to be a trial of Alfredo Beltran Leyva and the Beltran Leyva organization.

They already have La Barbie, Edgar Valdez Villareal, who is supposedly a member of the Beltran Leyvas.

They have El Grande.  Said he'll -- Villareal Barragan,
who's a member of the organization.  They have Chupeta,
Juan Carlos Ramirez, who supposedly --

THE COURT:  As you're listing all off these names,
it's going to be helpful to the jury to not pronounce them
in Spanish.  I understand for you that that's how you think
of those names, but I'm going to have to correct you or have
you state them in English, for the benefit of the court
reporter and the jurors and the Court.

MR. BALAREZO:  Your Honor, I'll give the
court reporter the names, but those are the names.

THE COURT:  Your accent makes it difficult, if not
impossible, to follow the names that you're saying.

MR. BALAREZO:  Your Honor, I can speak slow, but
I don't -- that's how their names are pronounced.
I don't know how to pronounce it in English, Your Honor.

THE COURT:  It's a not a problem.

MR. BALAREZO:  Chupeta.  I mean, is that better?
I mean, I don't know, Your Honor.

THE COURT:  Well --

MR. BALAREZO:  It's Chupeta.  That's --

THE COURT:  It's going to be an issue.

MR. BALAREZO:  All right.  I will have them print
it out, and I will lift it up every time, if necessary, so
the jury knows.

THE COURT:  I'm not going to have you do that,
that's for sure.

MR. BALAREZO:  All right.  Okay.

THE COURT:  But, you know, the heavily accented
pronunciation of those names, which I know might be common
to you, is going to make it difficult to follow.

MR. BALAREZO:  I will try to pronounce it in
English, although I don't know what the English
pronunciation is.

THE COURT:  I think Mr. Rosales is fluent in
Spanish too, and he doesn't put the same spin on it, let's
say.

MR. BALAREZO:  I can't speak for him, Your Honor.

THE COURT:  It makes it a lot easier to follow.

MR. BALAREZO:  All right.

THE COURT:  Just some friendly advice.

MR. BALAREZO:  Okay.  I will make sure the jury
knows who I'm talking about when I mention --

THE COURT:  You better make sure the Court knows
too --

MR. BALAREZO:  That's fine, Your Honor.

THE COURT:  -- before you start rattling off
names.

MR. BALAREZO:  Very well.

But, again, the issue is we have this nebulous

conspiracy that was charged.

We have a boilerplate indictment.

And this is, again, the focus of our motions regarding the Rule of Specialty.

At some point, this conspiracy needs to be defined.  What conspiracy are we trying?  The Court already said we're not trying the Federation.  The Court already said we're not trying Sinaloa.  So what are we trying?

We're obviously not trying the Washington state conspiracy.  So what conspiracy are we trying here?

And the government keeps trying to bring in all these other individuals.

Quite frankly, I think they're trying to bring in Chapo Guzman because everybody has heard of him.  That has nothing to do with this man and why he's on trial here. If he committed a crime with Chapo Guzman, then put the evidence on.  But he hasn't.  That's not part of the conspiracy they're trying to try.

They're trying to try a conspiracy with him and his brothers, conspiracy with Chapo Guzman, a conspiracy with Mayo Zambada -- Mayo Zambada -- is that better -- I don't know, I'm trying -- a conspiracy with all these other people that are unrelated, and we really are swatting at ghosts here, Your Honor.  And this is the problem from day one.  I don't know how else to raise the issue.

THE COURT:  Let me ask Mr. Rosales a question.

Of the seven seized shipments that you intend to prove the defendant's involvement in into the United States, which, if any of those seven were these people involved in the financing of or the conspiracy to illegally import that cocaine into the United States?

MR. ROSALES:  The Lena Maria, the San Jose, the Gatun, the Ocean Song.

Just to be clear, you're asking about which of these seizures are people like Ismael Zambada Garcia and Chapo Guzman investors in, along with the defendants -- or the defendant and his organization?

THE COURT:  Well, okay.  We'll start with investors, yeah.

MR. ROSALES:  Okay.

So San Jose, the Lena Maria, the Gatun, and the Ocean Song, the Court and the jury will hear evidence that, in those shipments, the defendant and his organization along with Mayo Zaremba and Chapo Guzman, were investors.

In terms of the three go-fast vessels that we've discussed that were seized by the Halliburton, the Morganthau and the Colombians, I believe the only testimony that the Court will hear about investors had been that the Beltran Leyvas were investors in those shipments.

One moment, Your Honor.

And I believe that's all the seizures that we intend to introduce.

So if you look at the seizures, we consider the go-fast vessels as one shipment, because the testimony will be that it was one shipment that was separately seized. So that's one shipment that is only Beltran Leyva investors, no evidence of Ismael Zambada Garcia or Chapo Guzman or anyone else from the Sinaloa Cartel being investors in.

However, the others, Ocean Song, Gatun, Lena Maria, and San Jose, four out of the five events you will hear that both groups were investors, that both groups were co-conspirators.

THE COURT:  So now back up.

If the Court were to prohibit, hypothetically, evidence that brought in Sinaloa Cartel's involvement in those particular shipments, those particular transactions, that wouldn't in any way prohibit you or incapacitate you from proving the conspiracy, because the conspiracy that the defendant is alleged to have participated in included many other people, brokers, the people in Colombia, their intermediaries, nothing to do with the Sinaloa Cartel, isn't that true?

MR. ROSALES:  I don't think that's entirely accurate.

For example --

THE COURT:  Well, let's start with the San Jose then.

