**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 12-CR-184 (RJL)** |
| **v.** | |
| **ALFREDO BELTRAN LEYVA,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

**I.      Introduction**

    The Government respectfully submits this Memorandum in Aid of Sentencing in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines Manual, § 6A1.2 (U.S. Sentencing Comm'n 2015).  The Government seeks a sentence that is sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a), and for the reasons set forth below believes a Guidelines sentence is reasonable.  Sentencing is scheduled for June 6, 2016 at 2:30 p.m.

**II.      Background**

    A.      Procedural History

    On August 24, 2012, a federal grand jury returned an Indictment charging the Defendant Alfredo Beltran Leyva, also known as "Mochomo" (the "Defendant"), with conspiracy to distribute five kilograms or more of cocaine, fifty grams or more of methamphetamine, one kilogram or more of heroin and one thousand kilograms or more of marijuana for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), 960(b)(1)(H) and

1

963 (hereinafter the "Indictment").  The charged conspiracy occurred between January 2000 and August 2012.  The Indictment also carries a criminal forfeiture allegation pursuant to 21 U.S.C. §§ 853 and 970.

On January 21, 2008, the Defendant was arrested by Mexican authorities pursuant to a Mexican investigation, which was not related to the instant case.  On November 27, 2013, the Government of Mexico ("GOM") granted the Defendant's extradition to the United States on the sole count of the Indictment as it related to a cocaine and methamphetamine distribution conspiracy,[1] without limitation as to the time frame of the conspiracy, and denied the Defendant's extradition as to the conspiracy relating to the trafficking of marijuana and heroin.

On the event of trial, on February 23, 2016, the Defendant pleaded guilty to the Indictment related to cocaine and methamphetamine, without a written plea agreement.

B.    The Defendant's Criminal Conduct

### 1.    Relevant Conduct in the Presentence Investigation Report

The U.S. Probation Department ("Probation") prepared a Presentence Investigation Report dated April 29, 2016 (the "PSR"), which sets forth the following criminal conduct.

Between approximately January 2000 and August 2014, the Defendant and his brothers Arturo Beltran Leyva ("Arturo") and Hector Beltran Leyva ("Hector") were the leaders of the Beltran Leyva drug trafficking organization ("DTO"), which was based in Sinaloa, Mexico.  PSR ¶ 7.  The DTO had an ongoing relationship with the Sinaloa Cartel, an organized crime syndicate, since the 1990s.  PSR ¶ 8.

During and in furtherance of the conspiracy, the DTO, beginning in or before January 2000, directed a large-scale narcotics transportation network involving the use of land, air and sea

---

[1]     On February 23, 2016, the Court dismissed the portions of the Indictment related to marijuana and heroin because the GOM did not grant the Defendant's extradition as to those drugs.

transportation, which was responsible for the shipment of multi-ton quantities of cocaine from South America, through Central America and Mexico, and eventually into the United States.  PSR ¶ 8.  The DTO facilitated its cocaine shipments through a network of corrupt law enforcement and political contacts located in Mexico and other countries.  PSR ¶ 8.  In addition to his responsibilities with respect to cocaine shipments, the Defendant was also responsible for the production and trafficking of methamphetamine from Mexico, with an individual named "Chapo Isidro." PSR ¶ 8.  During the course of the investigation, some of the loads of narcotics were seized in Mexico, other foreign countries, and in the United States.  PSR ¶ 8.

The DTO also employed "sicarios," or hitmen, who were responsible for multiple acts of violence, including murders, kidnappings, tortures, and violent collection of drug debts, at the direction of the DTO. PSR ¶ 9.  The members of the Beltran Leyva DTO carried weapons and firearms with them for protection from rival cartels as well as from arrest by law enforcement. PSR ¶ 9.  Within the DTO and in the course of doing business, bribes were paid to all levels of police and military personnel, which included state police, the prosecutor's office, and the Governor of State.  PSR ¶ 9.

As a result of his conduct during and in furtherance of the conspiracy, the Defendant is accountable for over 450 kilograms of cocaine and over 50 kilograms of methamphetamine.  PSR ¶ 11.