MR. ROSALES:  For example, for the San Jose and the Lena Maria, because it's from --

THE COURT:  He only needs to conspire with one person to have a conspiracy, right?  And you've already given me the names of nine co-conspirators, nine.  They're going to testify in this case.  Every one of those nine people are admitting to being a co-conspirator with this defendant.

If the jury just believed that, nothing else, the jury could find guilt beyond a reasonable doubt, right?

MR. ROSALES:  Your Honor is right on the legal theory behind that.

THE COURT:  Exactly.

So each of those nine, as I understood your description of what they would be testifying to, are going to point out, attest, to others, putting aside for the moment the Sinaloa investors, to other people in the Beltran Leyva organization who were involved, and co-conspirators as well, right?

MR. ROSALES:  Yes.

THE COURT:  I would say virtually every one of them is likely to do that.

Again, I don't know the evidence like you know the

evidence, but based on experience, I would have to guess
that they will say, sure, within a Beltran Leyva
organization, there were other co-conspirators, and these
were people we met with and this is what we did and blah,
blah, blah.  And the defendant was present and gave them
direction or whatever they're going to testify.
I don't know what they're going to testify to.  So it would
seem at first blush that there should be lots of evidence
that you will have.

          Now, the jury has to decide whether to believe it
or not and that's separate, and they have to withstand
cross-examination, whether to believe it or not, and whether
or not they think there is at least one other person who
conspired with this defendant to illegally import drugs from
Colombia through Mexico into the United States.

          MR. ROSALES:  Except, Your Honor, that it is
nearly impossible to separate the involvement of both
organizations, because --

          THE COURT:  Why?

          MR. ROSALES:  Because, as I've explained before,
this was really a symbiotic relationship.

          THE COURT:  No.  I understand that you want to
tell that story, I understand that, but that's not the
issue.  The issue at the moment is, can you prove your case
without it.

I think the answer, overwhelmingly, as a legal matter is, yes, you can.

Is it your first choice?  Of course not.  You want to tell this big story.  You want to tell the story of the interrelationship between those two cartels.  I understand that.

MR. ROSALES:  Not as -- we do, Judge.

THE COURT:  And I'm trying to keep that as narrow as possible for at least two reasons.  Number one, length of the trial, burden to the jurors.  Number two, the risk of unfair prejudice to this defendant for being tainted with a broad brush, the Sinaloa Federation brush, when there's, apparently, more than enough evidence, from your point of view, of his involvement in the Beltran Leyva Cartel to prove a conspiracy charge.

You've charged him with a relatively, on its face anyway, simple conspiracy, conspiracy with others to illegally import narcotics into the United States -- narcotics into the United States.

MR. ROSALES:  And, actually, Your Honor, you're right, there is a story that we would want to tell.

THE COURT:  Yeah.

Your indictment doesn't have specifics about paying bribes, it doesn't have specifics about killing people, it doesn't have specifics about interacting with the

Sinaloa Cartel.  Mr. Balarezo is correct in that regard.

You chose, and it's your choice, no one's questioning the government has a choice, but you chose to charge the way you charged it.  On its face, it's very –– it's very narrow, it's very limited in its face, it doesn't make lots of charges, or allegations, I should say.

It's not what we characterize oftentimes as a speaking indictment, where there's a long story being told. I actually would compliment you for that because I think the government does that way too often around this place, but that's a separate issue.

So you chose to do it the way you did it, and I have my concerns about how much –– and I've already warned you about this –– how far I'll let you go with regard to evidence relating to the Sinaloa Cartel and Federation for the reasons I've already explained, especially when it's apparent to me that you can more than prove your case without it.

It's one thing if you were to say to me, and you can convince me, we can't prove our case without it. Not only have you not taken that position, which I respect your honesty in that regard as an advocate because I don't think you could prove it.  You could demonstrate it, but it just simply, you know, mostly falls in the category of want as opposed to need.

MR. ROSALES:  Well, if I may, Your Honor, we were asked to look at our case in terms of what we would want -- not only what we would want but also what we would legally be allowed to present based on the charge that's in the indictment, which is a generalized conspiracy, from the year 2000 until the year 2012.

THE COURT:  It is.

MR. ROSALES:  And what we would want would be to bring in the entire story of the Federation so that the defendant could be held liable for the acts of his co-conspirators, even acts that he may not have been directly involved in but were part of the agreement that he entered into, which would mean all of the things that the Sinaloa Cartel was doing, maybe not fully with the Defendant's knowledge, but because their co-conspirators could be imputed upon him.

THE COURT:  Well, that's always tricky from a judge's point of view, because, you know, it's not an accident that the crime of conspiracy is referred to by no lesser an authority than the learned hand himself is the darling in the prosecutor's nursery.  It is clearly your darling, and you want to use it to get the stuff in. You're not the first one whoever wanted to do that, I might add.

MR. ROSALES:  Right.  And that's what we would

want.

And the Court has asked us to look at our case in terms of what we would need and to be very specific in terms of how this defendant and/or his organization is involved in this conspiracy and limiting our focus.

THE COURT:  But it isn't a trial of the organization, let's be clear about that.  The indictment the way it's written is not an indictment of an organization. I guess in theory you could have written it that way. You didn't.  That's your choice.  I'm not being critical of you, I'm just saying, you didn't write it that way.

The indictment is of this individual, and it's an allegation that this individual is engaged in a conspiracy with others, known and unknown.

MR. ROSALES:  And even looking at it in that perspective, Your Honor, what we've done is we've taken our witnesses and we've limited -- first of all, we started with well, over, I think it was 30, maybe even 40 witnesses, cooperating witnesses.

THE COURT:  That's good.

I think you told me you had 20 cooperators when we started on this road, about ten law enforcement offenses.