## 2. Proffered Evidence

In addition to the information contained in the PSR as described above, the Government also relies on evidence proffered in the Government's Motion in Limine to Admit or Allow Evidence, Cross Examination and Lead Case Agent at Counsel Table, Docket Entry No. 68 (the "Gov't Mot. to Admit"), the Government's Motion in Limine to Introduce Other Crimes Evidence

3

at Trial, Docket Entry No. 67 (the "Gov't Mot. Other Crimes"), and the evidence proffered during

the pre-trial hearings held on February 8 and 9, 2016, which the Government believes supports its

position for a Guidelines sentence.[2]

### III.   Applicable Sentencing Law

The United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") still provide

strong guidance to the Court in light of United States v. Booker, 543 U.S. 220 (2005).  Although

Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain

in place and that district courts must "consult" the Guidelines and "take them into account" when

sentencing. Booker, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin

all sentencing proceedings by correctly calculating the applicable Guidelines range" - that "should

be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 39 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in

Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and

the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of

sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the applicable

Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing

---

[2]       The Government believes that an evidentiary hearing is unnecessary in this case based on the facts before
the Court.  Nonetheless, the Government is prepared to call an agent to testify as to the proffered statements of these
witnesses should the Court find that more evidence is needed at the sentencing hearing.  The Federal Rules of
Evidence do not apply at sentencing, and therefore, the sentencing court can consider the testimony of an agent as to
statements made by witnesses.  See Fed. R. Evid. 1103(d)(3) (noting the FRE do not apply to sentencing
proceedings); see also United States v. Bras, 483 F.3d 103, 108, 376 U.S. App. D.C. 1, 6 (D.C. Cir. 2007) (affirming
the court's consideration of reliable hearsay testimony in a drug conspiracy prosecution).  The Sentencing
Guidelines also provide that the Federal Rules of Evidence are inapplicable at sentencing. See U.S. Sentencing
Guidelines Manual § 6A1.3(a) (U.S. Sentencing Comm'n 2015) ("In resolving any dispute concerning a factor
important to the sentencing determination, the court may consider relevant information without regard to its
admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of
reliability to support its probable accuracy."); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the
information … which a court of the United States may receive and consider for the purpose of imposing an
appropriate sentence.").

Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). <u>Gall</u>, 552 U.S. at 50.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." <u>Gall</u>, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," <u>Rita v. United States</u>, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," <u>Gall</u>, 552 U.S. at 46. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." <u>Id.</u> at 51.

A court should use the version of the Guidelines Manual in effect at the time of sentencing unless retroactive application of that version would result in a more severe penalty than would result from applying the version in effect at the time of the offense. <u>Peugh v. United States</u>, 133 S. Ct. 2072, 2078, 2082-83 (2013) (recognizing an ex post facto violation when a defendant is sentenced under Guidelines providing a higher range than the Guidelines in effect at the time of the offense).

## IV.    <u>A Guidelines Sentence is Appropriate</u>

### A.    <u>The PSR's Guidelines Calculation is Accurate</u>

As set forth below, the Government concurs with the Probation Department and submits that a Guidelines sentence is reasonable and appropriate in this case.

The Probation Department correctly calculated a base offense level of 38, finding the Defendant accountable for over 450 kilograms of cocaine and at least 50 grams of methamphetamine, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1).  PSR ¶¶ 11, 23.[3]

The Probation Department further applied a four-level adjustment for a managerial or supervisory role in the offense, pursuant to U.S.S.G. § 3B1.1(a), because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  PSR ¶¶ 16, 30.