MR. ROSALES:  We've narrowed it down to 11 cooperators.

And as we've demonstrated over the course of today

and yesterday, each and every one of those cooperators, with the exception of one, Mr. Carlos, has had direct dealings with the defendant and can testify in terms of their interactions with the defendant and his involvement in this conspiracy.

Now, their testimony would also include other co-conspirators and their actions in the furtherance of this conspiracy and that those other co-conspirators may include members of the Sinaloa Cartel. That is part of this -- it is very difficult to prove a case in a vacuum with just one witness saying, okay, this is what I said with this defendant, without the jury hearing the other moving parts that put that agreement into effect. Without the testimony of these witnesses about what the other moving parts were doing to complete these agreements, it's a very difficult case to understand.

And, again, it's very limited testimony. It's not about the history of the Sinaloa Cartel, it's not about the history of Chapo Guzman, it's about this defendant, his conspiracy, and his involvement with his co-conspirators.

THE COURT: But as I understand your description of your cooperator's likely testimony or proffer, so to speak, each of these -- of the nine, that there are two that are accountants.

But each of the nine, other than the two

accountants, are going to provide, I should -- maybe it's

not all of them, maybe it's some of them -- are going to

provide evidence, at least you think they are, that link

this defendant to one or more of those shipments that were

sealed; is that right?

        MR. ROSALES:  Correct.

        THE COURT:  So Ocean Song, I mean, there's going

to be a witness that's going to be able to testify of his

knowledge, of this defendant's involvement in and knowledge

of the Ocean Song shipment, right?

        MR. ROSALES:  Yes.

        THE COURT:  And so too with Halliburton?

        MR. ROSALES:  Correct.

        THE COURT:  And so too with Morganthau.

        And so too with the three Colombian navy go-fast

vessels seizures.

        And so too with Gatun and Lena Maria and San Jose,

right?  Okay.

        So assume that's accurate.  I have no reason to

question you there at this point; I haven't heard the

evidence.

        If that's true, that evidence alone, if believed,

makes your case.  It's up to the jury, of course, but that

makes your case, because this person who's testifying is a

co-conspirator.

MR. ROSALES:  But I think, Your Honor, stretch of limitation would hinder the government's case, and here's why.  That is because the witnesses would not be able to fully and truthfully testify about the events that led to these agreements and to those seizures.

It would be very difficult for a witness to leave out, for example, that during a meeting with the -- and this is -- I'm just trying to think of the different scenarios -- but that during a meeting with the defendant's brother, Artura Beltran Leyva, and with the defendant himself, that this witness was present, so was Mayo Zambada, so, perhaps, was Chapo Guzman.

And that during this meeting, they agreed to do this Gatun shipment or this Ocean Song shipment, name any one of the shipments.  And that is the way that this particular witness can bring in the defendant and show his involvement.

Well, if we're limiting his testimony on direct examination, one, it wouldn't be completely truthful or accurate; two, I think that we leave ourselves open to many objections about the line of cross-examination that counsel is going to be able to do on these witnesses.

How can we limit a witness's knowledge about a particular subject matter, whether it's a particular seizure or the conspiracy as a whole, without also limiting defense

counsel's ability to cross-examine him?  I think we're
running into some pretty rough waters there.

THE COURT:  I got a feeling that Mr. Balarezo
wouldn't have any problem with that, or he'll speak for
himself in a minute, obviously.  But I mean, I don't think
he's going to have any problem with that.

But if the essence of the testimony in your
hypothetical is that the witness says he was in a meeting
with Arturo and the defendant, and in that meeting, an
agreement was reached -- and there were others, without
getting into who their -- and what the circumstances were --
an agreement was reached to take the necessary steps to
acquire the cocaine from Colombia, ship it to Mexico for
then shipment onto the United States -- the fact that there
are investors from the Sinaloa Cartel or some other cartel
isn't really necessary to proving that this defendant --
again, if this was believed -- was a party to a conspiracy
to illegally import cocaine from Colombia through Mexico for
shipment to the United States, right?  It wouldn't matter.

It's not like -- correct me if I am wrong.
It's not like your fact situation is this.  Just again,
we're making this up so we can make a point:  The Ocean Song
was loaded with Colombian narcotics that the Beltran Leyva
Cartel purchased or invested in the purchase of, and it
was -- the ship -- the go-fast vessel boat that it was in or

the boat that it was in was a boat that the Sinaloa Cartel had provided to them, and they were the ones -- the Sinaloa people were the ones who were captaining this ship that was bringing the narcotics from Colombia into Mexico for them to transhipment into the United States.  Something like that.

        MS. LISKAMM:  I'm glad you brought that up, Your Honor, because, actually, with the Gatun, that was the case.

        THE COURT:  In the Gatun?

        MR. ROSALES:  The ship belonged to the Sinaloa Cartel.

        THE COURT:  Okay.

        Well, then that's a difference.

        MR. ROSALES:  And this is -- these are the distinctions that -- when I talk about the symbiotic relationship of these two organizations, we can say, for example, that one of these shipments -- let's say that a witness talks about a seizure or a shipment that there is no seizure for and the jury is not going to hear any evidence of it.  Because of the relationship, in many instances, that shipment was going to be received or was received by members of the Sinaloa Cartel and was transported to the defendant in Culiacán and was turned over to him there.

        Without talking about the role that the members of the Sinaloa cartel played in these shipments, the jury is

not going to get the picture -- or they're not going to get
a complete picture of the defendant's involvement in this
conspiracy.

I think --

THE COURT:  That could be explained without
mentioning El Chapo.  He didn't actually receive it
personally.  He didn't actually, you know, ride shotgun, so
to speak, to make sure it was safe all the way to this
defendant's home, right?