In addition, the Probation Department applied four offense-specific sentencing enhancements for the defendant's conduct during and in furtherance of the conspiracy.  First, a two-level enhancement was added, pursuant to U.S.S.G. § 2D1.1(b)(1), because the defendant possessed a dangerous weapon.  PSR ¶ 25.  Second, a two-level enhancement was added, pursuant

---

[3]    The base offense level was derived from converting the amounts of cocaine and methamphetamine attributable to the Defendant to their marijuana equivalent, or approximately 9,100 kilograms of marijuana.  PSR ¶¶ 23-24.

to U.S.S.G. § 2D1.1(b)(2), because the defendant used violence, made a credible threat to use violence and/or directed the use of violence.  PSR ¶ 26.  Third, a two-level enhancement was added, pursuant to U.S.S.G. § 2D1.1(b)(11), because the defendant bribed, or attempted to bribe, one or more law enforcement officers to facilitate the commission of the offense.  PSR ¶ 27. Fourth, a two-level enhancement was added, pursuant to U.S.S.G. § 2D1.1(b)(15)(C), because the defendant's conduct warrants an adjustment under U.S.S.G. § 3B1.1 and because the defendant was directly involved in the importation of a controlled substance.  PSR ¶ 28.

Finally, the PSR applied a three-level offense level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b).  PSR ¶¶ 34-35.

Based on the foregoing, the Defendant's Adjusted Offense Level is calculated at level 48 but is treated as a level 43, resulting in an adjusted Guidelines sentencing range of life imprisonment.  PSR ¶¶ 36, 72.[4]

B.     The Defendant's Objections to the PSR Should be Overruled

The Defendant objects to the managerial/leadership role designation in paragraph 16 of the PSR and to the four offense-specific sentencing enhancements in paragraphs 25-28 of the PSR. See Def. PSR Obj. at 1-2.  The Defendant does not and cannot offer any evidence to refute the veracity of the substantial and significant evidence regarding his role and responsibilities of his drug trafficking organization detailed in the PSR.  Therefore, the Court should uphold the Probation Department's findings.

---

[4]     The Government notes that the Probation Department did not include the offense-specific enhancements pursuant to U.S.S.G. § 2D1.1(b)(3) (use of an aircraft) and (b)(12) (use of premises for manufacturing and distribution), each of which would have added two levels to the Adjusted Offense Level.  However, the PSR and the evidence proffered above establishes that the Defendant and his DTO used aircraft to import controlled substances, that the Defendant maintained laboratories for the purpose of producing methamphetamine, and that the Defendant warehoused the tons of cocaine that were eventually sent to the United States.  The Government did not file an objection to the PSR regarding the exclusion of these enhancements because the Defendant's Adjusted Offense Level was well above 43, thus making the issue moot.  However, the Court should take these enhancements into consideration when determining the Defendant's sentence under 18 U.S.C. § 3553(a).

### 1.    The Defendant Was a Leader and Organizer in the Conspiracy

Section 3B1.1 of the Sentencing Guidelines provides that the sentencing court should increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).  As described in the comments to the Guidelines, to qualify for an adjustment under this section, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." § 3B1.1(a) app. note 2.  "Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." § 3B1.1(a) app. note  4.

Courts within this Circuit have often cited the factors identified in Application Note 4, particularly emphasizing that "[t]he exercise of decision making authority, recruitment, and a claimed right to a larger share of the proceeds are prominent among the factors that the commentary to the Guidelines indicates should be considered." United States v. Wilson, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (declining to engage in an "exegesis of the concept of control" and instead emphasizing decision-making authority, recruitment and claim over larger share of proceeds); United States v. Brodie, 524 F.3d 259, 270 (D.C. Cir. 2008).  For instance, in United States v. Brodie, the District of Columbia Circuit placed particular emphasis on the fact that the defendant "recruited individuals with specialized skills to facilitate his scheme, … coordinated the group's efforts and directed them in the performance of their respective tasks, … [and] paid the other participants flat fees for their services … [while keeping] the 'fruits of the crime' for himself," when upholding the District Court's determination on the issue of leadership.  Brodie,