MR. ROSALES:  When we talk --

THE COURT:  Think about that.

MR. ROSALES:  When we talk about the City of
Culiacán in the state of Sinaloa, which was an area that was
controlled by this defendant, there were -- in order for him
to operate there and vice versa, in order for Mayo Zambada
or for Chapo Guzman to operate there, there had to be mutual
agreements between the three individuals and the different
organizations in order for that to happen.

I think it's pretty difficult to explain the
defendant's control and ability to operate within Culiacán,
without also explaining the relationship that they had with
each other there, which could include providing drug
shipments to each other in that city, could include
providing security for drug shipments in that city or also
security for each other within that city.

It's not as simple as saying, this is what the Beltran Leyva organization or this defendant did, without also explaining how that relates to their interactions with other co-conspirators.

You know, there are other co-conspirators, there's no doubt about that.  We are not talking about drug shipments that the Sinaloa Cartel did on its own without the defendant's knowledge or without the defendant's participation in some way.  These are things that were being done together.

Again, each witness that we've narrowed this down to when they talk at all about a member of the Sinaloa Cartel, it's in the context of shipments or agreements that were made between the defendant and members of that organization in order to further the conspiracy, either organize a shipment, move it through Mexico or move it to the United States.  It is a very narrow focus.

THE COURT:  How many of the witnesses, the cooperating witnesses, were you planning on having testifying to meetings that he was participating in that the defendant was in and Chapo Guzman?

MR. ROSALES:  One moment, Your Honor.

(Government counsel confer off the record.)

MR. ROSALES:  To answer Your Honor's question, six of the cooperating witnesses would testify about meetings

between the -- that they were present for between the
defendant and Chapo Guzman.

And I want to make another point in terms of, you
know, this sort of bifurcation of --

THE COURT:  What if it just -- what if his -- what
if the testimony of those six witnesses wasn't specific to
Chapo Guzman was just represent -- a representative or
representatives of the Sinaloa Cartel?

MR. ROSALES:  Well, I think, Your Honor, part of
this is that the -- in order to understand the abilities of
the defendant and his organization to traffic drugs in
Mexico and to the United States, the jury has to understand
that they fell under the umbrella of the Sinaloa Cartel,
under the protection, so to speak, of the Sinaloa Cartel.

It's also important to understand that at one
point, they were members of the Sinaloa Cartel; that because
of their ability to start developing relationships with
Colombian sources of supply, converted themselves into
partners with the Sinaloa Cartel throughout their
drug-trafficking history, throughout the charge of this --
throughout the time charged in this conspiracy, still
operating under the protection of the Sinaloa Cartel.

For example, witnesses would testify that when the
three brothers first began, they worked directly under
Chapo Guzman.  They worked -- who worked directly under

Juan Jose Esparragoza Moreno.  And El Assul was the leader, Chapo was underneath him, and the Beltran Leyva brothers, including the defendants, were operatives for Chapo Guzman and El Assul.  It's pretty definitely to separate that.

Now, if you want to say that, you know, this is not a trial about the Federation, we agree.  This is a trial about the defendant and his conspiracy.  This includes, though, members of the Sinaloa Cartel who are his co-conspirators.

MR. BALAREZO:  Your Honor, can I respond?

THE COURT:  Sure.  Why not?

MR. BALAREZO:  Your Honor, I just want to clarify, did the government just say that the Gatun seizure belonged to the Sinaloa Cartel?  I think that was the representation that was made.

THE COURT:  I think they represented that the boat in question was owned and operated by the Sinaloa Cartel.

MR. BALAREZO:  Can I inquire through the Court as to who that load belonged to?

THE COURT:  I think it was a joint investment, but that was the impression I had.

MR. ROSALES:  It was, Your Honor, a joint investment by both organizations.

THE COURT:  Uh-huh.

MR. BALAREZO:  Which organizations, the Beltran

Leyva and --

MR. ROSALES:  And the Sinaloa Cartel.

THE COURT:  That was the impression I had.

MR. BALAREZO:  Your Honor, can I just approach ex parte for two seconds?  And then I just want to raise something with the Court, because it's --

THE COURT:  We'll do ex partes later.

MR. BALAREZO:  All right.  Well, I'll do this, I'll do it in open court then, Your Honor.

THE COURT:  Do whatever you think is right.

MR. BALAREZO:  I just lost it.  I'm sorry.

I handled another matter in the Eastern District of New York, and that was the U.S. versus Carlos Patino, P-a-t-i-n o, case No. 02-CR-1188.

On June 27th, 2010, the prosecutor, U.S. Attorney -- Assistant U.S. Attorney in that case sent me a letter, which, in particular to this discussion, dealt with the Gatun seizure.

And what he told me in that letter was that, please be advised the witness John Doe No. 1 -- and I was trying to see who John Doe No. 1 was -- who will be available for trial and for whom 3500 *Jencks* material we provided, has indicated that this multi-ton seizure was owned by a number of investors, including Ramone Quintero San Clemente, who is the boss of -- or was the boss of --

Elkin Soto, one of the ledger people, who is not a member of the Sinaloa Cartel or the Beltran Leyva organization; Artura Beltran Leyva, who we know who he is, Giovanni Vargis, who is another Colombian; Ever Villafene Martinez -- and I'll provide all the names to the reporter -- who was another Colombian; Javier Antonio Calle Seminal, who was known as Comba, who's another Colombian; Wilbur Verilla, who was another Colombian; Carlos Patino, my client at that time and who's Colombian; and a guy by the name of Victor Miguel Mahia, who was a Colombian and had a matter in this court. So these raise serious issues with me, because, at the very least, that raises a *Brady* issue for us.