524 F.3d at 270.

Here, there is ample evidence to support the PSR's factual findings for a four-level role adjustment.  As described in the PSR, the Government's previously filed motions and in the proffered testimony of the Government's witnesses at the pre-trial hearings, the Defendant was one of the organizers and leaders of the Beltran Leyva DTO, a sophisticated and extensive international drug trafficking organization comprised of hundreds of individuals.  Indeed, the Defendant even supervised two groups of a hundred men each who were in charge of the Defendant's security.  See Gov't Mot. Other Crimes at 5.  The Defendant's DTO trafficked massive quantities of cocaine from Colombia to Mexico and eventually the United States through various locations, and the Defendant, along with his brothers, supervised hundreds of people to ensure that this process ran smoothly.  See Gov't Mot. Other Crimes at 2–3; See also Transcript of Pre-trial Hearing held on February 9, 2016[5] ("PTH") at 19–23, 36.  Additionally, the extensive nature and scope of the Defendant's organization, as well as his responsibilities within the organization, warrant the four-level leadership enhancement.  See U.S.S.G. § 3B1.1(a) (stating that the criminal activity must have "involved five or more participants or [been] otherwise extensive").  The Defendant's DTO operated a complex transportation system that relied on planes, maritime assets, trucks, landing strips, and warehouse storage facilities across two continents.  See Gov't Mot. Other Crimes at 3.  The Defendant's role within the organization was to manage the operations of getting these drugs from Mexico to the United States.  In this capacity, the Defendant was responsible for supervising dozens and dozens of individuals involved in the distribution of narcotics.  Indeed, for decades, the Defendant and his DTO successfully trafficked tonnage quantities of cocaine from Colombia to Mexico that were then transported into the U.S. for further

---

[5]        The Transcripts for these hearings are under seal.

distribution. Id.

Aside from his overall responsibilities in the DTO, the Defendant also served as the DTO's plaza boss in the city of Culiacan, located in the state of Sinaloa, Mexico. As the plaza boss, he controlled and managed all aspects of the DTO's drug trade including: (1) oversight of all of the DTO's drugs that were brought in and out of the city; (2) oversight of payments to corrupt public officials who supported the DTO's illicit activities; and (3) management of the DTO's cooperative relationships with the leaders of the Sinaloa Cartel, with whom he shared control of Culiacan. See Gov't Mot. to Admit at 12. In this role as plaza boss, the Defendant supervised and managed hundreds of individuals within his area of control – Culiacan. Culiacan served as the central repository for a majority of the DTO's cocaine that was destined for the United States. Further, the Defendant's DTO imported massive quantities of ephedrine from Asia into Mexico, where the Defendant was in charge of overseeing its production into methamphetamine, and its transportation across the border into the United States. See id; see also PTH at 24. The Defendant's DTO also bribed law enforcement and military officials to facilitate their drug trafficking activities and protect its members from arrest; as the plaza boss, the Defendant approved these bribes. See Gov't Mot. Other Crimes at 8–9; see also PTH at 22–23, 25.

As the central repository for a majority of the DTO's narcotics, the city of Culiacan was vital to the success of the DTO's drug trafficking activities. Culiacan grew in importance once the DTO began fighting with Los Zetas, a rival cartel, around 2004, which cut-off the DTO's access to the United States along Mexico's border with Texas. The city served as a market place for the sale of large shipments of cocaine to the DTO's customers, who used the transportation routes controlled by the DTO and by the Sinaloa Cartel to import the cocaine into the United States. Culiacan also served as the transshipment point for the large shipment of cocaine that the DTO

imported into the United States.  As the plaza boss for the city of Culiacan, it was the Defendant's responsibility to oversee individuals involved in the sale of cocaine to the DTO's customers and to oversee individuals involved in the transportation of the remaining portions of cocaine to the United States.  Once these shipments to the United States were organized, the Defendant gave orders and instructions to others as to where loads of cocaine should be received, inventoried and stored, so as to avoid law enforcement detection.  Even when the Defendant was arrested and detained in Mexico, he continued to exercise control over the DTO by taking a large percentage of the profits either in the form of U.S. currency or cocaine that were received by the Beltran Leyva DTO, indicating his managerial role throughout the course of the conspiracy.   See Gov't Mot. Other Crimes at 10–11.