If the government is now representing that they have witnesses here that will say that that shipment, in particular, belonged to either the Sinaloa Cartel and/or the Beltran Leyvas, they clearly have another witness in 2010 who said otherwise. They said he might have belonged to Arturo Beltran Leyva, but it mentions nothing about Sinaloa. All the owners of those shipments were Colombian, so -- with the exception of Arturo.

So I'm a little confused now. Is the government saying that that shipment belongs to somebody else at this point? If it is, then I need to know who the name of that John Doe witness No. 1 is, who said otherwise, because these are the kinds of things that we need to know.

I have been asking for this from the first discovery letter I provided to the government about any witnesses that they know about who may have identified loads that belong to other people, other organizations, other groups.  The government guffawed at my request, but this is why we have these issues.

So now, another prosecutor, another federal prosecutor in another case they were putting that load on other people.

THE COURT:  Print out the letter.

MR. BALAREZO:  I will.

THE COURT:  You'll obviously have it on your iPad. Give a copy of it to Mr. Rosales.  He'll do whatever due diligence he can do as fast as possible --

MR. BALAREZO:  Thank you, Your Honor.

THE COURT:  -- and he'll report back to the Court on what he learns.

I'm not accusing anybody of any kind of *Brady*/Rule 16 issue right now.

MR. ROSALES:  Your Honor, if I may just briefly respond to that.

There's nothing inaccurate with what Mr. Balarezo has said there with what the government is representing here.

In fact, the witnesses who would testify about the

Gatun would testify that it was the Beltran Leyvas who organized the shipment with the Colombians.  That's pretty accurate in terms of what Mr. Balarezo has read in his letter.

The only Mexican involved with that seizure, according to this letter, is Alfredo Beltran Leyva.  Makes perfect sense, considering that, of the three brothers, his role within the organization was to be the face or have the contacts with the Colombians to organize these shipments.  Now, that the Colombians knew or didn't know who the other Mexican investors were or what their participation was in this shipment is entirely possible.

You will see, I think, from what we've said all along, is that there are multiple investors in those shipments.  Sometimes the Mexicans know who from the Colombian side is investing.  Sometimes the Colombians know who from the Mexican side is investing.

But just because the only person who they knew was investing in this particular shipment was Alfredo Beltran Leyva does not mean that Arturo didn't have an agreement with other co-conspirators such as Chapo or Mayo, or even his own brother, Alfredo Beltran Leyva, or others.  I don't see anything inconsistent with that.

THE COURT:  How about the issue of who owned the boat and who was, you know, in charge of the shipment?

MR. ROSALES:  In this particular case, the witnesses would testify that what occurred was a meeting between Alfredo Beltran Leyva and other co-conspirators who included members of the Sinaloa Cartel in which Arturo and Mayo Zambada agreed that Artura would provide the shipment, and that Mayo Zambada -- Mayo and Chapo, because they were partners, would provide the ship for this shipment, that the shipment would ultimately be sent in through the state of Sinaloa, and that the Mexican portion of the shipment would be delivered to the defendant in Culiacán.

Just one more point about the limitation of our witnesses' testimony.  I imagine that a lot of the defense case is going to -- or their argument during summation is going to be about the credibility of our witnesses.  If they are not allowed to truthfully and accurately describe their participation in this conspiracy to include other members who were co-conspirators, I think that it's going to do great damage to the government in terms of what the defense is going to be able to do in attacking their credibility, especially during summation.

THE COURT:  How could the defense attack the credibility of your witness if the witness was limited to describing El Chapo's presence as a member of the Sinaloa Cartel?

He's not going to -- he is, Mr. Balarezo, under no

scenario that I can envision -- he can correct me if I'm wrong -- under no scenario is he going to get up and correct your witness with regard to the presence of El Chapo.

He understands, Mr. Balarezo -- and that's the whole point of his argument -- that the government, using El Chapo as the representative of the Sinaloa Cartel to prove this conspiracy here, is a very damaging and very prejudicial impact, will have a very damaging and prejudicial impact on his client, because Chapo Guzman and his exploits, in the last two months, have been on the front page and on TV constantly.

It's almost reached folklore status.  He's escaping from the most supposedly secure prison in Mexico by building a tunnel.  I don't know if the tunnel is air conditioned, but it seemed like -- the folklore seems to be it was almost like it was air conditioned.  And then he's hiding out in some resort area, and the navy commandos come in to capture him and all that.  I mean, there's been so much publicity.

Believe me, I am very confident, if I have to ask this jury pool, have you ever heard of El Chapo Guzman, a very high percentage of them would raise their hand.

MR. ROSALES:  Your Honor, this is the individual who the defendant chose to conspire with and carry out his drug-trafficking activities.  Why should that limit the

government in terms of being able to show to the jury who his co-conspirators were?  The government didn't choose Chapo Guzman to be the defendant's co-conspirator.

THE COURT:  You chose to indict the way you chose to indict it.

This is not an indictment of the Federation or the Sinaloa Cartel.  It's a very limited, on its face, indictment of this defendant, with unknown others, to illegally import drugs into the United States.

I've told you for months I'm not going to turn this into a trial of the Federation or the Sinaloa Cartel, I'm not going to do that.  I have to be concerned about the possible unfair prejudicial effect, especially if you're using any reference to El Chapo Guzman is not necessary for you to prove your case.

You've already conceded that, and I might add, accurately so, you don't need to make reference to a specific Sinaloa representative in a room to make your point.