Lastly, the Defendant's power and control was extensive, which reflected the large scale and scope of the Beltran Leyva DTO.  Witnesses would have testified at trial that the Defendant had the power to enter into mutual agreements with other high-level drug traffickers, including members of the Sinaloa Cartel, to aid each other in the organization and receipt of large quantities of cocaine from Colombia, as well as the importation of that cocaine into the United States.  See PTH at 4, 11.  This speaks volumes as to the leadership role he served within the DTO.  Moreover, the Defendant exercised extensive control over the area in which he operated and told members of his DTO not to worry about getting into trouble given the influence he had over law enforcement and military in the area.  See PTH at 23, 25.

Therefore, the four-level role adjustment is clearly warranted and should be applied in this case.

**2.      The Defendant Possessed Dangerous Weapons During the Conspiracy**

Section 2D1.1(b)(1) applies a two-level enhancement when "a dangerous weapon

(including a firearm) was possessed."  U.S.S.G. § 2D1.1(b)(1).  "[T]he enhancement is to be applied whenever a firearm is possessed during conduct relevant to the offense of conviction, which 'includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"  United States v. Bell, 795 F.3d 88, 105 (D.C. Cir. 2015) (quoting U.S.S.G. § 1B1.3(a)(2)).

The Defendant claims that this enhancement does not apply and submits that the Defendant did not possess a weapon in furtherance of the conspiracy at the time of his arrest. Def. Obj. at 2. However, the two-level enhancement for weapons possession is clearly applicable.  At the time of his arrest in 2008, the Defendant possessed eight pistols including an AK-47. PSR ¶ 10.  During this time period, the Defendant was an active member of the charged drug conspiracy – a fact to which he allocuted at his guilty plea hearing. Therefore, he cannot now claim that somehow the weapons which he possessed at the time of his arrest were unrelated to narcotics trafficking.  See Def. Obj. at 2.  Even if the Defendant could claim that the 2008 weapons were unrelated to his DTO's drug trafficking (he cannot), at trial the Government would have provided the testimony of several individuals who observed the Defendant armed and surrounded by armed guards, including one witness who was in charge of the Defendant's personal security in Culiacan, to ensure that the Defendant was not arrested or killed by a rival cartel.  See Gov't Mot. Other Crimes at 4–5.  At trial, this witness would have testified regarding his/her first-hand knowledge of the Defendant regularly carrying a pistol for his protection from arrest or a rival cartel. Id.  Further, this witness observed the Defendant return from meetings with Joaquin Guzman Loera, also known as "Chapo" ("Chapo"), in the mountains of Mexico wearing a tactical vest containing grenades.   Id. at 5. Additionally, this witness is aware that the Defendant had two groups of armed men in Culiacan, with each group consisting of approximately 100 men who carried various types of high powered

weapons, including AK-47s, AR-15s, bazookas and 50-caliber weapons. Id. These men provided armed protection and support to the Defendant to ensure that the Defendant and his co-conspirators could conduct their drug trafficking activities uninterrupted from law enforcement and rival cartels. Id. This witness is also aware that the Defendant traveled with at least ten cars filled with gunmen to protect the Defendant from any rival cartels. Id. Accordingly, Section 2D1.1(b)(1) is applicable.

### 3. The Defendant Used Violence and Directed the Use of Violence in Furtherance of the Conspiracy

Section 2D1.1(b)(2) provides for a two-level enhancement because the defendant "used violence, made a credible threat to use violence or directed the use of violence." The Defendant claims that this enhancement does not apply because there is no evidence that he "engaged in making credible threats of violence" or "directed the use of violence." Def. Obj. at 2. This argument makes no sense in light of the extensive testimony regarding the Defendant's use of violence. For example, Government witnesses would have testified at trial that in the course of participating in the Beltran Leyva DTO the Defendant used violence or ordered the use of violence in the furtherance of the DTO's drug trafficking activities. Specifically one witness learned that two members of the Defendant's DTO who were the chiefs of "sicarios" (or hitmen), "El Rayito" and "Wacho," were in charge of kidnapping, interrogating and torturing enemies of the Defendant. See Gov't Mot. Other Crimes at 5. These enemies, referred to as "contras," were individuals from Tamaulipas or Nuevo Leon, Mexico who were believed to be associated with the Zetas Cartel, or individuals from Chihuahua or Navolato, Mexico who were believed to be associated with Vicente Carrillo Fuentes's Juarez Cartel. Id. The Zetas and Juarez Cartel are both rivals to the Defendant and the Beltran Leyva DTO. Id. This witness was present for meetings that the Defendant conducted every morning in which "El Rayito" and "Wacho" would inform the Defendant of