Your point is this man is conspiring -- this man is conspiring with all nine of the co-conspirators that you're calling, all of the nine cooperators you're calling, exclusive of the two, although you could probably include the two of them too, the two accountants; the nine others, non-accountants are all admitting to conspiring with him.

If the jury believes them, you've made your case, your case
is made.

Every one of those nine is going to testify to
others, exclusive of the Sinaloas for the moment, that were
participating in the same conspiracy.

It's --

MR. ROSALES:  But I --

THE COURT:  What you're asking for -- the benefit
of what you're wanting to achieve in the public arena,
you're asking a lot, in terms of the risk to a verdict,
if you're lucky enough to get one, that will withstand
appellate scrutiny.

And let me tell you something, the only thing more
painful than trying this case once is trying it twice --

MR. ROSALES:  I think, Your Honor --

THE COURT:  -- or a third time.

You need to think through, Mr. Rosales -- not you
personally, your team, and your agents, you need to think
through the difference between want and need in this regard.

I understand your natural desire to tell the world
the story.  I'm not going to let you do that.

MR. ROSALES:  But I want to be clear, Your Honor.
The story that we've now put together based on Your Honor's
instructions is the story of this defendant and his
co-conspirators.

And I think Your Honor has brought up an excellent opinion on numerous occasions today and at other times, and that is:  If the jury believes our cooperators.

The only fair way for the jury to evaluate the truthfulness of our cooperators, because Mr. Balarezo, I'm sure, is going to do an excellent job of cross-examination of dirtying them up --

THE COURT:  He is not going to bring up El Chapo Guzman.  He's not.  You know that.

MR. BALAREZO:  But the only way for our jury to truly believe our cooperators is for them to tell the full and accurate story, the truth about their dealings with the defendant and his co-conspirators.

THE COURT:  No one is suggesting they're not going to tell the truth, no, no, no, no.

I don't know how long you've been in this business, but we, in trials, all the time, cabin off certain areas that witnesses are not allowed to testify to. It happens all the time because of the prejudicial effect that would be unfair because of 403, right?  It happens all the time.

There's certain things that witnesses aren't permitted to go into.  It happens all the time in trials, criminal trials.  There's nothing unusual about this. This is not novel.  We do it all the time.

MR. ROSALES:  So what happens, Your Honor --

THE COURT:  We have privileges.  We have privileges that keep the truth from coming out.  Why?  Because we, as a society, value that privilege so much that we keep the truth from going to the jury.  It's protected behind a privilege; whether it's an attorney-client privilege; whether it's the doctor-patient privilege, or it's priest-penitent privilege, we protect certain information; we keep the truth from the jury.

No one is suggesting that any witness you'd put on would lie and not tell the truth.  The issue is whether or not the testimony of those witnesses can be presented in such a way as to not unfairly, unnecessarily create a prejudice that is unfair under the law to the defendant.  That's the question.

I haven't ruled yet, I haven't decided, but I'm thinking about it, and you best think about it yourselves.  You've got a couple of days to be thinking, because I'll probably rule before we start the trial.  I'll have to because of the opening arguments.

Who's doing your opening?

MR. ROSALES:  Ms. Henry is doing the opening.

MS. HENRY:  I am, Your Honor.

THE COURT:  So we'll give her some guidance before you do your opening.

Of course, we have to give Mr. Balarezo some guidance too.

MR. BALAREZO:  Mr. Purpura.

THE COURT:  Mr. Purpura too.

Where were we?

MR. ROSALES:  The next exhibit, Your Honor, after the photos, are the photographs of the Lena Maria seizure.

THE COURT:  Who took these photos?

MR. ROSALES:  These photos were taken by members of the U.S. Coast Guard.

THE COURT:  All right.  Okay.  What's next?

MR. ROSALES:  Next is a demonstrative or series of demonstrative maps.

THE COURT:  That's 20.

MR. ROSALES:  Exhibit No. 20.

THE COURT:  22.

MR. ROSALES:  I'm sorry.  22.  Yes.

THE COURT:  22, all I know is like a disk.

MS. LISKAMM:  That's correct, Your Honor.  They were prepared on a disk.

Give me one moment.

(Government counsel conferred off the record.)

MR. ROSALES:  Your Honor, these are -- nine slideshows, which would demonstrate for the jury -- would not be an exhibit admitted into evidence but it would just

be demonstrative, which would show for the jury the movement

of how the drugs were moved from Colombia to the open waters

in the Pacific in through Mexico and then up to the

United States.

THE COURT:  Well, you have witnesses who are going

to testify to that, right?

MR. ROSALES:  But it would aid the jury in

understanding what the witness is saying, and it would also

help us limit --

THE COURT:  Well, who prepared these?

MR. ROSALES:  The government prepared them with

the help of a witness.

THE COURT:  I'll have to look at them.

MR. ROSALES:  It would also include, generally,

based on the witnesses' experience, the various prices of a

kilo of cocaine from Colombia in Mexico, and as well as in

the United States.

THE COURT:  You're going to have people who are

expert in that who are going to testify to that, aren't you?

MR. BALAREZO:  The witnesses -- the cooperating

witnesses would be testifying about that.

THE COURT:  Right.  So they knew from firsthand

experience.

MS. LISKAMM:  And this particular witness, whose

information was used to prepare this map, would.

THE COURT:  Which witness was that?

MS. LISKAMM:  That would be witness No. 8.

THE COURT:  Witness 8?

That Jesus Rey Zambada?

MR. ROSALES:  Correct, Your Honor.

THE COURT:  What's next?

MR. ROSALES:  The next exhibit is No. 23, which is the chemist photographs for the Lena Maria seizure.

THE COURT:  All right.  Any problems with those, Mr. Balarezo?

MR. BALAREZO:  23, Your Honor?