"contras" who were kidnapped, interrogated, and tortured the night before.  Id. at 5-6.  This witness would also have testified that the Defendant would then give the order to "El Rayito" and "Wacho" to kill those "contras" and make them disappear.  Id. at 6.

Additionally, another witness would have also testified at trial regarding the murder of a co-conspirator, Julio Beltran, who worked directly with the Defendant to traffic cocaine.  Id.  The Defendant and Julio Beltran were partners in loads of cocaine that were being received in Mexico from Colombia.  Id.  Part of one of these loads of cocaine was lost, and Julio Beltran reported that only a small portion of this load of cocaine had been saved.  Id.  It was later learned that Julio Beltran had saved a larger portion of the load and hidden it from the other investors.  Id. at 6-7.  The Defendant's brother, Arturo, ordered the Defendant to have Julio Beltran killed, and the Defendant's sicarios carried out the order and killed Julio Beltran.  Id. at 7.

As set forth above, numerous cooperating witnesses would have described several acts of violence that the Defendant authorized, participated in or directed, all in furtherance of the DTO's narcotics trafficking operations.  Accordingly, Section 2D1.1(b)(2) is applicable.

### 4.    The Defendant Used Bribery to Facilitate Drug Trafficking

Section 2D1.1(b)(11) provides for a two-level enhancement because the Defendant "bribed, or attempted to bribe, one or more law enforcement officers to facilitate the commission of the offense."  Again, the Defendant claims that there is no evidence that he engaged in bribery.  Def. Obj. at 2.  At trial, the Government would have introduced evidence of public corruption through bribery as direct evidence of the Defendant's involvement in the charged conspiracy.  See Gov't Mot. Other Crimes at 8–9, see also PTH at 22-23, 25.  Cooperating witnesses would have testified about bribes paid by the Defendant, or on behalf of the Defendant, to all levels of police and military personnel, namely, the municipal police, state police, Governor of the State, federal

highway police, the prosecutor's office and their investigative agency in Culiacan.  See Gov't Mot. Other Crimes at 8–9.  These payments included bribes the Defendant paid to a high-ranking member of the military to allow the Defendant to cultivate, harvest and sell five to six tons of marijuana during each harvest.  Id. at 9.

These bribes also allowed the DTO to operate with impunity.  See id. at 8-9.  Co-conspirators were also seen driving around in police patrol cars; the Defendant's brother, Arturo, was escorted by police on a regular basis; and the drugs were even escorted by local police as they were being trafficked through Mexico.  Id. at 9.  The police also turned over "contras" (discussed above) on a regular basis to the Beltran Leyva DTO.  Id.

Finally, a Government witness would have testified at trial regarding bribes given to prison officials to allow the Defendant to receive drug proceeds while he was incarcerated in Mexico and to allow phones and other contraband to be smuggled into the prison where he was housed.  Id. Accordingly, Section 2D1.1(b)(11) is applicable.

**5.     The Defendant Was Directly Involved in the Importation of a Controlled Substance**

Section 2D1.1(b)(15)(C) provides for a two-level enhancement where the defendant's conduct warrants an adjustment under USSG § 3B1.1 and because the defendant "was directly involved in the importation of a controlled substance."  More specifically, Section 2D1.1(b)(15)(C) applies "if the defendant is accountable for the importation of a controlled substance under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)), i.e., the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the importation of a controlled substance."  U.S.S.G. § 2D1.1 app. note 20.