THE COURT:  Uh-huh.

MR. BALAREZO:  Same as before; nothing new.

THE COURT:  24.

MR. ROSALES:  That would be the Lena Maria lab reports.

THE COURT:  All right.  25.

MR. ROSALES:  The San Jose seizure photographs.

THE COURT:  Now, the first one in my package is not a photograph, it's like a bill-of-sale thing.  It's like this.

25.1.  Looks like some kind of registration form or something.

MR. ROSALES:  Yes, Your Honor.  I believe that this is a photocopy of the merchant vessel registry for the

San Jose, which --

            THE COURT:  What's the San Jose?

            MR. ROSALES:  The San Jose is the ship itself.

            This was a -- this is a photocopy of the merchant
vessel registry, which was located on the San Jose.

            THE COURT:  Okay.

            MR. ROSALES:  The rest are photographs of the
San Jose seizure.

            THE COURT:  Okay.  Looks pretty straightforward.

            MR. BALAREZO:  Your Honor, with respect to the
Exhibit 22, I don't think the Court has seen those, but I do
object to those, because when the Court sees, it's not --
it's maps that are titled examples of deals.

            For example, an example of a 10,000-kilo shipment
to Mexico.  And then it's a total hypothetical.  I think the
witness can testify about their personal experience and
actual deals.  But for them to sit up there and speculate
about how things are done, that's something else that
shouldn't be appropriate at trial.

            You'll have to see them.

            THE COURT:  I haven't seen them yet.

            MR. BALAREZO:  You'll have to see them,
Your Honor.  I totally object to 22, to all of the slides.
It's a PowerPoint presentation.

            MR. ROSALES:  And, Your Honor, it would not be

speculation.  It would be from -- it would be an example that would be easy for the jury to understand of a shipment that this witness has done with this defendant in the past.

We use the example of 10,000 kilograms because it is an easy number to deal with.  It is --

THE COURT:  Is it any easier than 100?

MR. ROSALES:  We could do 100, but the amounts that this witness would be testifying about are well over 10,000.  So if anything, we came down in terms of the number.

And it explains, visually, what we discussed earlier about how, when a shipment is done from Colombia, there are various investors, typically the investment is split between the Mexicans and the Colombians, and how that investment transforms as it goes up to Mexico and then into the United States.

THE COURT:  Okay.

MR. ROSALES:  Which is particularly relevant to this defendant, because other witnesses would testify that this defendant -- one other witness would testify that this defendant purchased from him the Colombian portion of a shipment of each shipment that he brought in, and that this defendant then brought it into the United States.

I believe we're on 26, which is San Jose seizure photographs.

THE COURT:  That's for the chemists.

MR. ROSALES:  For the chemists, yes.

THE COURT:  And 27 are lab reports.

MR. ROSALES:  Lab reports.

28 are the ledgers.

THE COURT:  This is witness No. 11?

MS. LISKAMM:  Mr. Ramirez.

THE COURT:  Which is the witness who's going to testify as to these ledgers?

MR. ROSALES:  Mr. Ramirez.

THE COURT:  What's his number?

MR. ROSALES:  No. 11, Your Honor.

THE COURT:  No. 11.

MR. ROSALES:  Next is No. 29, which are photographs of --

THE COURT:  Now, hold on.  We're still doing 28.

Now, where did these ledgers come from?

MR. ROSALES:  Those are the ledgers, Your Honor, that were authored by one of the members of No. 11's organization at his request, and which he also reviewed after they were prepared.

THE COURT:  Was he the one who had firsthand knowledge of the information that's being entered here?

MR. ROSALES:  Yes, Your Honor.

THE COURT:  And how did he learn it?  Was he

dealing directly with the defendant?

MR. ROSALES:  He did have face-to-face meetings with the defendant.

The ledgers were prepared based on his meetings with his accountant, who he directed to input this information, and he reviewed the entries after they were done.

This is the witness who left to Brazil after June of 2004, I believe.

THE COURT:  Right.

So let's look at these for a second.  These were all on a laptop.

MR. ROSALES:  These were on a laptop, Your Honor.

THE COURT:  So what's your expectation as to how you're going to go over these with the jury page by page?

There's a lot of pages here.  There's 38 pages.

MR. ROSALES:  I anticipate that these ledgers will be introduced for completeness, but that the witness will focus on the entries that pertain to the shipments that were done with the defendant.

This is the witness who has the series of ten shipments done with the defendant, and this particular witness will focus on those ten shipments.

THE COURT:  So which pages will those be on? Like what'll be the first page that has a shipment that

relates to this defendant?

MR. ROSALES:  One moment, Your Honor.

Your Honor, I apologize.  This is going to be Ms. Goldbarg's witness.  I'm not entirely sure as to which pages she's going to focus on for these particular shipments, nor where they begin in this exhibit.

THE COURT:  Look at 28.5 for a second. This particular page has about 40 lines, something like that, between July 1, 2004, and July 15, 2004, left-hand column.

Do you know which, if any, of these entries relate to this defendant?

MS. LISKAMM:  I do not, Your Honor.

THE COURT:  Go ask your agents; they should certainly know.  Case agents should know.

Who's the case agent here?

ALSO PRESENT:  (Hand raised.)

THE COURT:  He should know.  It's his job.

MR. ROSALES:  Your Honor, this agent is not the one who reviewed these ledgers with the witness.

THE COURT:  Where's the one who did?

MR. ROSALES:  He's in New York.

THE COURT:  New York.  Doesn't do us a lot of good.

There's a column here that says observacion.

Do you know what that is?

MR. ROSALES:  One moment, Your Honor.

(Government counsel conferred off the record.)