Here, it is beyond dispute that the Defendant's criminal conduct caused the importation of a controlled substance.  As set forth above, the Defendant was one of the leaders of the Beltran

Leyva DTO, who was responsible for overseeing the manufacture and distribution of narcotics for importation into the United States.  In addition, the Defendant managed his DTO's extensive transportation network, which smuggled tonnage quantities of cocaine from Colombia, through Mexico and eventually to the United States.  Specifically, the Defendant's central role within the Beltran Leyva DTO was to make sure the drugs were in fact safely imported into the United States. In this role, the Defendant met with co-conspirators, to include the Government's witnesses, to plan drug shipments; communicated via phone and radio with co-conspirators regarding planned departures and arrival of narcotics, and directed workers to move the drugs using planes, highways and other methods of transport.  Additionally, the Defendant had daily meetings where he would check in with the plaza bosses along the U.S./Mexico border to determine the status of the Defendant's drug shipments being crossed into the United States and the movement of money back from the United States into Mexico for the payment of those drug shipments.  See PTH at 24. Therefore, Section 2D1.1(b)(15)(C) is applicable.

C.     A Guidelines Sentence is Reasonable and Appropriate

For the reasons set forth below, a sentence within the applicable Guidelines range is sufficient, but not greater than necessary, to achieve the goals of sentencing.  Specifically, these factors are most important:  the nature and circumstances of the offense, the need for the sentence to reflect the severity of the offense, the need for adequate deterrence, and the need to protect the public.

**1.     Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense**

The Defendant committed serious crimes, over an extended period of time, against the United States by his active participation in an expansive Mexican DTO that was responsible for transporting multi-ton quantities of cocaine from Colombia to Mexico for ultimate importation

into the United States.  In fact, one Government witness was alone responsible for supplying the

DTO with over 1 million kilograms of cocaine during the course of the conspiracy.  Therefore,

the amount of cocaine that the Defendant is responsible for conspiring to import into the United

States well exceeds the highest offense level under the Sentencing Guidelines.  This is a

testament to the extremely serious nature of the Defendant's criminal conduct.

Additionally, the proffered testimony of the Government's witnesses establishes that as

one of the leaders of the Beltran Leyva DTO, members of the organization rarely did anything

significantly impacting the DTO without the Defendant's authorization.  It is therefore the

Defendant who, as one of the heads of this DTO, is truly responsible for these large quantities of

cocaine being illegally trafficked into the United States.

As the Court is well aware, cocaine is an extremely dangerous and destructive illegal

street drug.  Cocaine abuse has devastated communities in the United States, Colombia, Mexico

and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent by-standers,

and wreaking havoc on innocent family members and children.  It's also a very destabilizing and

corruptive force in countries throughout the region that don't have strong enough law

enforcement institutions to combat it, such as in Mexico, further adding to the destructive nature

of the crime.  Its social costs have been enormous.  The Defendant's offense involved aiding and

abetting individuals in Mexico and elsewhere who imported these drugs into the United States

and it also involved the Defendant's direct participation in the importation of these drugs into the

United States.

Additionally, the Defendant's trafficking was not limited to only cocaine, but also

methamphetamine.  The Defendant worked with members of the DTO involved in the production

and distribution of methamphetamine, which is currently plaguing some areas of the United

States on the same levels as crack-cocaine once plagued the United States.

In addition to the serious nature of the drug trafficking charges to which the Defendant pled guilty, the Defendant's role within the conspiracy highlights the seriousness of the offense. The Defendant was responsible for the DTO's operations in a "plaza" in Mexico, which is often referred to as a "plaza boss."  Further, the Defendant's role was to direct second-level managers and supervisors regarding day to day operations of the DTO as well as to obtain information from co-conspirators about rival cartels in the area.  As set forth in the Government's extensive pretrial filings, there has been a history of significant violence in Mexico between rival cartels. This has resulted in extreme loss of life to both those involved in this illegal trade, as well as innocent civilians.  The extreme violence associated with this is even further highlighted by the fact that the Defendant possessed a firearm in connection with his drug trafficking activities.