MR. ROSALES:  I do not know, Your Honor.

THE COURT:  Have you had these translated?

MR. ROSALES:  They have not been translated, Your Honor.

THE COURT:  How would you expect them to be put before a jury?

I'm not going to give a jury documents in a language they don't know.

How are we going to give them to a jury?

MR. ROSALES:  I do not know how Ms. Goldbarg was planning on introducing these or whether or not she was going to have them translated.

THE COURT:  Well, at what point is this witness supposed to testify in this trial?

MR. ROSALES:  He would likely be in the second or third week.

THE COURT:  You've got a lot of work to be done on translation between now and then if you're going to use all 38 pages.  You better chat with her.

Was there any reference to this defendant in these documents?  Is his name in there?  Or is there a symbol or an alias being used to represent him in here?

MS. LISKAMM:  I believe, for these ledgers, there was a code word or name used to designate his organization as the investors or receivers of the particular shipments.

THE COURT:  But you don't know what that is?

MS. LISKAMM:  I do not, Your Honor.

THE COURT:  Well, agents don't know, you don't know.  I guess Ms. Goldbarg has got this as like a secret or something, huh?

Well, she better plan on coming in to tell me about it in the next couple days.

She also better be able to explain how we're going to put these before a jury in Spanish.

My recollection of the other ledger -- let's see. What number was the other ledger?  It was mostly numbers, not a lot of writing, more like an accounting sheet.

MR. ROSALES:  That was No. 7, Your Honor.

THE COURT:  All right.  Let's take a look at that one for a second.

First page is almost all numbers.  There's a few words on it.  But the accountant can certainly say what those are.

Second page, again, is almost all numbers; there's a few words.

Third, again, is almost all numbers page.

There's some little words in there too.

Fourth page has more words.

MR. ROSALES:  I believe that most of the words on the fourth page are individuals' names or code names for individuals.

THE COURT:  So, presumably, the witness is going to go through each of those?

MR. ROSALES:  Yes, Your Honor.

THE COURT:  Does he speak English?

MR. ROSALES:  He does not, Your Honor.

THE COURT:  You better look into translating these too while you're at it.

What's that leave us with, 29?

MR. ROSALES:  29, which are photographs of the November 2007 seizure, one of the go-fast vessels.

THE COURT:  Who took these pictures, Colombia Navy?

MR. ROSALES:  These are the Colombian Navy, Your Honor.  Members of the Colombian Navy or Colombian law enforcement.

With these photographs, Your Honor, we are attempting to get better copies of these photographs.

THE COURT:  What I'm about to tell you is that I've looked at the first three and they're not -- I can't discern what they are.

MR. ROSALES:  I believe that they were distorted

when they were --

       THE COURT:  So --

       MR. ROSALES:  -- blown up to.

       THE COURT:  So based on -- I'm up to 29.7.
They kind of look like -- they kind of look like a, you
know, an impressionistic painting, but not a good one.

       I don't think you're going to be using them in
this form.

       MR. ROSALES:  We're working on converting the
images, Your Honor, to try to get better copies.

       THE COURT:  Yeah, that's not going to work.
I'm not putting these before a jury.

       What other issues do you have?

       MR. ROSALES:  One issue, Your Honor, is that
Exhibit No. 16 --

       THE COURT:  Chemists' photographs?

       MR. ROSALES:  Correct.

       Exhibit No. 16 was actually -- we've subsequently
split that into two separate exhibits because the
photographs are from two separate chemists.

       THE COURT:  Are they both testifying?

       MR. ROSALES:  They are, Your Honor.

       The first section would be 16.1 to 16.10, that
would be one chemist.  The remainder, 16.11 to 16.15, would
be another chemist.

And then we mistakenly combined them.  And we have copies of the relabeled second set, second half of this exhibit, for the Court and for defense counsel.

THE COURT:  All right.  How are they going to be numbered, the new ones?

MR. ROSALES:  So the new ones would be 30.1 through 30.5.

THE COURT:  All right.

Any objection to that, Mr. Balarezo?

MR. BALAREZO:  No, Your Honor, not the way they're numbered.  But the same issue we had before with all the pictures.

MR. ROSALES:  And that concludes the exhibits, Your Honor.

THE COURT:  All right.

Ms. Liskamm, do you have any update as to how far along Ms. Goldbarg is with regard to her review of the documents at the intelligence agency?

MS. LISKAMM:  No, Your Honor, we have not received an update, which can only mean to take that she's still there diligently working.

THE COURT:  All right.

Well, we'll give her till tomorrow to complete her assignment.

I'll set the next hearing for Thursday morning.

It's 11:00, Counsel.  11:00 a.m.

And we'll spend a little time on Thursday talking about voir dire questions.

MS. LISKAMM:  And would Your Honor be going over the jury instructions as well?

THE COURT:  No.  There won't be time for that on Thursday.

Mr. Balarezo, is there anything you need to raise between now and Thursday morning?

MR. BALAREZO:  No, Your Honor, not beyond what I've raised today.

THE COURT:  Okay.

MR. BALAREZO:  Thank you.

THE COURT:  We might have some more argument on Thursday.  I want to do some research on the issue we discussed today about limiting the government's evidence with regard to El Chapo, because of the possible unfair prejudicial effect on the defendant.  So counsel for both sides should be giving some thought to that overnight.

See you on Thursday.

DEPUTY CLERK:  All rise.

This Honorable Court now stands in recess until return of court.

(Proceedings concluded at 4:19 p.m.)

C E R T I F I C A T E

      I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: May 5, 2016_____    /S/__William P. Zaremba_____

                                William P. Zaremba, RMR, CRR