Thus, the serious nature and circumstances of this offense necessitates a sentence of life imprisonment.

## 2.    Adequate Deterrence

Given the adverse impact that drug trafficking has on society, it is important that the Court impose a sentence that deters others from undermining the rule of law.  Further, while this prosecution has incapacitated some of the narcotics trafficking through Mexico, importation of controlled substances from Mexico and the region into the United States still occurs.  The recommended sentence would provide a critical general deterrence to other narcotics trafficking leaders that their participation in narcotics importation into the United States will result in substantial sentences.

### 3.      Protect the Public from Further Crimes of the Defendant

Prior to his arrest, the Defendant was a leader of a DTO responsible for trafficking significant quantities of cocaine, methamphetamine and marijuana to the United States.  A life sentence is the only way to protect the public from further crimes committed by the Defendant. Anything short of a life sentence would lead to the Defendant's deportation back to Mexico, where his criminal activity will only continue.  As previously noted, the Defendant committed his crimes while he resided in Mexico and he continued to orchestrate shipments of drugs into the United States while he was incarcerated in Mexico.  The Defendant's power and influence in Mexico over public officials and his co-conspirators was a result of nearly three decades of drug trafficking.   Despite the Defendant's extradition to the United States, his DTO continues to operate through the DTO's remaining leadership which includes members of the Defendant's family still residing in Mexico.  As a result, any possibility of the Defendant's return to Mexico will result in a return to his criminal activities.

### 4.      The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) articulates "the need to avoid <u>unwarranted</u> sentence disparities among defendants <u>with similar records</u> who have been found guilty of <u>similar conduct</u>."  18 U.S.C. § 3553(a)(6) (emphasis added).  By its terms, the statute requires a specific evaluation of the compared defendants' records and conduct.  When determining whether a sentence creates an unwarranted disparity, the Court should also consider, <u>inter alia</u>, a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated.  <u>See, e.g.</u>, <u>United States v. Mejia</u>, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any

disparity resulting from defendant's "harsher" sentence was not unwarranted).  A defendant is

only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a

particular result."  United States v. Carrasco-De-Jesus, 589 F.3d 22, 29 (1st Cir. 2009).

The Defendant in this case is charged as the sole defendant.  There are several related cases

that are still pending, and thus not similarly situated as this case.  Further, the Defendant's conduct

in this case is not similarly situated to those defendants in the related cases.  As set forth above,

the evidence demonstrates that the Defendant was the leader of the DTO and is therefore in a

position where his conduct is not similar to the conduct of his subordinate co-conspirators.  An

advisory guideline sentence is appropriate and reasonable in this case to avoid unwarranted

sentencing disparities.

IV.     **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to a term of imprisonment within the applicable Sentencing Guideline range of life imprisonment, as calculated by the PSR.  The Government submits that this sentence is sufficient, but not greater than necessary, to punish the Defendant for his crime, promote respect for the law, deter the Defendant and others from committing similar serious crimes in the future, and protect the public.

Respectfully submitted this 31st day of May, 2016.

                                ARTHUR WYATT, Chief
                                Narcotic and Dangerous Drug Section
                                Criminal Division
                                United States Department of Justice

                        By:     _/s/_____
                                Andrea Goldbarg
                                Amanda N. Liskamm
                                Adrian Rosales
                                Trial Attorneys
                                Marcia M. Henry
                                Assistant United States Attorney
                                United States Department of Justice
                                Narcotic and Dangerous Drug Section
                                145 N Street, Northeast
                                East Wing, Second Floor
                                Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the defendant, this 31st day of May 2016.


Respectfully submitted,

ARTHUR WYATT, Chief
Narcotic and Dangerous Drug Section


By:      /s/
Andrea Goldbarg
Amanda N. Liskamm
Adrian Rosales
Trial Attorneys
Marcia M. Henry
Assistant United States Attorney
Narcotic and Dangerous Drug Section
U.S. Department of Justice
145 N Street NE
Second Floor, East Wing
Washington, DC 20530